Roland ALEXANDER, Jr., et
al., Plaintiffs,

v.

YOUNGSTOWN BOARD OF EDUCA-
TION et al., Defendants.

Civ. A. No. C74–118Y.

United States District Court,
N. D. Ohio, E. D.

April 12, 1978.

Thomas I. Atkins, Boston Mass., John L. Breckenridge, Lloyd Haynes, E. Winther McCroom, Youngstown, Ohio, Theresa Demchak, James L. Hardiman, Cleveland, Ohio, Nathaniel R. Jones, New York City, for plaintiffs.

Joseph E. Vouros, Youngstown, Ohio, James E. Roberts, Youngstown, Ohio, for Youngstown defendants.

Eugene Green, Youngstown, Ohio, Barry R. Laine, Youngstown, Ohio, for State defendants.

## MEMORANDUM OPINION AND ORDER

CONTIE, District Judge.

On June 3, 1974, nine named students of the Youngstown, Ohio public school system and their parents initiated this action, pursuant to 42 U.S.C. §§ 1981, 1983–1988, and 2000d, to redress the alleged deprivation under color of law of rights guaranteed by the Thirteenth and Fourteenth Amendments to the United States Constitution.[1] Plaintiffs named as defendants the Youngstown Board of Education and its individual members, the Superintendent of the Youngstown City School District, the Governor of the State of Ohio, the Attorney General of the State of Ohio, the Ohio State Board of Education and its individual members, and the Superintendent of Public Instruction, Ohio Department of Education.[2] The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331(a), and 1343(3) and (4).

In their complaint, plaintiffs assert that the State defendants by their action and inaction have effected segregation on the basis of race in the Youngstown public school system in violation of the Fourteenth Amendment to the United States Constitution and Article 1, Section 2 of the Ohio Constitution. Specifically, it is asserted that these defendants acting through subunits of state government have engaged in practices which have had the foreseeable and actual effect of incorporating into the school system private residential, racial discrimination. It is further contended that the State defendants have allocated educational resources in a manner that has resulted in racial discrimination in the provision of school facilities and other resources,

---

1. Initially joined in this action as a party plaintiff was the National Association for the Advancement of Colored People (NAACP). However, on July 30, 1974, this Court granted plaintiffs' motion to dismiss the NAACP.

2. For convenience and ease of reference, the Youngstown Board of Education and its individual members, and the Youngstown Superintendent of Schools shall hereinafter be referred to as the "Youngstown defendants." The balance of the named defendants as officials of the government of the State of Ohio shall hereinafter be designated the "State defendants."

and in the establishment and maintenance of a pattern of racially separate schools.

With regard to the Youngstown school defendants, plaintiffs essentially allege that these defendants acting under color of state law have in the past pursued and are presently pursuing policies and practices in the operation of the Youngstown public schools with the purpose and effect of perpetuating a segregated school system. Such racially discriminatory practices and policies assertedly include the planning and construction of new school facilities, the designation of attendance zones and feeder patterns, the assignment of students and teachers, and the fostering of existing racially discriminatory patterns in public and private housing. Further, it is alleged that the Youngstown defendants have wholly failed and refused to take appropriate action to rectify the foreseeable effects of their asserted policies and practices of discrimination on the basis of race upon the Youngstown public schools.

Equitable relief in the form of a permanent injunction is sought. Plaintiffs also request an award of attorneys' fees and the costs incurred in prosecuting this action.

Both the Youngstown defendants and the State defendants have essentially denied the allegations of the complaint.

Plaintiffs, having initiated this action in their own behalf and on behalf of all persons similarly situated, moved the Court on July 2, 1976, to certify the within action as a class action under Rule 23(b)(2), Federal Rules of Civil Procedure. By Order of July 26, 1976, this Court certified "the class of all children attending the Youngstown Public Schools and their parents or guardians" as the class represented by the named plaintiffs.

Subsequently, the Court in its Order of December 29, 1976 granted the motion of defendants, the Governor and Attorney General of the State of Ohio, for summary judgment and dismissed them as party defendants.

Thereafter, this action proceeded to trial on the issue of liability. The Court duly heard extensive testimony and received numerous exhibits in January and February, 1977.

After the trial of this action and submission of the parties' briefs, the United States Supreme Court, on June 27, 1977, rendered its decision in *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851. Thereafter, the Court directed the parties to file additional briefs in light of this decision.

Upon consideration of the entire record herein, the Court enters its findings of fact and conclusions of law as required by Rule 52(a), Federal Rules of Civil Procedure.

## LEGAL PRINCIPLES

More than two decades ago, the Supreme Court declared in *Brown v. Board of Education*, 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873 (1954), that racially segregated public educational facilities are inherently unequal and deprive students of the equal protection of the laws guaranteed by the Fourteenth Amendment.[3] The *Brown* decision was concerned with "the elimination of state-mandated or deliberately maintained dual school systems with certain schools for Negro pupils and others for white pupils." *Milliken v. Bradley*, 418 U.S. 717, 737, 94 S.Ct. 3112, 3123, 41 L.Ed.2d 1069 (1974).

In order to constitute a violation of the Constitution, this duality or racially segregated condition of the public schools must have resulted from discriminatory state action. *Swann v. Board of Education*, 402 U.S. 1, 17–18, 91 S.Ct. 1267, 1277, 28 L.Ed.2d 554 (1971). As recognized in *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976), the primary purpose of the Equal Protection Clause is the prevention of official conduct

---

**3.** On February 22, 1887, more than 67 years before the landmark *Brown* decision, the State of Ohio abolished segregation in its public schools. *Deal v. Cincinnati Board of Education*, 369 F.2d 55, 58 (6th Cir. 1966).

which discriminates on the basis of race. Absent a statutorily mandated dual school system, a predicate for finding unlawful state-imposed segregation exists where "school authorities have carried out a systematic program of segregation affecting a substantial portion of the students, schools, teachers, and facilities within the school system." *Keyes v. School District No. 1,* 413 U.S. 189, 201, 93 S.Ct. 2686, 2694, 37 L.Ed.2d 548 (1973).

■ The burden is upon plaintiffs to prove not only the existence of segregated schools, but also the creation or maintenance thereof by intentional state action. *Id.* at 198, 93 S.Ct. at 2692. Proof of a racially discriminatory purpose or intent is essential to establish a violation of the Equal Protection Clause. *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 413, 97 S.Ct. 2766, 2772, 53 L.Ed.2d 851 (1977); *Arlington Heights v. Metropolitan Housing Development,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 239 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). Racial imbalance in the schools resulting from factors other than official conduct and not within the control of school authorities, such as housing patterns, is alone insufficient to show a deprivation of constitutional rights. Such a condition of de facto segregation is distinguished from de jure segregation by the latter's requirement of purpose or intent to segregate. *Keyes v. School District No. 1,* 413 U.S. 189, 208, 93 S.Ct. 2686, 2697, 37 L.Ed.2d 548 (1973). A showing of de jure segregation is necessary to support a finding of a constitutional violation and invoke the Court's equitable powers to remedy any racial imbalance. See *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977); *Higgins v. Board of Education,* 508 F.2d 779 (6th Cir. 1974).

Essentially, de jure segregation is "a current condition of segregation resulting from intentional state action." *Keyes v. School District No. 1,* 413 U.S. 189, 205, 93 S.Ct. 2686, 2696, 37 L.Ed.2d 548 (1973). As set forth in *Oliver v. Michigan State Board of Education,* 508 F.2d 178, 182 (6th Cir. 1974), a finding thereof requires a demonstration of three key elements: "(1) action or inaction by public officials (2) with a segregative purpose (3) which actually results in increased or continued segregation in the public schools." The crucial element is a racially discriminatory purpose or intent without which there can be no equal protection violation. *Washington v. Davis,* 426 U.S. 229, 245, 96 S.Ct. 2040, 2050, 48 L.Ed.2d 597 (1976).

■ A determination of the requisite intent is difficult in any legal context, but peculiarly so in school segregation cases where the actions of numerous officials as individuals and as a collective body are subject to scrutiny. Only in exceptional circumstances is a decision of such authorities motivated by a single consideration or dominated by one particular purpose. *Arlington Heights v. Metropolitan Housing Development,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). However, a racially discriminatory purpose need not be the primary motivating factor in a decision to establish the element of intent; it need only be a factor. *Id.* at 265–66, 97 S.Ct. at 563.

In order to discern whether an invidious discriminatory purpose was indeed a motivating factor in any of the defendants' decisions or actions, the Court must engage in an exhaustive examination of both the subjective and objective evidence. As stated by the Supreme Court in *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976):

Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another. . . . Nevertheless, we have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another. Dispropor-

tionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution.

Thus although the discriminatory effect of official action is a relevant consideration, it is alone seldom determinative of segregative intent absent a clear, otherwise inexplicable pattern. *Arlington Heights v. Metropolitan Housing Development,* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977).

The Supreme Court in *Arlington Heights v. Metropolitan Housing Development, supra,* identified several other areas of inquiry appropriate in determining the issue of intent:

■ The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. . . .

■ The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes. . . .

■ Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role.

■ Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.

■ The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.

*Id.* at 267–68, 97 S.Ct. at 564–65. From these objective indicia of official action, the Court may infer the required intent.

The authority to infer intent or purpose from the acts or policies of school officials is critical since such are generally the consequence of competing considerations and mixed motivation. This was clearly recognized by the Sixth Circuit Court of Appeals in *NAACP v. Lansing Board of Education,* 559 F.2d 1042, 1047–48 (1977), as follows:

Indeed, it would be difficult, and nigh impossible, for a district court to find a school board guilty of practicing de jure segregation, unless the court is free to draw an inference of segregative intent or purpose from a pattern of official action or inaction which has the natural, probable and foreseeable result of increasing or perpetuating school segregation.

Thus while a court may infer segregative intent from the circumstances, the inference is permissible and not mandatory even in cases where segregated patterns exist in fact. See also *Higgins v. Board of Education,* 508 F.2d 779, 793 (6th Cir. 1974).

■ Where the evidence supports a finding of purposeful segregation as to part of a school system, the burden of proof shifts to defendants. This burden-shifting principle was succinctly enunciated by the Supreme Court in *Keyes v. School District No. 1,* 413 U.S. 189, 208, 93 S.Ct. 2686, 2697, 37 L.Ed.2d 548 (1973), in the following manner:

[A] finding of intentionally segregative school board actions in a meaningful portion of a school system, as in this case, creates a presumption that other segregated schooling within the system is not adventitious. It establishes, in other words, a prima facie case of unlawful segregative design on the part of school authorities, and shifts to those authorities the burden of proving that other segregated schools within the system are not also the result of the intentionally segregative actions.

The burden of proof thereby devolved upon defendants can be discharged in either of two ways. Defendants can rebut a prima facie case by showing that "segregative intent was not among the factors that motivated their actions" or that "its past segregative acts did not create or contribute to the current segregated condition" of the schools. *Id.* at 210–11, 93 S.Ct. at 2698–99.

■ In attempting to meet their burden, school authorities most often rely upon invocation of the neighborhood school policy, and attribute the existence of racial imba-

lance in the schools to residential patterns and not official action. Standing alone, it is generally accepted that the assignment of students to their neighborhood schools does not violate the Constitution. *NAACP v. Lansing Board of Education,* 559 F.2d 1042, 1049 (6th Cir. 1977). However, the inoffensiveness of the neighborhood school policy and its viability as a defense can only be determined in the context of its overall application within the school system.

■ In *Oliver v. Michigan Board of Education,* 508 F.2d 178 (1974), the Sixth Circuit Court of Appeals indicated that an inference of segregative purpose arising from a pattern of official action which foreseeably results in increased or continued segregation becomes proof unless defendants affirmatively show that their "action or inaction was a consistent and resolute application of racially neutral policies." *Id.* at 182. The failure of school officials to accurately anticipate the effect on the racial composition of the schools from a racially neutral retention of the neighborhood school policy does not establish the existence of a dual school system, absent a showing of segregative intent. *NAACP v. Lansing Board of Education,* 559 F.2d 1042, 1049 (6th Cir. 1977).

In *Keyes v. School District No. 1,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), the Supreme Court addressed the reliance of school officials upon the neighborhood school policy and firmly stated that:

> the mere assertion of such a policy is not dispositive where, as in this case, the school authorities have been found to have practiced *de jure* segregation in a meaningful portion of the school system by techniques that indicate that the "neighborhood school" concept has not been maintained free of manipulation.

*Id.* at 212, 93 S.Ct. at 2699. On the other hand, the Court quoted its earlier observations in *Swann v. Board of Education,* 402 U.S. 1, 28, 91 S.Ct. 1267, 1282, 28 L.Ed.2d 554 (1971):

> "Absent a constitutional violation there would be no basis for judicially ordering

assignment of students on a racial basis. All things being equal, with no history of discrimination, it might well be desirable to assign pupils to schools nearest their homes. But all things are not equal in a system that has been deliberately constructed and maintained to enforce racial segregation. . . ."

*Keyes, supra,* 413 U.S. at 212, 93 S.Ct. at 2699. Thus it would appear that where there is no finding of intentional segregation, a neutral neighborhood school policy may suffice to explain defendants' actions.

## ANALYTICAL APPROACH

Within the framework of the foregoing relevant legal principles, the Court shall proceed to a detailed factual analysis. Before doing so, however, it is essential to briefly outline three factors critical to an understanding thereof. These factors are: the Consolidated Stipulations of Fact; the census maps; and facility utilization.

After lengthy discussions the plaintiffs and Youngstown defendants agreed to and filed with the Court on January 4, 1977 a document consolidating the factual matters stipulated to by these parties. Upon review thereof, the Court has found numerous inconsistencies not only within the stipulations, but also between the stipulations and other documentary evidence and testimony. In some instances, the Court has only been able to note the inconsistencies. However, where possible, the Court has determined the actual facts, and has rejected the stipulations not in accord therewith. The Court cannot adopt stipulations that are manifestly in error.

Throughout the following factual analysis, the Court shall refer to the census maps introduced into evidence by plaintiffs. These demographic maps show the racial composition of the residential population of Youngstown by census blocks. However, the maps do not show the density of the population in such blocks. Said limitation on the utility of these census maps must be recognized since an area indicated to be 50% to 90% black residentially may in fact contain few residents and thus exercise no

appreciable effect on the schools. Alone, the census maps are a general graphic representation of the location within the City of Youngstown of its black population.

The third, and perhaps the most important, factor is facility utilization. In discussing the various boundary changes, student assignments, construction of new facilities, and additions to existing buildings, the parties usually referred to the "capacity" of the various schools. However, capacity is a nebulous term which connotes the architectural dimensions of a structure. Such may and often does differ from the actual utilization of a facility by school officials. Whereas according to architectural plans a room may be designed to accommodate a certain number of students, sound educational practice may dictate another result. Thus the Court shall not be concerned with the "capacity" of a school because of the misleading connotation. Rather, the Court shall refer to the "maximum optimum utilization" or the "optimum utilization" of a facility as such was reasonably perceived by the school officials at any point in time.

The Court notes that various measures have been employed by the school officials to determine optimum utilization. For instance, the 1952 Report calculates the optimum utilization of elementary schools on the basis of thirty (30) students per classroom and that of secondary schools on the basis of twenty-five (25) students per classroom. (Px 83). On the other hand, the 1964 Report uses a thirty (30) student per classroom measure overall with the exception of special classrooms and specific function rooms such as study halls and gymnasiums which have their own optimum utilization factor. Further, it appears from the testimony of Dr. Schoenhard that there is no absolute, immutable standard to measure the optimum utilization of a school since the size of rooms and other factors may vary and such dictate the number of students that can be housed therein.

Recognizing the foregoing problems, the Court has nevertheless computed the maximum optimum utilization for the schools at various points in time from the data in the record. In view of the limitations previously expressed, and since the base data does not take cognizance of special education and special function classrooms, the Court shall employ such figures as only a general guide to analysis.

In determining the maximum optimum utilization of the schools for the years for which utilization data is available in the record, the Court shall use contemporaneous documents whenever possible. Since the Court is concerned with determining intent, and since such documents are generally reflective of the knowledge and motivation that formed a predicate for school action, they must be considered the best evidence thereof.

Thus the 1952–53 and 1958–59 maximum optimum utilization figures are derived from the 1952 Report, plaintiffs' exhibit 83, and are computed on the basis of thirty (30) students per elementary classroom and twenty-five (25) students per secondary classroom. Of course additions to facilities are reflected in the optimum utilization figures.

The 1961–62 and 1963–64 maximum optimum utilization figures are calculated on the basis of thirty (30) students per classroom on all three levels. These figures are generally derived from defendants' exhibits P–1 through P–38. However, there are exceptions such as in the case of the elementary schools feeding East High School; the optimum utilization figures for such schools for 1963–64 are derived from the 1964 Report, plaintiffs' exhibit 229.

From the 1967–68 through 1976–77 school years, the maximum optimum utilization figures used by the Court are those contained in plaintiffs' exhibit 158.

Throughout the factual analysis that follows, the Court has employed charts showing the utilization of the schools and the percentage black student enrollment thereof. A plus ( + ) figure represents overutilization while a minus (–) figure represents underutilization. The percentage given equals the percentage black student enroll-

ment of the school indicated or the level or system average.

Footnotes are also frequently used to explain the maximum optimum utilization of schools where the exhibits provide different figures. These footnotes merely state what is contained in the exhibits and reference to the foregoing explanation is necessary to understand how the utilization figures were calculated. For convenience, the Court has prepared charts illustrating maximum optimum utilization, enrollment, and utilization for 1952–53, 1958–59, 1961–62, and 1963–64. These are contained in the appendix following this opinion.

With the foregoing in mind, the Court shall proceed to analyze the actions of the Youngstown defendants in the following areas: new school construction; additions to existing facilities; boundary changes; assignment of students; feeder patterns; optional attendance zones; grade structure changes; and school closings.

## EFFECTS ANALYSIS

The physical dimensions of Youngstown provide for the natural division of the city territory into several sections. This natural division of the city was recognized as long ago as 1921. By resolution of June 14, 1920, the Youngstown Board of Education authorized a thorough survey of the city and its schools upon which the building program for the next twenty years might be based. (Px 79). The results of that survey were issued on November 1, 1921 in a published document entitled "A Survey And Building Program For The Youngstown City Schools 1920–1940." Therein at page 7 it is recognized as follows:

> Several strong natural features divide the city area into definite and separate school zones, each of which must attain to a complete system of schools for itself in order to conserve the best interest of all the people and the travel time and safety of the children.

The primary dividing line was recognized to be the Mahoning River which divides the city into two large units: the north and the south sides of the city. The north side contains two distinct sections separated from each other by Crab Creek and its many railroad tracks. On the south side of Youngstown, four well defined sections were created by Mill Creek and its park, Pine Hollow, and the Southern Railroad and its ravine. Thus as stated in the 1921 Survey, Youngstown is comprised of six distinct zones of area and population to be treated as such in a construction program of schools for the future. Accordingly, the Survey set forth a plan to provide a complete system of schools within each section. (Px 79).

The building program devised in 1921 was followed to a great extent by the Youngstown school officials in the ensuing years. Six separate school zones were in fact developed, although not in complete accord with those provided in the 1921 program. Specifically, the separate school zone for that area of Youngstown south of the Mahoning River and east of Pine Hollow did not materialize. It appears according to the Survey that the planned development of this zone was premised, in part, upon the expected annexation of additional territory to the city; this annexation was not achieved. As a consequence, only three zones were developed south of the Mahoning River. North of the river, instead of the two zones planned in the 1921 Survey, a third zone was created. Thus six distinct zones each with their own school plant were created essentially in conformity with the 1921 program. (Px 79).

In view of the foregoing, the Court deems it both necessary and proper to analyze the acts and omissions of the Youngstown defendants within the six separate sections of the city. The six separate zones to be studied are derived from the six high school districts in Youngstown. With the exception noted above, this is in accord with the 1921 building program. Thus within the framework of the six high school zones, the Court shall proceed to analyze the acts and omissions of the Youngstown school defendants from 1940 to today.

## RAYEN ZONE

Within the Rayen zone to be discussed below are the following schools: Rayen High School; Hayes Junior High School; and Butler, Elm, Covington, Harding, Jefferson, McKinley, Madison, and Tod Elementary Schools.

According to the 1940 census the non-white population of Youngstown was concentrated in greatest numbers in two sections of the city. One of those sections was comprised of the area west of Fifth Avenue with the Mahoning River as its south and west boundary. (Px 41). This area was within the Rayen zone.

In 1940, Covington Elementary School opened with twenty classrooms to serve an area west of Belmont Avenue, south of Parmalee, and east of Federal Street. (Stip. 114). This facility actually replaced the Covington Elementary School structure in existence since at least 1900. The 1921 Survey described said structure as perhaps the worst school building in Youngstown and recommended its replacement because of its ideal location. (Px 79). The Covington district encompassed an area of Youngstown commonly referred to as the "Monkey's Nest" and was predominately black in its residential population according to the 1940 census data. Immediately to the north and east of Covington were Elm, McKinley, and Harding Elementary Schools, which schools served areas that were predominately white in their residential population. (Stip. 114).

Also in 1940, Rayen High School received an addition of two classrooms and an auditorium.

Although Hayes Junior High School was constructed in 1927, the oldest recorded boundary available to the Court is dated July 7, 1945. (Px 249). According to said boundary description, Hayes served students in grades seven through nine. Those ninth graders living west of Fifth Avenue remained at Hayes for the ninth grade while those living to the east of Fifth Avenue went to Rayen High School. Based on the census data discussed above, one of the greatest concentrations of black residents in Youngstown was located west of Fifth Avenue. Thus it would appear that a substantial number of black students remained at Hayes for the ninth grade and did not attend Rayen until the tenth grade. The racial significance thereof, however, cannot be determined since the record does not contain racial data for the Youngstown public schools during the 1940's. In fact, racial data indicating the racial composition of the school population is not available until the 1952–53 school year.

In 1948, Harding Elementary School received an addition of six classrooms. Thus Harding had a total of eighteen classrooms as a result of this addition.

Butler Elementary School had an attendance area which bordered on the Mahoning River and served the section of Youngstown known as the "Monkey's Nest." The northern boundary of Butler was expanded in 1949 to include a portion of the Jefferson Elementary School attendance area located west of West Federal Street. Based on the 1940 and 1950 census data as stipulated by the parties, the only portions of Jefferson's area which were majority black in population were those transferred hereby to Butler. (Stip. 186). The 1950 census map, however, shows that a number of blacks were living east of West Federal Street and thus within the Jefferson district. It would appear that the result of this particular boundary change was to increase the percentage black students at Butler while decreasing that at Jefferson. The true result thereof, however, cannot be readily ascertained in view of the lack of racial data.

In 1950 Jefferson Elementary School received the addition of an auditorium. No racial significance can be attached to this action.

As stated in the 1921 Survey, with each passing year the expansion of business in the Wood Elementary School area greatly reduced the number of homes and the student population therein. As a result and as recommended in the 1921 Survey and the 1945 Study, plaintiffs' exhibit 78, Wood was

closed in 1951 and a new Elm Elementary School was opened. Wood's attendance area, which had been bound on the north by Carlton Street, on the east by Crab Creek, on the south by the Mahoning River, and on the west by Market Street and Wick Avenue, was divided into two parts with Wood Street serving as the dividing line. The northern portion of the Wood attendance area was transferred to Elm, while the southern part was transferred to Lincoln Elementary School. (Stip. 147).

|  | 1950-51 | 1952-53 | |
|---|---|---|---|
| Wood | -326 | | |
| Elm | | +159 | 26.4% |
| Lincoln | -106 | -25 | 30.2% |
| Total Elementary | | | 20.1% |
| Total System | | | 18.6% |

According to the stipulations, the 1950 census data indicates that the only sizeable black community east of Fifth Avenue, west of Crab Creek, and north of the Mahoning River was contained within the former Wood attendance zone. (Stip. 147).[4]

The area transferred to Elm contained most of the black students enrolled in Wood. The effect thereof was integrative since, according to the stipulations, the 1950 census data indicates that most of the black residents east of Crab Creek lived within the Lincoln Elementary zone. (Stip. 147). Therefore, to have assigned the northern portion of the Wood district to Lincoln would have served to increase Lincoln's percentage black students when Lincoln, in all probability, already had a substantial number of black students. However, the pre-

cise effect cannot be ascertained due to the lack of racial data for this period.

After the 1951 closing of Wood Elementary School, no action was taken in the Rayen zone until 1954 when the southern boundary of McKinley Elementary School was expanded to include the northern part of Elm's attendance area. (Stip. 189).

|  | 1952-53[5] | |
|---|---|---|
| McKinley[6] | +20 | 0.0% |
| Elm[7] | +159 | 26.4% |
| Total Elementary | | 20.1% |
| Total System | | 18.6% |

The area transferred thereby was predominately white in its residential population according to the 1950 and 1960 census data. (Stip. 189). This change provided some relief to the overcrowded Elm. However, since there is no evidence of the number of students transferred, no analysis of the adequacy thereof can be made. While this transfer may have been segregative in effect, since a residentially white area was removed from Elm and given to a white school, any inference of intentional discriminatory action cannot be deemed established.[8] The evidence also infers a racially neutral transfer to relieve overcrowding in conformity with the neighborhood school policy.

The parties stipulated that the northern boundary of Covington Elementary School was contracted in 1955 to transfer to Jefferson Elementary School an area which was bound on the north by Lexington, on the east by Covington Street, on the west

4. However, the 1950 census map shows a sizeable group of blacks residing in the Lincoln area. Such map also shows most of the Elm attendance area was white residentially.

5. The next period for which data is available is the 1958-59 school year. The Court concludes that because of the time lapse involved, such data cannot be used to accurately assess the effect of a 1954 boundary change.

6. Plaintiffs' exhibit 83 indicates that McKinley had 11 classrooms with a maximum optimum

utilization of 330. Defendants' exhibit P-14, however, shows McKinley with 14 classrooms and a maximum optimum utilization of 420.

7. According to the 1952 Report, plaintiffs' exhibit 83, Elm had 18 classrooms and an optimum utilization of 600 students.

8. As shown infra at page 1002, students in the Old Harrison district north of Thornhill Avenue were being transported to Elm. These students numbered approximately 30 and were white.

by Federal Street, and on the south by Park and Wick Avenues. (Stip. 202).

| | 1952–53 | | 1958–59 | |
|---|---|---|---|---|
| Covington | +53 | 70.2% | +81 | 93.0% |
| Jefferson | −35 | 23.8% | +73 | 50.0% |
| McKinley | +20 | 0.0% | +15 | 1.7% |
| Elm | +159 | 26.4% | +158 | 49.0% |
| Washington | −268 | 0.0% | −342 | 0.0% |
| Total Elementary | | 20.1% | | 29.4% |
| Total System | | 18.6% | | 26.3% |

As further stipulated, this area was predominately white residentially according to the 1950 and 1960 census. (Stip. 202). However, the 1950 census map shows that in fact the area transferred contained only one 0% to 14% black block, while all the others were from 25% to 90% black in their residential population. Thus, this transfer served to increase the number of black students at Jefferson; whereas in 1952–53 Jefferson was 23.8% black, in 1958–59 it was 50% black. Thus Jefferson became considerably blacker than the system average, and was overcrowded by 1958–59.

No figures are available to the Court for the 1955–56 school year. Interpolating from the available data, for the 1955–56 school year the black student enrollment at both schools was considerably above the system average. Since the boundary change entailed the reassignment of numerous black students to a whiter school it was probably integrative to racially neutral in effect.

Two more integrative alternatives were available in that both McKinley and Washington Elementary Schools were underutilized. Yet utilization of McKinley probably would have required transportation; a transfer of Covington students to Washington would have required transportation. Therefore, considering the expense of transportation and the geographic proximity of Covington to Jefferson, this particular

choice was not unreasonable. It was fully consistent with the neighborhood school policy, and with an objective of reducing the overutilization at Covington.

In 1955, an auditorium was added to McKinley Elementary School. Further analysis of this addition is not necessary.

From 1955 until 1961 there was no action taken by the Youngstown school officials in the Rayen High School zone. In September 1961, Butler Elementary School was closed due to low enrollment, and its students were reassigned and transported to Tod Elementary School. (Stip. 148).[9] According to the Boundary Change Report, no families were then residing in the River Bend area. (Px 249).

| | 1958–59 | | 1961–62 | |
|---|---|---|---|---|
| Butler | −272 | 96.6% | | |
| Tod | −114 | 7.8% | −162 | 51.8% |
| Elm | +158 | 49.0% | −35 | 77.7% |
| Washington | −342 | 0.0% | −458 | 0.0% |
| Jefferson | +73 | 50.0% | +27 | |
| Covington | +81 | 93.0% | −19 | |
| Grant | +158 | 61.0% | +60 | 96.8% |
| Total Elementary | | 29.4% | | 33.2% |
| Total System | | 26.3% | | 29.8% |

This reassignment was apparently integrative as to Tod, although the evidence fails to establish the relevant statistics for the next preceding school year. However, it is reasonable to assume that, in the 1960–61 school year, the percentage blacks enrolled at Tod was substantially below the system average. Therefore, while this transfer caused Tod's percentage black student enrollment to rise well above the system average, the Board action negates any inference of a policy to preserve white schools. From a utilization standpoint, Tod was also a logical choice since in the next preceding school year it had 100 students, and even after the transfer it was significantly underutilized.[10]

9. Stipulation 143, however, states that Butler Elementary School was closed in 1958. Such is in conflict with both stipulation 148 and the Boundary Change Report, plaintiffs' exhibit 249, which provide that Butler closed in 1961. Further, plaintiffs' exhibits 106 and 108 show that for the 1958–59 school year,

Butler had an enrollment of 208 students. Thus the Court finds that stipulation 143 is clearly in error and that Butler Elementary School closed in 1961.

10. The number of students transferred to Tod from Butler may have been as low as 80. See Px 289.

Although it probably would have been physically feasible to send the Butler students to Washington, Stambaugh, and/or Harding and thus close Tod, other considerations militated against these options. A November 1959 letter from the Superintendent of Youngstown Public Schools to the Youngstown Metropolitan Housing Authority (hereinafter YMHA) indicates that the latter's intent to place a housing unit in the Tod area coincided with the Board's long range plans. Thus it appears that independent of any action by school officials, the housing authorities were planning a development in the Tod area whose students would have to be accommodated by the school system. (Stip. 171). Confirming same is a memorandum from G. H. Schoenhard to Dr. Wanamaker, then Superintendent of the Youngstown Public Schools, which contains a resume of a conference held with Mr. Chester Amedia of the YMHA on December 9, 1960. Therein it is stated that it was expected that ground would be broken for the housing sites by March 15, 1961 with completion of construction to occur eighteen months thereafter or approximately in September 1962. It was further stated that site E near Tod School had been enlarged from 142 to 152 dwellings and that it was expected that about 80% of the houses in the site would be occupied by nonwhite population. Additionally, it was believed that the Tod site would be similar in composition and family size to the Kimmel Brook development. (Stip. 172).

The elementary schools that were contiguous to Butler were Elm, Jefferson, Covington, and Grant. While Washington was also contiguous, it was separated from Butler by Mill Creek and its park. As shown by the above utilization and percentage

black student enrollment figures, in 1961–62, Grant and Jefferson were overutilized and thus not reasonably available to receive students from Butler. Elm was only underutilized by 35 students and Covington by 19 students. Thus singly or together these latter two schools could not reasonably handle the Butler students. Moreover, both schools were identifiably black so that a transfer thereto would have been segregative. These facts combined with the planned housing expansion in the Tod area rendered reasonable the Board's efforts to maintain Tod, to transfer Butler students to Tod to effectuate same, and to depart from the normal neighborhood school policy. To have transferred the Butler students to Washington, which could have easily absorbed them, would have left Tod woefully underenrolled. While such alternative would have been more integrative than the one actually chosen, this does not alter the fact that a reasonable, non-racial basis existed for the Board's action.

It should be noted that the Brier Hill Annex was, in fact, built in the Tod area in 1963. Despite such housing project, Tod's enrollment continued its downward decline from 1958 through 1961 and on into 1963–64.[11] It appears that the Brier Hill Annex housed senior citizens and not families as initially projected.

Also in 1961, Hayes Junior High School received the addition of a gymnasium. In June, the ninth graders living to the west of Fifth Avenue, which students formerly remained at Hayes Junior High School, were transferred to Rayen and thus all ninth graders in the Rayen area attended Rayen High School. (Px 249). According to the 1960 census map, the subject area west of Fifth Avenue appears to have con-

11. The imprecision and haphazard manner of housing planning in Youngstown, is demonstrated in the aforesaid memo from Schoenhard to Wanamaker. In the resume of a conference held with Mr. Edward Folk, city planning director, it is noted that Tod School

would be kept crowded because of the site E development of the YMHA. (Px 402). That such never materialized is evidenced by the utilization figures for Tod School in the ensuing period.

tained most of the black population in the Hayes-Rayen attendance district.

| | 1958-59 | | 1961-62 | |
|---|---|---|---|---|
| Hayes[12] | -58 | 34.9% | -319 | 47.3% |
| Rayen[13] | -344 | 25.0% | -404 | 27.4% |
| Total Junior | | 24.7% | | 31.1% |
| Total Senior | | 18.8% | | 23.7% |
| Total System | | 26.3% | | 29.8% |

| | 1963-64 | | 1967-68 | |
|---|---|---|---|---|
| Elm[15] | -60 | 71.6% | | |
| McKinley | -50 | 5.7% | -114 | 16.3% |
| Madison | -163 | 50.0% | -150 | 67.6% |
| Harding | -58 | 1.0% | -178 | 9.1% |
| Covington | -74 | 98.4% | -88 | 97.5% |
| Washington | -316 | 0.3% | -468 | 0.4% |
| Total Elementary | | 39.1% | | 44.9% |
| Total System | | 35.1% | | 39.6% |

Since both Hayes and Rayen were substantially underutilized, this factor is not significant in this instance. The action was integrative as to Rayen since even after this influx of black students its black student enrollment was below the system average. A similar but greater increase in the percentage black students at Hayes can in no way be attributed to this change.

A gymnasium was added to Rayen High School in 1962. This building addition requires no analysis, however.

Elm Elementary School was closed in 1965 according to stipulation 149.[14] The Elm students residing in the area bound on the north by Madison Freeway, on the east by Wick Avenue, on the south by the Mahoning River, and on the west by Fifth Avenue were reassigned and transported to Harding and Washington Elementary Schools. Those living in an area bound on the north by Park Avenue, on the east by Wick Avenue, on the south by Madison Freeway and on the west by Fifth Avenue were reassigned to McKinley Elementary School, while others residing in an area bound on the north by Park Avenue extended westward, on the east by Fifth Avenue, and on the west by Belmont Avenue were reassigned to Covington Elementary School. (Stip. 149). In addition to those four schools, stipulation 180 provides that Elm students were also assigned to Madison.

Further, said stipulation notes that the students assigned to Harding and McKinley were white for the most part, while those assigned to Madison were predominately black. (Stip. 180).

The former Elm students transferred to Covington resided in an area which was about half 25% to 50% black and half 50% to 90% black in its residential population. This area contained a few blocks that were 0% to 14% black and some that were 14% to 25% black. Further, according to the 1965 elementary school overlay, the area transferred to Covington included that part of the former Elm district which was east of Fifth Avenue and predominately white in its population. This overlay conflicts with stipulation 149 which indicates that students from this area were transported to Harding Elementary School. Based on the evidence presented, the Court is unable to accurately determine which is correct, although it appears probable that the subject stipulation is in accord with fact.

As provided in stipulation 190, the section of Elm reassigned to McKinley was predominately white in its residential population according to both the 1960 and 1970 census data. The 1960 census map shows, however, that about half of this area was 14% to 25% black. Thus some modicum of integration was achieved since a predominately

12. According to plaintiffs' exhibit 83, Hayes had 37 classrooms and a maximum optimum utilization of 925. Defendants' exhibit P–27, however, provides that Hayes has 36 classrooms and a maximum optimum utilization of 1,080.

13. Plaintiffs' exhibit 83 provides that Rayen had 53 classrooms and a maximum optimum utilization of 1325. According to defendants' exhibit P–36, however, Rayen has 51 classrooms and a maximum optimum utilization of 1530.

14. In conflict with said stipulation are stipulations 143 and 180 which state that Elm was closed in 1964. The Court credits stipulation 149.

15. The utilization figures for Elm and Madison for the 1963–64 school year are based on the information contained in Px 229.

white school received an area with a significant number of black residents.

The reassignment involving Harding Elementary School was not indicated on the 1965 elementary school overlay. According to stipulation 180, however, the area assigned to Harding was white residentially and the students were similarly white. The 1960 census map shows that the area was 0% to 14% black in its residential population except for one block which was 14% to 25% black. Thus a limited integrative effect resulted. It should be noted that in addition to these students, the students from the Old Harrison district north of Thornhill Avenue were now transported to Harding; they had been transported to Elm. (Px 285).

Upon the closing of Elm, the section of Youngstown bound on the north by Carlton Street, on the east by Crab Creek, on the south by Wood Street, and on the west by Wick Avenue, and commonly known as "Smokey Hollow" was added to Madison Elementary School. As stipulated by the parties, this area was approximately 50% black in its residential population according to the 1960 and 1970 census. (Stip. 179). As further stipulated, the students assigned to Madison were in turn primarily black. (Stip. 180).

The reassignment of Elm students to Madison served to decrease Madison's underutilization. Although said reassignment may have increased Madison's percentage black students, Madison was already above the system average in its percentage black students prior to the boundary change.

Moreover, in terms of geographic proximity to Madison, the area transferred hereby was the closest.[16]

Those students residing in the area ultimately to be cleared by the university renewal project and the Madison Expressway Program were transported to Washington Elementary School upon the closing of Elm. (Px 285). This was to be a temporary arrangement since eventually the homes in the area from which these students came would be removed. As stipulated by the parties, this area was majority white in its residential population according to the 1960 and 1970 census. (Stip. 148). However, the census map for 1960 indicates that such area assigned to Washington was about half 0% to 14% black and half 14% to 25% black with a small section from 50% to 90% black in its residential population. Therefore, this reassignment was clearly integrative. Although it constituted a deviation from the neighborhood school policy, the expected eventual elimination of residences in the subject former Elm area rendered this reassignment temporary in nature.

In summary, the Elm closing reassignments were in many instances integrative in effect and reasonably related to non-racial factors.

In 1965, the southern boundary of Harding Elementary School was expanded to include the northern section of the McKinley attendance district. (Stip. 194). According to the Boundary Change Report, on July 28, 1965, Harding's southern boundary was changed by two blocks and Tod Lane, Lora and Fairgreen Avenues as far west as

---

**16.** It appears that as far back as May 1964, consideration was given to a transfer of the Smokey Hollow area to Madison. A memorandum dated May 18, 1964 from George Schoenhard to Dr. Wanamaker, then Superintendent of the Youngstown Public Schools, dealt with the subject of the "Advisability of transferring all of the Smokey Hollow pupils who are now attending Elm School to Madison rather than just sending the seventh graders." (Px 288). The memo discusses the effect of such transfer upon Elm and considers also the effect of students upon the Victory Annex upon Madison. This memo concludes that the general area was in such a state of flux that at the time it was difficult to make an objective decision, and recommends that for a time decisions with regard to student transfers in the area should be made on a yearly basis. This memo demonstrates the manner in which school officials dealt with overcrowding problems. As can be seen therefrom, numerous alternatives were considered in a somewhat haphazard manner. It does not demonstrate that racial factors were considered, but shows that utilization and classroom arrangement were given prime consideration.

Belmont were added to its attendance district. (Px 249).

| | 1963-64 | | 1967-68 | |
|---|---|---|---|---|
| Harding | -58 | 1.0% | -178 | 9.1% |
| McKinley | -50 | 5.7% | -114 | 16.3% |
| Total Elementary | | 39.1% | | 44.9% |
| Total System | | 35.1% | | 39.6% |

As stipulated by the parties, the area transferred was, according to both the 1960 and 1970 census, overwhelmingly white residentially. (Stip. 194). While the reasons for this change are not established by the evidence, it may have been made at this time in order to free additional space at McKinley for the Elm students transferred there. Both Harding and McKinley were whiter than the system average, and thus as to Harding this action was racially neutral. It did, however, serve to reduce the number of white students at McKinley causing in turn an increase in the proportion of blacks at that school.

By a letter to parents dated August 21, 1967, the Youngstown school officials notified those persons residing in the area of Youngstown State University that thereafter the school system would not provide transportation to Washington Elementary School from the university area. (Px 285). Thus in 1967, the eastern boundary of Covington Elementary School was expanded to include that section of the former Elm attendance district from which students had been bused to Washington. (Stip. 204). Plaintiffs' expert William Lamson testified that due to financial reasons the transportation program to Washington was eliminated.

There were significant physical changes taking place within said area. As projected at the time of Elm's closing, the expansion of the university and the freeway would in turn produce a decrease in the number of elementary school age children residing in the central section of Youngstown. Thus few students could have been living in the university area thereby rendering transportation to Washington an expensive and unnecessary proposition. Moreover, this reassignment represented a return to the neighborhood school policy since Covington Elementary School was in close geographic proximity to the university area. Racially, an integrated area was added to a predominately black school and thus the effect thereof was integrative.

In 1970, the issue of closing Tod Elementary School again arose, as reflected in a letter dated November 10, 1970 from Chester Amedia, Director of the YMHA, to Dr. Viering, then Superintendent of Youngstown schools. (Px 404-A). According to said letter, a committee representing parents who were residents of the Brier Hill Annex met with Mr. Amedia and requested that the YMHA appeal to the Youngstown school officials and Board to allow Tod School to remain open. A number of reasons were advanced why the closing of Tod would present a hardship on such families. Essentially they dealt with the problems that would arise as a result of the transportation of these students to another school. As stated therein, the majority of the Brier Hill Annex children lived within five minutes of Tod. These parents essentially asserted that the closing of Tod would deprive them of the benefits of the neighborhood school policy including incurring additional expenses for such items as clothes, lunches, and transportation. (Px 404-A).

Nevertheless, in September 1971, Tod Elementary School was closed. (Stip. 144, 152).

| | 1970-71 | | 1971-72 | |
|---|---|---|---|---|
| Tod | -54 | 44.6% | | |
| Jefferson | -17 | 90.3% | -88 | 87.0% |
| Covington | -129 | 97.9% | -127 | 83.3% |
| Stambaugh | -497 | 13.7% | -494 | 13.3% |
| Harding | -57 | 15.0% | -79 | 16.7% |
| McKinley | -106 | 21.7% | -150 | 18.5% |
| Total Elementary | | 44.5% | | 39.8% |
| Total System | | 44.1% | | 43.4% |

The former Tod attendance area was split into two sections: the eastern section was within walking distance of Jefferson and thus the children residing therein were assigned to Jefferson; the children residing in the northern and western sections of the former Tod district were transported to the discontiguous Covington. (Px 221). Also

at this time, Covington's western boundary was expanded to include a section of the former Butler attendance district which had been a discontiguous area assigned to Tod from 1961 to 1971. (Stip. 205).

It appears from the 1970 census map that all of the areas transferred to Jefferson and Covington at this time were mostly white in their residential population. Thus these reassignments were integrative in that these two identifiably black schools received a substantial number of white students. This is reflected in the 1971–72 percentages for Jefferson and Covington which show a considerable decrease in both schools' percentage black students. It appears that Covington was utilized since a bus garage for the public schools was located in the Tod area and could thus easily transport Tod area students to Covington on its way into the central city area.

The grade structure of Hayes Junior High School was changed for the 1971–72 school year from grades seven and eight to grades six through eight. At the same time the grade structures of Covington, Harding, Jefferson and McKinley Elementary Schools were all changed from kindergarten through sixth grade to kindergarten through fifth grade. (Px 271).

|  | 1970-71 | | 1971-72 | |
|---|---|---|---|---|
| Hayes Junior High | -378 | 64.7% | -158 | 64.9% |
| Covington | -129 | 97.9% | -127 | 83.3% |
| Harding | -57 | 15.0% | -79 | 16.7% |
| Jefferson | -17 | 90.3% | -88 | 87.0% |
| McKinley | -106 | 21.7% | -150 | 18.5% |
| Madison | -179 | 68.9% | -42 | 71.3% |
| Total Elementary | | 44.5% | | 39.8% |
| Total Junior | | 51.6% | | 63.0% |
| Total System | | 44.1% | | 43.4% |

Although not indicated in the stipulations or other data, such changes may have been part of the reorganization necessary to effectuate the Tod closure. These schools all fed Hayes Junior High School. The only school within the Hayes feeder pattern which did not experience a grade structure change was Madison. Racially these grade structure changes have not been demonstrated to be significant.

The boundary between East and Rayen High Schools became Crab Creek from Adams Street to the Mahoning River in November 1971. (Stip. 249).

|  | 1970-71 | | 1971-72 | |
|---|---|---|---|---|
| East | -347 | 58.8% | -637 | 56.9% |
| Rayen | -352 | 54.2% | -260 | 54.9% |
| Total Senior | | 39.3% | | 38.7% |
| Total System | | 44.1% | | 43.4% |

The attendance area transferred thereby from East to Rayen was majority white in its residential population according to the 1970 census map. Racially this boundary change and territory transfer was neutral in effect.

For the 1972–73 school year, the grade structure of Hayes Junior High School was returned from a grade six through eight school to a grades seven and eight school. (Px 271). Concomitant with this change the grade structures of Covington, Harding, Jefferson, and McKinley Elementary Schools were changed from grades kindergarten through fifth to kindergarten through sixth grade. Again the only school within the Hayes Middle School feeder pattern which did not experience any grade structure change was Madison which throughout remained a kindergarten through sixth grade school.

|  | 1971-72 | | 1972-73 | |
|---|---|---|---|---|
| Hayes | -158 | 64.9% | -508 | 68.5% |
| Covington | -127 | 83.3% | -14 | 84.0% |
| Harding | -79 | 16.7% | -44 | 20.6% |
| Jefferson | -88 | 87.0% | -20 | 88.7% |
| McKinley | -150 | 18.5% | -148 | 21.7% |
| Total Elementary | | 39.8% | | 46.8% |
| Total Junior | | 63.0% | | 55.8% |
| Total System | | 43.4% | | 44.7% |

A look at the utilization figures for Hayes for the 1972–73 school year indicates a dramatic increase in its underutilization. Hayes, however, lost substantially more students than the elementary schools gained by the return of the sixth grades thereto. Thus this grade structure change does not provide a full explanation for Hayes' loss of enrollment. It may be attributed in part to a decline in the popula-

tion of the area. The evidence presented, however, fails to provide the Court with an accurate explanation therefor. In terms of the racial effect of this change, it appears to have been totally neutral.

Subsequent to the 1972 grade structure change described above, no other changes within the Rayen zone have been proven to the Court.

## EAST ZONE

The schools comprising the East zone are: East High School; East [17] and Lincoln Junior High Schools; Haddow, Harrison, Lincoln [18], Madison, Richey, and Roosevelt Elementary Schools.

The original Roosevelt Elementary School was built in the early 1900's. In 1940, however, a replacement facility containing seven classrooms was opened. The attendance area assigned to Roosevelt was bound on the north by Shehy Street, on the east by Lincoln Park, on the south by the Mahoning River, and on the west by Forest Avenue. (Stip. 115). The parties stipulated that, according to the 1940 census, Roosevelt and one of its contiguous schools, Lincoln Elementary, contained within their attendance districts most of the black population residing east of Crab Creek and the Mahoning River. (Stip. 115). It was further stipulated that to the east of and contiguous thereto were Richey and Coitsville Elementary Schools of the East and North zones, respectively. These schools served an area which was white in its residential population according to the 1940 census data. (Stip. 115).

Likewise in 1940, Richey Elementary School received a two room addition. (Stip. 115). As noted above, Richey's attendance area contained only white residents at this time. Finally, in 1940, five classrooms were added to East High School.

The record before this Court is devoid of any racial data for the individual schools prior to the 1952–53 school year. In view thereof, the Court cannot analyze either the racial effect or reasonableness of the 1940 building constructions and additions.

The parties stipulated that the western boundary of Sciencehill Elementary School was contracted in 1946 to transfer a portion of its attendance area to White Elementary School. (Stip. 207). Yet Sciencehill was not commissioned until 1955. (See pages 1017, 1018, *infra*.).

Harrison Elementary School was constructed in the early 1900's north of Thornhill Avenue in northeastern Youngstown. (Hereinafter this school shall be referred to as Old Harrison for purposes of clarity.) In 1949, this facility was closed, and those students residing north of Thornhill Avenue were bused to Richey, while those to the south were reassigned to Madison.

|  | 1952–53 |  |
| --- | --- | --- |
| Richey | +2 | 0.0% |
| Madison | −52 | 21.0% |
| Elm | +159 | 26.4% |
| Total Elementary |  | 20.1% |
| Total System |  | 18.6% |

According to the 1950 census map, both the area north and the area south of Thornhill Avenue were predominately white in their residential population. The assignment of students from the southern section of the Old Harrison district to Madison was probably integrative in effect since Madison's attendance area encompassed numerous blocks with black residents. The reasonableness of the reassignment cannot, however, be judged due to the lack of utilization figures for the 1949–50 school year in this record. For the 1950–51 school year, Madison Elementary School was underutilized by 206 students according to the February 1952 "Public Schools in Youngstown, Report No. 6." (Px 83). In view thereof,

---

**17.** East Junior and Senior High Schools were accommodated in the same facility.

**18.** As will be discussed *infra* Lincoln served as an elementary school until the 1971–72 school

year. Effective that year, it was converted to a middle school.

the Court infers that Madison was considerably underutilized in the next preceding school year, and that the reassignment was thus reasonable from a facility utilization standpoint.

The reassignment of students residing north of Thornhill Avenue to Richey was racially neutral in its effect. The reasonableness of this reassignment in terms of facility utilization cannot, however, be determined since the relevant figures have not been made available to the Court. The 1952 Report indicates that, based on the September 1950 enrollment Richey was overutilized by 40 students, but that its excess student population was, in 1952, being transported to Elm Elementary School. (Px 83). When this reassignment was initiated is not established.

Thus the record does not demonstrate that the reassignment to Richey was an unsound administrative decision. Moreover, said reassignment was apparently effected to quell the considerable opposition to the closing of Old Harrison raised by the residents of the area north of Thornhill Avenue. In an effort to mollify these individuals and assure their continued support, the Youngstown school officials promised that students residing north of Thornhill Avenue would be reassigned to schools which fed Rayen High School. Such action has not been shown to have been unreasonable or discriminatory in effect.

Based on the foregoing, the Court concludes that the evidence does not establish that the closing of Harrison and the concomitant reassignments were segregative in effect or purpose.

In 1951, the students residing north of Thornhill Avenue in the Old Harrison attendance district were reassigned and transported to Elm Elementary School. Said arrangement continued until 1964.

| | 1952-53 | |
|---|---|---|
| Elm | +159 | 26.4% |
| Richey | +2 | 0.0% |
| Madison | -52 | 21.0% |
| Harding [19] | +178 | 0.0% |
| McKinley | +20 | 0.0% |
| Total Elementary | | 20.1% |
| Total System | | 18.6% |

The Old Harrison students residing south of Thornhill Avenue continued to attend Madison Elementary School.

Racially the reassignment of the students north of Thornhill Avenue to Elm was unquestionably integrative in effect. These white students, numbering approximately 30, were transported to a school in which the percentage black student enrollment was significantly above the elementary school average for the following year. From an administrative viewpoint, however, said assignment was not sound. According to the 1952–53 utilization figures shown above, Elm was considerably overutilized, while Madison could have easily absorbed the students residing north of Thornhill. However, Elm was within the Rayen High School feeder pattern and thus the change was consistent with the previously discussed promise made to the parents of these students.[20]

Sixteen rooms and a gymnasium were added to East High School in 1953. (Stip. 119). As noted above, East at this time

19. According to plaintiffs' exhibit 83, Harding had 12 classrooms and a maximum optimum utilization of 360. Defendants' exhibit P–9, however, provides that Harding has 18 classrooms and a maximum optimum utilization of 540.

20. For the 1955–56 school year, it appears that both Elm and Madison Elementary Schools fed both Rayen and East High Schools. (Px 159–

A). Whether or not this was true prior thereto has not been shown in this record. If this was in fact true as early as 1951 and thereafter, the transportation of the Old Harrison students residing north of Thornhill Avenue to Elm evidences poor administrative judgment; however, as such assignment was clearly integrative in effect, no inference of segregative intent arises.

served as both a junior and senior high school.

| | 1952-53[21] | |
|---|---|---|
| East Jr. & Sr. | +145 | 22.9% |
| North Jr. & Sr. | +85 | 34.5% |
| Rayen Jr. & Sr. | -238 | 19.5% |
| Wilson Jr. & Sr. | -457 | 0.7% |
| South Sr. | +101 | 9.9% |
| Total Junior | | 21.1% |
| Total Senior | | 14.4% |
| Total System | | 18.6% |

The Court is unable to accurately assess the racial effect of the East addition since the next available racial data is that for the 1958–59 school year. Based on the figures for the year preceding the addition, however, the effect appears to have been neutral since the percentage black students enrolled at East was only slightly above the system average.

From an administrative standpoint, the construction of an addition to East had a reasonable basis. As reflected in the February 1952 "Public Schools in Youngstown, Report No. 6," East High School was 237 students over its optimum utilization figure in September 1950.[22] Such overutilization continued through the 1952–53 school year as shown above; in said year East was overutilized by 145 students. Further, the 1952 Report projected that the junior high school enrollment in the East area would rise to 925 students for 1955, and suggested that such enrollment justified a separate junior high school facility for the area. Rather than construct same, it appears that the school officials responded to the immediate needs of this rapidly growing area by the addition to East. In view of the foregoing, therefore, the Court finds that there was a reasonable basis for the East addition in 1953.

Based on the utilization figures set forth above, it appears that East's overcrowded condition could have been relieved through the reassignment of its students to either Rayen or Wilson. Of the two, only Wilson presented an integrative alternative; it was, however, located across the Mahoning River from the East High School district. Moreover, a reassignment of East students to either Rayen or Wilson would have been contrary to the neighborhood school policy.

In 1957, Harrison Elementary School opened with 19 classrooms. (Stip. 121).

| | 1952-53 | | 1958-59 | |
|---|---|---|---|---|
| Harrison | | | +74 | 52.0% |
| Madison | -52 | 21.0% | +119 | 38.0% |
| Elm | +159 | 26.4% | +158 | 49.0% |
| McKinley | +20 | 0.0% | +15 | 1.7% |
| Harding | +178 | 0.0% | +143 | 0.0% |
| Scienceville | +4 | 14.3% | Facility | Closed |
| White | +14 | 2.0% | -10 | 17.4% |
| Total Elementary | | 20.1% | | 29.4% |
| Total System | | 18.6% | | 26.3% |

Said facility, located south of Thornhill Avenue, replaced Old Harrison which had closed in 1949. Harrison Elementary was apparently constructed, in part, to service the Kimmel Brook Housing Project built in 1955, and the Thornhill Village Housing Development.

21. The utilization statistics contained in the chart were calculated on the basis of the optimum utilization figures for the respective schools contained in the February 1952 Report. (Px 83). Further, said report notes that the junior and senior high schools had been combined in the same structure at Rayen, Chaney, and North. The junior high school map contained in said Report, however, shows that East and Wilson were also junior high schools. Additionally, the Report notes that only Hayes, Hillman and Princeton Junior High Schools had their own physical plants. Thus it would appear that the junior high students at East and Wilson were housed within the same facility as the senior high students; no evidence of separate facilities has been presented to the Court.

22. According to said Report, East High School had 53 classrooms and a capacity of 1,325. With the addition in 1953, East had 69 classrooms and a capacity of 1,725 students. Defendants' exhibit P–34, however, indicates that prior to the 1953 addition East had 50 classrooms, and that thereafter it had 66 classrooms. The Court is unable on the basis of this record to determine which of the documents prepared by the school officials is correct. Since, however, the Court is seeking to determine the intent of the Youngstown school officials' actions, a contemporaneous document is more indicative thereof. Thus the Court shall use the figures contained in the 1952 Report as the basis for its calculations of facility utilization.

The parties stipulated that in some instances the Youngstown school officials built schools to accommodate the children residing in newly built housing projects operated by the Youngstown Metropolitan Housing Authority. (Stip. 165). The parties further stipulated that, at least as of 1956, the YMHA knew the race of the individual families residing within Kimmel Brook. (Stip. 169). As of December 15, 1956, the apartments were occupied as follows: 125 were occupied by non-whites; 49 were occupied by whites; and 9 were occupied by spanish speaking residents. (Stip. 169). The number of residents within the project increased rather rapidly so that as of April 30, 1957, 80 were white, 200 were non-white, and 11 were spanish speaking. (Stip. 169). In view of the apparent exchange of data regarding the location and capacity of both housing projects and schools between the YMHA and Youngstown public school officials, the Court infers that the school officials were aware of the racial composition of the Kimmel Brook Housing Project sometime in 1956. The residents of Thornhill Village were majority white. (Tr. Vol. 13, 2900).

The need for a new elementary school in the Old Harrison district is evidenced by a March 21, 1957 memorandum entitled "Some School Building Considerations by Sections of the City." (Px 264). Concluding that a sizeable school was needed in the area, the memorandum states that as of that time 375 students were being transported to Elm and Madison Elementary Schools from the Kimmel Brook-Thornhill Village area, and that a total of approximately 521 students from said area were being transported to Elm, Madison, and Lincoln Elementary Schools. (Px 264). These figures include the approximately 30 students residing north of Thornhill Avenue in the Old Harrison district who were being transported to Elm Elementary School.[23]

In apparent response to a recognized need, the new Harrison Elementary School was built to be a sizeable facility. Indeed it opened with an optimum utilization of 570, and was thus larger than the average elementary school in the Youngstown Public School system. The record does not disclose, however, the number of students enrolled in Harrison during its first year. Although it could easily accommodate the aforementioned 521 students that were being transported during the 1956–57 school year, it had little excess capacity. Thus by the 1958–59 school year, Harrison was overutilized and 52.0% black. The construction of Harrison was nevertheless reasonable, as a new elementary school was needed in the Old Harrison district. The then existing contiguous schools could not adequately accommodate the students residing therein. Moreover, the dictates of a racially neutral neighborhood school policy called for the building of a school within walking distance of said students.

Therefore, although the Youngstown school officials presumably knew the race of the residents in the Old Harrison district, the Court finds, based on the record herein, that the construction of Harrison Elementary School was a reasonable and racially neutral action.

Although Harrison Elementary School apparently had the same boundaries as Old Harrison, the students residing within said district north of Thornhill Avenue continued to be transported to Elm Elementary School. Thus the school officials continued to effectuate the promise to residents of said area that their children would be assigned to schools which fed Rayen High School. This continued assignment of these white students to Elm clearly does not evidence segregative intent since Elm's percentage black student enrollment was, the following school year, substantially the same as that of Harrison.

---

**23.** It is apparent that the students residing north of Thornhill Avenue had to be transported to whatever school they attended throughout this period.

Mary Haddow Elementary School opened with 17 classrooms in 1960. (Stip. 125).

| | 1958-59 | | 1961-62 | |
|---|---|---|---|---|
| Haddow | | | -141 | 16.3% |
| Roosevelt[24] | +100 | 52.0% | -160 | 57.4% |
| Lincoln | +64 | 37.0% | -49 | 70.3% |
| Richey | +43 | 2.2% | -19 | 15.5% |
| Sciencehill | | 48.0% | | 50.0% |
| Coitsville | +26 | 10.4% | -55 | 0.0% |
| Total Elementary | | 29.4% | | 33.2% |
| Total System | | 26.3% | | 29.8% |

Despite the stipulation, Haddow is not shown on the 1960 elementary overlay. This discrepancy is possibly explained by the fact that the boundaries for the Haddow attendance district were not set until 1961.

The construction of Haddow Elementary School does not appear to have been segregative in effect. Although racial data for the year of its opening has not been presented to the Court, Haddow's student enrollment for the 1961-62 school year was 16.3% black. Despite the fact that such percentage was below the system average, it demonstrates that Haddow was in fact integrated and not built to contain a specific race. Admittedly, Haddow's student enrollment contained fewer black students than that of the contiguous Roosevelt, Lincoln, and Sciencehill Elementary Schools. On the other hand, however, its percentage black students was greater than that of the contiguous Richey and Coitsville Elementary Schools.

Moreover, the need for a new school in the Haddow area was recognized as early as the March 21, 1957 Report discussed above. Therein it was noted that 31 student residents of Lincoln Knolls, a single family residential development, were being transported to Warren Richey Elementary School, and that if the development grew rapidly, the schools in the area would soon be overcrowded. (Px 264). This conclusion, as well as the continuing growth of the area, is substantiated by the utilization figures for the 1958-59 school year which demonstrate that all schools contiguous to the Haddow area were overcrowded. It was thus reasonable for the school officials to conclude that a new elementary school was needed. Additionally, this construction again evidences adherence to a neighborhood school policy whereby schools were built close to areas of growing population. There is no indication that race played any part in the construction of Haddow Elementary School.

In 1959-60, Roosevelt Elementary School had a total of sixteen classrooms. Nine of these classrooms were constructed in 1909; the remaining seven were added in 1940. In 1960, the original nine classrooms were demolished and fourteen new classrooms were added. (Dx P-18). Thus, as of the 1960-61 school year, Roosevelt had a total of twenty-one classrooms and an optimum utilization of 630 students. (Stip. 125).

| | 1958-59 | | 1961-62 | |
|---|---|---|---|---|
| Roosevelt | +100 | 52.0% | -160 | 57.4% |
| Haddow | | | -141 | 16.3% |
| Jackson[23] | +194 | 0.2% | -111 | 0.9% |
| Adams | -204 | 8.2% | -444 | 13.4% |
| Lincoln | +64 | 37.0% | -49 | 70.3% |
| Richey | +43 | 2.2% | -19 | 15.5% |
| Total Elementary | | 29.4% | | 33.2% |
| Total System | | 26.3% | | 29.8% |

Prior to this addition, Roosevelt was significantly overutilized and was inadequate to meet the demands of this growing area of Youngstown as evidenced by the optimum utilization figures for the 1958-59 school year. The only two readily recognizable alternatives to the action taken were reassignment of Roosevelt students to Adams and/or Haddow. Such alternatives were not, however, convenient from the stand-

---

24. According to the 1952 Report, Roosevelt had 16 classrooms for an optimum utilization of 480 students. (Px 83).

25. Plaintiffs' exhibit 83 provides that Jackson had 16 classrooms and a maximum optimum utilization of 480. According to defendants' exhibit P-11, Jackson originally had 17 classrooms and then received an addition of 2 classrooms in 1961. Thus said exhibit indicates that Jackson has 19 classrooms and a maximum optimum utilization of 570.

point of geographic proximity since each school was a considerable distance from Roosevelt making transportation a necessity. In any event, this addition appears to have been racially neutral and was supported by a rational basis, namely modernization of facilities, the neighborhood school policy, and the need for more rooms to accommodate present and future growth.

The 1960 elementary school overlay shows a boundary change between Lincoln and Roosevelt Elementary Schools whereby an area that was majority black in its residential population was transferred to Lincoln. Such cannot be accurately analyzed by the Court, however, since it is not known in what year between 1955 and 1960 the change was effected. However, since both schools were over the system average in their percentage black students in the 1952–53, 1958–59, and 1961–62 school years, it is doubtful that this boundary change had any significance and was other than neutral racially.

In June 1961, Kennedy Park Terrace, a low income housing development located on Kendis Circle, was zoned into the Roosevelt Elementary School attendance district. (Px 249).

|  | 1958-59 |  | 1961-62 |  |
|---|---|---|---|---|
| Haddow |  |  | -141 | 16.3% |
| Roosevelt | +100 | 52.0% | -160 | 57.4% |
| Total Elementary |  | 29.4% |  | 33.2% |
| Total System |  | 26.3% |  | 29.8% |

The parties stipulated that for the 1961–62 school year students residing in this development were also given the option of attending Mary Haddow Elementary School. (Stip. 198).

Such option was created apparently upon the request of the private developers of Kennedy Park Terrace.[26] A June 8, 1961 letter by Superintendent Wanamaker indicates that students residing in Kennedy

Park Terrace were assigned and transported to Roosevelt. (Px 274). Parents were given the option of sending their children to Mary Haddow, but the school system did not accept responsibility for their transportation thereto. Kennedy Park Terrace apparently was not included within the Haddow School district because of the lack of adequate and safe sidewalks from the development to said school.

Thus, the students residing in Kennedy Park Terrace had to be transported whether they attended Roosevelt or Mary Haddow Elementary Schools. According to the testimony at trial, it was convenient to transport said students to Roosevelt due to the location of the bus garage. Additionally, the 1960 census map shows Kennedy Park Terrace to have been residentially white. The number of blacks residing therein apparently was not great since the 1970 census map indicates that the development area was only 25% to 50% black in its residential population. Thus in 1961, a predominately white residential area was zoned into a school with a black student enrollment considerably above that of the system average. In view thereof, the assignment of students residing in Kennedy Park Terrace to Roosevelt Elementary School was integrative.

The creation of an elementary school option for residents of Kennedy Park Terrace was also an integrative action since the option applied to all residents whether black or white. Moreover, such action was reasonable since Mary Haddow had considerable unused capacity.

The enrollment problem facing East Junior and Senior High School in the 1960's was documented in a report dated May 18, 1964. (Px 229). Actually the problem was two-fold: there were too many pupils in the East High building; and such condition was

---

**26.** Testimony at trial indicated that the creation of the option was the result of the developers' desire to attract white residents to the development by offering Mary Haddow as the elementary school for their children. This planned integrated housing development apparently was unable to attract white residents thereto.

The motives and actions of the developers, however, cannot be ascribed to the school officials. On balance, the actions taken by the school officials do not, in fact, reflect segregative intent since one of the obvious purposes was to aid the development of an integrated housing development.

intensified by too great a span in age and grade levels. As stated in the 1964 Report, the September 1963 enrollment of East in grades seven through twelve was 2,019 students. It was projected that the enrollment for said grades would gradually increase to 2,101 students by the 1966–67 school year and plateau thereafter until the 1970–71 school year. The optimum utilization figure for East, however, was estimated to be 2,120 students.[27] Although the maximum projected enrollment could be absorbed without expanding East according to the report, such made difficult, if not impossible, implementation of smaller classes for those students with special learning problems. Moreover, concern was evidenced over the fact that within one facility students ranging in age from 10 to 19 years co-mingled. Such was recognized by the school officials as presenting a less than desirable situation for student emotional and social growth. Two possible solutions to this problem were discussed in the report. The first involved the construction of a new junior high school for the East side of the city, while the second proposed that the seventh grades be retained at the elementary schools.

After analyzing all aspects of these two possible solutions, the 1964 Report recommended that, effective September 1964, with certain listed exceptions, those seventh graders who would have gone to East at that time remain at the various elementary schools, and transfer to East upon entering the eighth grade. Exceptions were noted for those children who would profit from special education classes in separate facilities at East, and for the seventh graders at John White and Elm Elementary Schools whose numbers were too small to make their stay in those buildings practicable. Thus it was recommended that the seventh graders at John White join those at Richey, and study be given to the possibility of Elm's seventh graders attending Madison.

Such recommendations could have been implemented in the existing school facilities with the exception of Warren Richey wherein a small addition of two classrooms was urged. It was advised that such addition be available for use at Richey with the opening of the 1964–65 school year.

The following chart shows the enrollment and utilization of the eight elementary schools, excluding kindergarten, which fed East High School according to the 1964 Report. (Px 229 at 6). The percentage black students enrolled at the respective schools for the 1963–64 school year is derived from plaintiffs' exhibit 107.

| | 9–63 ENROLLMENT | TOTAL CAPACITY | UTILIZATION | |
|---|---|---|---|---|
| Elm | 540 | 600 | –60 | 71.6% Black |
| Haddow | 386 | 490* | –104 | 11.9% |
| Harrison | 433 | 470* | –37 | 64.2% |
| Lincoln | 918 | 1060* | –142 | 68.7% |
| Madison | 447 | 610* | –163 | 50.0% |
| Richey | 167 | 180 | –13 | 30.9% |
| Roosevelt | 457 | 580* | –123 | 52.2% |
| White | 252 | 240 | +12 | 72.7% |
| East Jr. & Sr. | 2019 | 2120 | –101 | 42.0% |
| Total Elem. | | | | 39.1% |
| Total Jr. | | | | 35.4% |
| Total Sr. | | | | 30.1% |
| Total System | | | | 35.1% |

*Maximum optimum utilization with slow-learner classes.

The evidence in this record does not disclose whether the recommendations of the 1964 Report were completely implemented. The racial effect of implementing these recommendations would have been neutral. With two exceptions, the percentage black students enrolled at each of the elementary schools feeding East High School for the 1963–64 school year was substantially above the system average; only Haddow and Richey Elementary Schools had black student enrollments less than the system average. The percentage black students enrolled at East was likewise considerably greater than the junior high school, senior high school, and system average. Thus retaining the

---

27. .This optimum enrollment for East High School was calculated on the basis of 30 students per 44 regular classrooms, 25 students per 16 special classrooms, and 50 students per the 8 rooms consisting of the gymnasium, library, study halls, and vocal and instrumental rooms. (Px 229).

seventh graders at the elementary schools would not have had any segregative effect upon East. Moreover, the reassignment of the seventh graders at John White to Richey Elementary School would have been integrative in that White was an identifiably black school, while Richey had fewer black students than the elementary and system average. Transferring Elm's seventh graders to Madison Elementary School would have been a neutral action since both schools had significantly more black students than the system average.

From a facility utilization standpoint, there was a reasonable basis for the recommendations. Thus the recommendations and their implementation represent sound administrative judgment. In view thereof, and in view of the neutral racial effect of the recommendations, no inference of intentional segregation arises therein.

It should be noted that the 1964 Report on the East High area represents one of the few comprehensive studies of a school problem presented to the Court. Said report demonstrates a practical approach to a difficult problem, and an attempt to solve same consistent with a neutral neighborhood school policy. This report does not evidence any segregative purpose on the part of the Youngstown school officials in solving the enrollment problem on the east side of Youngstown.

The parties stipulated that in 1964 Richey Elementary School received an addition of two classrooms. (Stip. 127). Thus it appears that the recommendations contained in the 1964 Report were followed at least in part. The racial effect of the addition to Richey was neutral. The reassignment of seventh graders from John White Elementary School to Richey in conjunction with the addition, as noted above, was integrative. The addition was both reasonable and necessary since Richey was only underutilized by 13 students for the 1963–64 school

year. Thus no adverse racial inference can be drawn from the addition to Richey.

Upon the closing of Elm Elementary School in 1965, the students residing north of Thornhill Avenue in the former Old Harrison attendance district was reassigned and transported to Harding Elementary School.

| | 1963–64 | | 1967–68 | |
|---|---|---|---|---|
| Harrison | $-37^{28}$ | 64.2% | $-47$ | 69.8% |
| Harding | $-58$ | 1.0% | $-178$ | 9.1% |
| McKinley | $-50$ | 5.7% | $-114$ | 16.3% |
| Madison | $-163$ | 50.0% | $-150$ | 67.6% |
| White | $+12$ | 72.7% | $-39$ | 82.2% |
| Total Elementary | | 39.1% | | 44.9% |
| Total System | | 35.1% | | 39.6% |

This reassignment continued until 1974. According to the 1960 census map, the subject area north of Thornhill Avenue was predominately white in its residential population.

The racial effect of this reassignment was segregative in that white students were bused from a racially identifiable black school upon its closing to a racially identifiable white school. The reassignment of the students residing north of Thornhill Avenue to Harding continued the deviation from the neutral neighborhood school policy started in 1949, in that these students lived within the boundaries of the attendance district for Harrison Elementary School. Although Harrison was underutilized by 37 students two years prior to this action, the 1964 Report on the East High area indicates that in 1963–64 Harrison's sixth grade students attended Madison Elementary School. Thus Harrison was not able to accommodate all of the students residing in its district. In view thereof, it could neither retain the seventh grade as recommended by the report, nor adequately serve the approximately 30 students residing north of Thornhill Avenue.

An explanation for this particular reassignment appears to be the original 1949

---

**28.** The utilization figures for Harrison and Madison Elementary Schools are based on the maximum optimum utilization figures for said schools contained in the 1964 Report. · (Px 229). For the 1963–64 school year, both schools contained slow-learners' classes, and thus their maximum optimum utilization was less than that reported in plaintiffs' exhibit 158.

promise to residents of the former Old Harrison area north of Thornhill Avenue that their children would remain in elementary schools that fed Rayen High School. Harding was one such school, and, based on the 1963–64 utilization figure, had sufficient excess space to accommodate these students. To the extent that the reassignment resulted from parental pressure upon the Youngstown school officials, it does not appear to have been totally unreasonable.

The reassignment of the students residing north of Thornhill Avenue is alone not sufficient to show intentional segregation; it may however, raise an inference thereof. While the assignment of the students residing north of Thornhill to Harrison might have been integrative, such an effect would have been minimal since these students represented less than 1% of the school population.

As previously indicated, Harrison was not capable of accommodating all the students within its area from shortly after its opening in 1957. By 1967, however, it is apparent that the situation at Harrison was not relieved by additions thereto due in part to the influence of sociological and economic factors. A September 11, 1967 memorandum from G. H. Schoenhard to Mr. W. W. Zinser deals with "The question regarding overcrowding at Harrison School." (Px 244). Said memorandum states that each year Harrison reaches reasonable capacity with some of its students being transported to Madison and Harding.[29]

As to Harding Elementary School, the 1967 memorandum indicates that approximately 30 to 35 students from the northern

section of the Harrison district were bused thereto. Further, the memo states that:

> These pupils (1–6) live in a rather isolated area and sociologically are quite different from those pupils who attend Harrison or Madison. At one time they had their own little school there but it has been taken down. They are quite happy to be bused to Harding. Harding has plenty of room for them.

Thus, factors outside of a neutral neighborhood school policy were considered by the school officials in dealing with the overcrowded situation in the Harrison area. Moreover, rather than propose a solution to a difficult situation, the memorandum merely concludes that the situation is an interesting one. (Px 244).

In 1971, the northern boundary of Harrison Elementary School was redefined along Thornhill Avenue according to the testimony of plaintiffs' expert William Lamson.

| | 1970-71 | | 1971-72 | |
|---|---|---|---|---|
| Harrison | -151 | 69.7% | -91 | 71.6% |
| Harding | -57 | 15.0% | -79 | 16.7% |
| Total Elementary | | 44.5% | | 39.8% |
| Total System | | 44.1% | | 43.4% |

This redefinition merely represented further recognition of existing fact. It did, however, establish a clear racial boundary line whereby the white residents of the area north of Thornhill Avenue were transported to the predominately white Harding Elementary School, while the predominately black residents of the area south of Thornhill Avenue continued at Harrison Elementary School. Based on the utilization figures shown above, it appears that Harrison Elementary School could have accommodat-

---

**29.** In conjunction with the transportation of Harrison students to other elementary schools, the memorandum states that in some years Harrison housed only students in kindergarten through grade four, while in other years it could accommodate several fifth grades. For the 1967–68 school year, 114 sixth and seventh graders were bused from Harrison to Madison Elementary School, while 30 first through sixth graders were bused from Harrison to Harding Elementary School. (Px 244). Based on the racial data available to the Court for the 1967–68 school year, the reassignment to Madison was neutral in its racial effect since the percentage black students enrolled at both Harrison and Madison was considerably above the system average. With regard to the reassignment of the 30 Harrison students residing north of Thornhill Avenue to Harding, the racial effect thereof has been previously discussed. With the exception of the 1967–68 school year, there is no other evidence as to grade structure changes at Harrison for specific school years. Therefore the Court cannot ascertain the racial effect thereof.

ed the approximately 30 elementary school students residing north of Thornhill Avenue. Harrison's earlier overcrowded condition appears to have been relieved since, as will be discussed below, it retained its next sixth grade class for the 1971–72 school year instead of reassigning those students to Madison Elementary School.

Effective the 1971–72 school year, Lincoln Elementary School was converted into a middle school servicing grades seven and eight.[30] Such change resulted in the reassignment of approximately 517 students from Lincoln and surrounding schools to Madison, Roosevelt, Mary Haddow, Warren Richey, John White, and Harrison Elementary Schools. (Px 221).

|  | 1970–71 | | 1971–72 | |
|---|---|---|---|---|
| Lincoln Elem. & Jr. | -265 | 64.5% | -384 | 61.5% |
| Roosevelt | -175 | 43.1% | -48 | 42.8% |
| Richey | +2 | 68.6% | -45 | 56.4% |
| White | +21 | 83.2% | +104 | 79.3% |
| Haddow | -124 | 39.1% | -88 | 44.8% |
| Madison | -179 | 68.9% | -42 | 71.3% |
| Harrison | -151 | 69.7% | -91 | 71.6% |
| Total Elementary | | 44.5% | | 39.8% |
| Total Junior | | 51.6% | | 63.0% |
| Total System | | 44.1% | | 43.4% |

First, the western boundary of Roosevelt Elementary School was expanded to take in part of Lincoln's attendance area thereby adding approximately 181 students to Roosevelt. (Px 221). This area transferred to Roosevelt was predominately white in its residential population according to the 1970 census data. (Stip. 200).

Second, 39 students from Roosevelt Elementary School who resided east of Jackson Street and below the southern extremity of Lincoln Park were reassigned and trans-

ported to Mary Haddow Elementary School. (Px 221). According to plaintiffs' exhibit 249, however, Roosevelt's boundary was amended in June 1971 to transfer the Haseltine area from Gladstone Avenue east to Mary Haddow Elementary School in order to create additional room at Roosevelt for students from the then closed Lincoln Elementary School. The record before the Court does not clarify the discrepancy created by the two exhibits prepared by the same Youngstown school official. Thus the Court cannot determine the exact area that was transferred from Roosevelt to Haddow, and the precise month in which the boundary change was made.

The Haseltine area students were transported to Mary Haddow Elementary School by the same bus which was at the time already transporting students residing in Kennedy Park Terrace thereto. (Px 221). Based on the 1970 census map, this isolated area then made a part of the Haddow attendance district was mostly 14% to 100% black in its residential population with a number of blocks that were 0% to 14% black residentially.

At the closing of Lincoln Elementary School, there was one additional reassignment involving Roosevelt and Haddow Elementary Schools. Kennedy Park Terrace was officially transferred from the Roosevelt attendance district to that of Mary Haddow. (Px 249).[31] Kendis Circle, the location of Kennedy Park Terrace, was 25% to 50% black in its residential population according to the 1970 census map.

The racial effect of the three above described reassignments upon Roosevelt Elementary School was neutral. The percent-

---

30. According to plaintiffs' exhibit 249, Lincoln Elementary School was closed in June 1971 and its pupils were reassigned to Madison, Richey and Roosevelt Elementary Schools. Plaintiffs' exhibit 221, on the other hand, provides that Lincoln was closed in September 1971. The record before the Court does not disclose in which month Lincoln was actually closed. In any event, it is established that Lincoln Elementary School was closed prior to the 1971–72 school year, and not in 1969 as provided by stipulation 143.

31. The parties stipulated that, in 1971, the western boundary of Mary Haddow was expanded to take in a portion of Roosevelt's attendance district which area was predominately black in its residential population according to the 1970 census. (Stip. 199). This particular boundary change is not, however, shown on the 1976 elementary school overlay. Further, it is not clear whether the stipulation is referring to the transfer of Kennedy Park Terrace to Haddow although such appears to be the case.

age black students enrolled at Roosevelt for the 1970–71 school year declined slightly for the 1971–72 school year. For both years, Roosevelt's percentage black students was just below the system average although after the reassignments it was above the elementary school average. From a facility utilization standpoint, these reassignments were reasonable since Roosevelt's substantial underutilization during the 1970–71 school year decreased for the 1971–72 school year.

The reassignment of students residing in the Haseltine area and at Kennedy Park Terrace from Roosevelt to Mary Haddow was integrative or neutral as evidenced by the increase in Haddow's percentage black students, and since Roosevelt experienced a slight decrease in its percentage black students. Although the percentage black students at Haddow during the 1971–72 school year was greater than the elementary school average, said average declined from that of the preceding year. Nevertheless, both Haddow and Roosevelt had a black student enrollment that was representative of the number of black students at the elementary school level. Moreover, the transfer of additional students to Haddow was reasonable in terms of facility utilization since Haddow became less underutilized as a result thereof.

Third, the area north of Oak Street and east of Garland, formerly within Lincoln's attendance district, was placed within that of Warren Richey. Richey's enrollment was thus increased by an additional 58 students. (Px 221). Based on the 1970 census map, the area transferred to Richey was predominately white in its residential population.

Fourth, since the closing of Sciencehill Elementary School in September 1969, approximately 50 children from the John White attendance area had been transported to Richey. Upon the closing of Lincoln in September 1971, these students were returned to John White. (Px 221). The area returned to White thereby was mostly white in its residential population according to the 1970 census map.

These reassignments had a neutral racial effect upon Warren Richey and John White Elementary Schools. Prior thereto, both schools had a black student enrollment that was considerably above the system average. Although the percentage black students enrolled at each decreased substantially for the 1971–72 school year, such was still considerably above the system average. From a facility utilization standpoint, the reassignment does not evidence sound administrative judgment as to White since its overcrowded condition was only exacerbated.

Fifth, according to plaintiffs' exhibit 221, the remainder of the Lincoln Elementary School attendance district was reassigned to Madison Elementary School thereby transferring 278 students residing west of Garland Avenue and Forest Avenue. Further, said exhibit provides that the students living south of Oak Street were bused to Madison. Plaintiffs' exhibit 249, however, indicates that in June 1971, due to the closing of Lincoln Elementary School, students residing in the area west of Garland Avenue and Fruit Street, from the Mahoning River on the south to Valley Street on the north, were transported to Madison Elementary School. To further complicate matters, the 1976 elementary school overlay shows the western boundary of Madison Elementary School to be different from that described by either of these two exhibits. The Court is unable, on the basis of this record, to resolve the conflicts in the data and determine the exact area transferred to Madison Elementary School. At most the Court can find that, as stipulated by the parties, the southern and western boundaries of the Madison attendance district were expanded in 1971 to include a part of the former Lincoln Elementary district which area was predominately black in its residential population according to the 1970 census data. (Stip. 181).

As to Madison Elementary School, this reassignment was not racially significant in effect. Although the percentage black students enrolled at Madison increased for the 1971–72 school year, Madison's percentage black students was considerably above the

system average prior to the transfer. Moreover, in view of the fact that Madison's underutilization decreased, the reassignment was reasonable from an administrative standpoint.

Lastly, prior to the closing of Lincoln, Madison Elementary School had housed 30 sixth grade students from Harrison Elementary School. Upon Lincoln's closing, Harrison retained its next sixth grade class of students in order to provide additional room at Madison. (Px 221). As a result, the grade structure of Harrison was changed from kindergarten through fifth grade to kindergarten through sixth grade for the 1971–72 school year. (Px 271). The racial effect thereof upon Harrison was racially insignificant. Since Harrison was underutilized by 151 students for the 1970–71 school year, this grade structure change represents a reasonable administrative action.

Of the six elementary schools directly affected by the closing of Lincoln Elementary School, Haddow, Madison, and Harrison experienced an increase in their percentage black students, and Roosevelt, Richey, and White experienced a decrease. With regard to the three elementary schools with an increased black student population, Haddow experienced the greatest increase and yet its percentage black students was only slightly above the elementary and total system averages for the 1971–72 school year. The percentage black students at Madison and Harrison increased even more slightly, but both schools had a black student enrollment that was considerably above the system average prior to the reassignments discussed above. From a facility

utilization standpoint, the only questionable reassignment is that involving John White Elementary School since it was overutilized by 104 students for the 1971–72 school year. Said reassignment was, however, integrative and represented a return to the neighborhood school policy therein. Overall, no inference of segregative intent arises from the student reassignments at the elementary school level upon the closing of Lincoln Elementary School.

In 1971, East Junior High School was closed when its seventh and eighth grades were reassigned to Lincoln Middle School.[32] (Px 249).

|  | 1970–71 | | 1971–72 | |
|---|---|---|---|---|
| East Jr. & Sr. | -347 | 58.8% | | |
| East Senior[33] | | | -637 | 56.9% |
| Lincoln Elementary | -265 | 64.5% | | |
| Lincoln Middle | | | -384 | 61.5% |
| Total Elementary | | 44.5% | | 39.8% |
| Total Junior | | 51.6% | | 63.0% |
| Total Senior | | 39.3% | | 38.7% |
| Total System | | 44.1% | | 43.4% |

As a result, East was only a senior high school serving grades nine through twelve for the 1971–72 school year. (Px 271).

Contrary to the reassignment described in plaintiffs' exhibit 249, for the 1968–69 through 1970–71 school years, plaintiffs' exhibit 271 indicates that East High School served grades eight through twelve. Thus it would appear that, based on said exhibit, East had no seventh graders to reassign to the then converted Lincoln Middle School. Further, plaintiffs' exhibit 271 provides that the grade structures of the seven elementary schools which fed East Junior and Senior High School prior to 1971–72 were as

---

**32.** The 1964 Report on the East High area recommended that seventh grade students remain at the elementary schools in order to alleviate the overcrowded condition of East. (Px 229). As discussed above, it is not clear from this record whether said recommendation was implemented. This 1971 reassignment, however, raises the inference that either the recommendation was not followed or that an interim change was made whereby seventh grade students in the East High area were reassigned thereto.

**33.** The 1964 Report on East High School indicated that its maximum optimum utilization approximated 2,120 students. (Px 229). Plaintiffs' exhibit 158, however, in showing student capacity and utilization from 1967 through 1976 indicates that East's maximum optimum utilization is 1,980. In view of the fact that the Court is now dealing with actions taken in the 1970's, the Court shall use the figures in plaintiffs' exhibit 158 since it is the more contemporaneous document.

follows: Harrison had grades kindergarten through fifth; Roosevelt and White had grades kindergarten through sixth; and Haddow, Lincoln, Madison, and Richey Elementary Schools had grades kindergarten through seventh.[34] For the 1971–72 school year, the six elementary schools feeding Lincoln Middle School and East Senior High School all served kindergarten through sixth grade according to plaintiffs' exhibit 271. The Court is unable to determine on the basis of this record which of the two exhibits is correct, and thus cannot make a finding as to the grade structure changes that actually occurred.

As a result of the inconsistencies noted above, the Court cannot accurately analyze the reorganization in the East High area that occurred in 1971. It does appear, however, that the restructuring had a neutral racial effect upon Lincoln Middle School and East Senior High School. The percentage black students enrolled at East Senior High School declined slightly for the 1971–72 school year. Moreover, while East remained above the system average, the percentage black students enrolled at Lincoln was, after its conversion to a middle school, below the junior high school average. From a facility utilization viewpoint, the previous underutilization of both schools increased greatly. No inference of segregative intent arises from this grade restructuring since it was insignificant in terms of racial effect.

As noted above, concomitant with the grade structure changes at Lincoln Middle School and East Senior High School, Haddow, Harrison, Madison and Richey Elementary Schools all became kindergarten through sixth grade schools for the 1971–72 school year thus joining Roosevelt and White in such a grade structure. (Px 271). There has been no showing that such was in fact segregative in effect or intention.

For the 1972–73 school year, the grade structure of Richey Elementary School was

changed from kindergarten through sixth grade to first through sixth grade. (Px 271). The record does not disclose to which school kindergarten students from the Richey area were reassigned; nor does it indicate the reason for this grade restructuring. As a result thereof, Richey's underutilization increased. The percentage black students in Richey's student population likewise increased from 56.4% for the 1971–72 school year to 63.2% for the 1972–73 school year. It is not logical to attribute such increase to the mere loss of the kindergarten. Moreover, said increase was substantially the same as the increase in the percentage black students on the elementary school level throughout the system. The racial effect of this grade restructuring at Richey appears to have been neutral.

In 1974, as stipulated by the parties, Coitsville Elementary School was closed and all of its students were reassigned to Mary Haddow Elementary School. (Stip. 225).

|  | 1973–74 | | 1974–75 | |
|---|---|---|---|---|
| Coitsville | −108 | 17.4% | | |
| Haddow | −105 | 58.1% | −97 | 52.3% |
| Roosevelt | −82 | 41.8% | −72 | 47.8% |
| Richey | −75 | 64.6% | −35 | 70.2% |
| Thornhill | −209 | 88.5% | −203 | 93.5% |
| White | +40 | 83.6% | −5 | 86.2% |
| Total Elementary | | 43.7% | | 45.2% |
| Total System | | 45.5% | | 46.7% |

The eastern boundary of Haddow was expanded to take in the entire area previously within the Coitsville attendance district. As a result thereof, 123 white students and 26 black students were transferred to Mary Haddow. (Stip. 227).

Concurrent with the expansion of Haddow's eastern boundary was the contraction of its western boundary. This entailed the reassignment of 77 students, the majority of whom were black, to Roosevelt and Richey Elementary Schools. (Stip. 226). The Haseltine area which was within walking distance of Roosevelt was returned thereto

---

34. Thus, if plaintiffs' exhibit 271 is correct, it appears that the recommendations made in the 1964 Report were, with the exception of Harrison and Roosevelt Elementary Schools, implemented for the 1968–69 through 1970–71 school years. (Px 229). See discussion of 1964 Report supra at 52–54.

from Haddow according to the testimony of plaintiffs' expert William Lamson. This is consistent with the report entitled "Suggested Relocation of Coitsville Pupils" which provides that Coitsville's entire student body could be transferred to Mary Haddow if certain changes were made. (Px 246). Said report also suggests the transfer of students residing in the Kennedy Park Terrace area to Richey Elementary School through the use of transportation.[35] This suggestion apparently was adopted since the parties stipulated that Richey's southern boundary was extended to the southeast in order to incorporate Kennedy Park Terrace. (Stip. 222).

Stipulation 222 further provides that Kennedy Park Terrace had previously been an optional zone between Roosevelt and Mary Haddow Elementary Schools. This stipulation, if referring to the immediately preceding period, is, however, in conflict with the above discussed transfer of Kennedy Park Terrace to Mary Haddow in June 1971. (Px 249). Additionally, the 1974 Report on the relocation of Coitsville pupils shows the number of children attending Mary Haddow from Kennedy Park Terrace. (Px 249). Likewise, there is in the record a copy of a letter sent to parents regarding the closing of Coitsville which provides that students residing in the Kennedy Park Terrace area had been attending Haddow as room was available, but that such space no longer existed. (Px 287). In view thereof, the parents were informed that their children would be transferred to Richey, effective September 4, 1974, and that bus transportation would be furnished by the school system. Thus, the Court finds stipulation 222 describing Kennedy Park Terrace as an optional zone to be incorrect herein.

The 1974 Report on Coitsville also recommended the transfer of eight students residing on Oak Street from Richey to Roosevelt Elementary School. Such recommendation was apparently adopted in view of

the parties stipulation that the southern boundary of Richey was contracted in 1974 to transfer to the Roosevelt attendance district the northern section of Oak Street from Lansdowne to Excelsior. (Stip. 221). This particular change is not, however, shown on the 1976 elementary school overlay.

The fourth reassignment effected pursuant to the 1974 Report was the reestablishment of kindergarten classes at Richey Elementary School. As a result, the grade structure at Richey was changed from first through sixth grade to kindergarten through sixth grade for the 1974–75 school year. (Px 271).

The parties further stipulated that at the 1974 closing of Coitsville, Thornhill Elementary School had 83 empty seats for the 1974–75 school year. (Stip. 228). Despite such stipulation, plaintiffs' exhibit 158 lists Thornhill's enrollment for said school year as 247 students which resulted in its being underutilized by 203 students. No explanation for such discrepancy has been provided the Court, and thus the Court is unable to accurately determine the underutilization of Thornhill for the 1974–75 school year. Stipulation 228 implies that Coitsville students could have been transferred to Thornhill. It appears, however, that the only portion of Coitsville's attendance area within walking distance of Thornhill Elementary School was predominately black in its residential population. A transfer thereof would have, in all probability, only served to increase Thornhill's number of black students when it was already 88.5% black in the 1973–74 school year. Therefore, it appears that Thornhill was not a realistic integrative alternative in 1974.

Following the 1974 closing of Coitsville Elementary School and the reassignment of its students, the percentage black students attending Mary Haddow Elementary School decreased for the 1974–75 school year. As a result, said percentage was closer to the

---

**35.** Due to the location of Kennedy Park Terrace, students residing therein had to be transported to whichever elementary school they were assigned. Thus it is not significant that transportation was suggested and needed here.

elementary average, although still above the same. The reassignments were not unreasonable from a utilization standpoint since Haddow was still underutilized.

The part of Oak Street transferred to Roosevelt Elementary School from Richey was predominately white in its residential population according to the 1970 census map. As indicated above, the 1974 Report notes that only eight students were involved in such transfer. It would thus appear that this reassignment could have only a minimal racial effect, if any. The students residing in the Haseltine area returned to Roosevelt were, as stipulated by the parties, predominately black. As a result, the percentage black students at Roosevelt increased. Nevertheless, Roosevelt was then only slightly above the system average in its percentage black students. The reassignment was not an unreasonable administrative action in that Roosevelt was underutilized to approximately the same extent both prior to and after the same.

Similarly, the percentage black students enrolled at Richey Elementary School increased for the 1974–75 school year. Although such increase may have resulted from the inclusion of Kennedy Park Terrace within the Richey attendance district, such transfer involved the reassignment of only 33 pupils according to the 1974 Report. Moreover, said report indicates that Roosevelt acquired only 8 students from Richey in the transfer of the predominately white Oak Street area. On balance, these two reassignments probably served to increase Richey's black student population. Richey was, however, considerably above the system average prior thereto. In view of the foregoing, the actions taken with regard to Richey Elementary School were not reasonably significant in their racial effect. Such were also insignificant in terms of facility utilization.

The closing of Coitsville Elementary School was administratively sound because of the condition and age of this facility. Overall, the racial effect of the student reassignments made at that time was neutral. Moreover, such were generally rea-

sonable from the standpoint of efficient facility utilization. Thus, the credible evidence does not establish that the reassignments made at the close of Coitsville were anything other than racially neutral actions.

In September 1974, those students residing in the Hubbard Road area north of Thornhill Avenue, who were being transported to Harding Elementary School, were transferred to McKinley Elementary School. (Px 221).

| | 1972–73 | | 1973–74 | | 1974–75 | |
|---|---|---|---|---|---|---|
| Harding | −44 | 20.6% | −86 | 28.4% | −108 | 34.9% |
| McKinley | −148 | 21.7% | −105 | 18.0% | −129 | 16.8% |
| Harrison | −113 | 74.4% | −165 | 77.8% | −141 | 82.0% |
| Total Elem. | | 46.8% | | 43.7% | | 45.2% |
| Total System | | 44.7% | | 45.5% | | 46.7% |

This reassignment was assertedly effected due to overcrowding at Harding Elementary School and a declining enrollment at McKinley Elementary School. (Px 221). It is described in the stipulations as a boundary change; the parties stipulated that the eastern boundary of McKinley was expanded to incorporate the northern half of the Harrison attendance district which consisted of the area north of Hubbard Road and Thornhill Avenue. (Stip. 191). As further stipulated, this northern section was predominately white in its residential population, while the southern half of the Harrison attendance district was predominately black in its residential population according to the 1970 census data. (Stip. 191).

Although plaintiffs' exhibit 221 and stipulation 191 provide that this Harding to McKinley transfer occurred in September 1974, other evidence in the record indicates that such was, in fact, initiated in September 1973. There is a memorandum, dated December 11, 1972, from the principal of Harding Elementary School to the Pupil Personnel Department which states that Harding was overcrowded and that such situation would become "impossible" in September 1973. (Px 295). It is further noted therein that 37 students were then bused to Harding which students apparently resided north of Thornhill Avenue in the Harrison

attendance district. The memorandum concluded by requesting that a study be made of the possibility of reassigning these 37 students to McKinley, Richey, or even Coitsville Elementary School in order to relieve the overcrowded situation at Harding. (Px 295).

Following the above described memorandum was a letter to Superintendent Robert L. Pegues, Jr., from Irene Ward, Director of Personnel, dated December 19, 1972. (Px 295). Therein it is stated that the 37 children being transported to Harding Elementary School were in fact those residing in the Hubbard Road area of the Harrison Elementary School attendance district. It was further acknowledged that these students were transported to Harding to appease the parents in the area who were dismayed by the closing of Old Harrison Elementary School. Further, Miss Ward stated that it was time to restudy the situation and that it may have been possible for these 37 students to walk to Harrison Elementary School. On the other hand, if transportation was necessary, it would have been logical to transport these students to McKinley Elementary School, and not Coitsville. Moreover, the letter indicated that a question remained as to whether Harrison could accommodate these students since in the past its sixth grade students had to be transported to Madison Elementary School. The letter concluded by advising that, if the original families to whom the promise was made upon the closing of Old Harrison were still residing in the area, opposition could be encountered in trying to make changes. (Px 295). At the bottom of this letter a handwritten note provides that Miss Ward called Superintendent Pegues who approved the transfer of the subject students to McKinley for implementation in September 1973. (Px 295).

The third document indicating that this reassignment from Harding to McKinley occurred in September 1973 is a letter to parents from Harold J. Kennedy, Co-ordinator of Visiting Teacher Services. (Px 295). Said letter states that, due to its heavily overcrowded condition, Harding Elementary School would no longer be able to accommodate those students transported thereto beginning in September 1973. Instead, such students were to be transported to McKinley Elementary School where ample space was available.

Upon review of all the evidence, the Court concludes that the transfer of the students residing in the Hubbard Road area from Harding Elementary School to McKinley Elementary School occurred in September 1973. Although this conflict in the record is thereby resolved, another conflict is presented by the data. As noted throughout the exhibits discussed above, this reassignment was purportedly necessitated by the overcrowded condition at Harding and the declining enrollment situation at McKinley. The utilization figures presented to the Court in plaintiffs' exhibit 158, however, do not support these statements.

Plaintiffs' exhibit 158 indicates that for the 1972–73 school year, Harding was underutilized by 44 students, McKinley was underutilized by 148 students, and Harrison was underutilized by 113 students. These three elementary schools continued to be underenrolled in 1973–74: Harding had 86 empty seats; McKinley had 105 available seats; and Harrison had 165 unused places. (Px 158). There is no explanation in the record for the discrepancy between the statements in the documents made contemporaneous with the decision to reassign and upon which said decision was apparently predicated, and the utilization figures provided the Court. The actual utilization figures are not of prime importance, however. Rather, the Court is concerned with the rationale and motives of the school officials. Thus the Court shall rely on the documents antedating the 1973 reassignment in analyzing the same.

The racial effect of the reassignment of the students residing north of Thornhill Avenue in the Harrison attendance district to McKinley Elementary School was segregative. The area within which these students resided was predominately white in its resi-

dential population according to the 1970 census map. Thus these predominately white students were reassigned and transported to a school in which the percentage black enrollment was significantly below the elementary school average instead of to their neighborhood school which was a racially identifiable black school. The apparent reasons for this deviation from a neutral neighborhood school policy were the facility utilization problems described in the above discussed documents.

NORTH ZONE

Although the North district was not one of the original six districts planned in the 1921 Survey, it is apparent from the evidence that population trends and patterns necessitated the installation of a complete school system in this area. Over the years, the following schools were utilized in this district: Scienceville and North High School; North and Sciencehill Junior High Schools; and Coitsville, Scienceville, Sciencehill, Thornhill, and White Elementary Schools.

As of 1940, the evidence indicates that the North district consisted of the following schools: Coitsville (1910), Scienceville (1912), Thornhill (1916), and White (1926) Elementary Schools; and Scienceville High School (1925) which apparently served grades seven through twelve. (Px 78). However, stipulation 117 provides that in 1940 Sciencehill and White Elementary Schools each received an addition of two rooms. As will be developed below, Sciencehill Elementary School was not commissioned until 1955. Thus, stipulation 117 is unquestionably in error insofar as it asserts the existence of a Sciencehill Elementary School. If this stipulation is referring to Scienceville Elementary School, it is also in error since that building did not receive an addition in that year. (Px 78). However, Scienceville High School did receive an addition. (Px 78).

The attendance districts served by Scienceville and White Elementary Schools were occupied by white residents. Immedi-

ately to the north thereof was located Thornhill Elementary School; the attendance area of said facility was occupied primarily by black residents. (Stip. 117).

The 1945 Study recommended the closure of the Scienceville Elementary School building and the transfer of its students to the south wing of the then existing Scienceville High School building and John White Elementary School. (Px 78). It further recommended that the Scienceville High School building be converted for the use of elementary and junior high school students, and that Scienceville High School students, grades ten through twelve, be assigned to East High School.

The 1952 Report makes the same recommendations, although it refers to the Scienceville High School building as the Old North High School building. (Px 83). It is thus apparent that at sometime between 1945 and 1952 the Scienceville High School building was recommissioned North High School.

The parties have stipulated that the western boundary of Sciencehill Elementary School was contracted to transfer a section of its attendance area to White Elementary School in 1946. (Stip. 207). As Sciencehill Elementary School had not been commissioned as of 1946, the stipulation is obviously in error. Presumably, the parties were referring to a transfer from Scienceville Elementary School, which was found in the 1945 Study to be structurally deficient, of a portion of its attendance area to White.

As this record contains no racial composition data prior to 1952, the Court is unable to ascertain the racial effect of any of the actions of defendant School Board in the 1940's.

No further actions were taken in the North zone until 1954, the year of the *Brown* decision. The parties have stipulated that, in that year, White Elementary School received an eight room addition. (Stip. 120). However, defendants' exhibit P-25 establishes that said facility opened in 1926 with four rooms. Recalling that in 1940 there was a two room addition to this

# 1018

facility, that in 1964 six classrooms were added, and the indisputable fact that this facility has never had more than fourteen rooms, it is apparent that stipulation 120 is in error. The Court finds from review of plaintiffs' exhibit 85, defendants' exhibit P-25, and the testimony of William Wayson, Tr. Vol. 12, 2617-2620, that in 1954 two temporary prefabricated rooms were added to this facility. Thus as of that year, White Elementary School had a total of 8 classrooms, and an optimum utilization of 240 students.

|  | 1952-53 |  | 1958-59 |  |
|---|---|---|---|---|
| White | +14 | 2.0%, | -10 | 17.4% |
| Scienceville | +4 | . | Facility closed. |  |
| Richey | +2 | 0.0% | +43 | 2.2% |
| Madison | -52 | 21.0% | +119 | 38.0% |
| Total Elementary |  | 20.1% |  | 29.4% |
| Total System |  | 18.6% |  | 26.3% |

It is apparent that the addition of two rooms to White Elementary School did not directly alter the racial composition of its students. However, two years prior to this addition, in the 1952-53 school year, White was overutilized. Further, each of the contiguous school districts, with the exception of Madison, were also overutilized in that year. The transfer of white students to Madison would have necessitated transportation, thereby increasing the school system's operating costs as well as deviating from the system's neighborhood school policy. In view of these facts, it is apparent that the subject addition to White was an administratively reasonable choice.

In 1955, a new North High School facility opened with 24 classrooms and an optimum utilization of 600 students. (Stip. 118). Said facility was built upon the grounds of, and apparently in close geographic proximity to, the old North Junior and Senior High School, formerly known as Scienceville High School, which as of 1952 had 26 classrooms and an optimum utilization of 650 students. Upon the opening of the new North High School, the old structure was recommissioned Sciencehill Junior High and Elementary School.[36]

|  | 1952-53 |  | 1958-59 |  |
|---|---|---|---|---|
| North Jr. & Sr. | +85 | 34.5% |  |  |
| North Sr. |  |  | -108 | 35.0% |
| Rayen Sr. | -238 | 19.5% | -344 | 25.0% |
| Wilson Jr. & Sr. | -457 | 0.7% | -227 | 0.8% |
| Sciencehill Jr.[37] |  |  |  | 40.0% |
| Sciencehill Elem. |  |  |  | 48.0% |
| Total Senior |  | 14.4% |  | 18.8% |
| Total Junior |  | 21.1% |  | 24.7% |
| Total Elem. |  | 20.1% |  | 29.4% |
| Total System |  | 18.6% |  | 26.3% |

Analysis of the racial effect of this reorganization is complicated both by the number of facilities involved and by the paucity of data for the relevant years. For example, no racial composition data exists in this record for Scienceville Elementary School, which was closed upon the commissioning of Sciencehill in 1955 pursuant to the rec-

**36.** Plaintiffs' exhibit 85 states that as of May 1970, Sciencehill had 30 classrooms; however, this record does not establish when the additional 4 classrooms were constructed.

■

**37.** Old North High School was recommissioned Sciencehill Elementary and Junior High School in 1955. However, no data contained in this record demonstrates which portions of said facility were assigned to each usage. It is therefore impossible to ascertain the optimum utilization figures for said facilities' junior high and/or elementary school functions. This paucity of data, combined with plaintiffs' failure to demonstrate the date of the four room addition referred to in footnote 36, renders impossible reference to school utilization in analysis. Further, while plaintiffs have listed the capacity of said structure at 900 students, there has been no demonstration as to the basis for said computation. (Px 158). As previously noted, prior to 1960 this school system employed a 25 student per classroom optimum utilization figure for junior and senior high schools while employing a 30 student per classroom optimum utilization figure for elementary school classrooms. Assuming that the 4 classroom addition to the old North High building occurred after the opening of Sciencehill in 1955, since no change is listed in that year, said structure would have had a 650 optimum utilization for junior high school students or a 780 pupil optimum utilization for elementary school students. Since said structure was used for both purposes, however, it is impossible to ascertain the optimum utilization figures relied upon by the school officials in making their determinations. For this reason, the Court cannot pursue any detailed utilization analysis herein.

ommendations of the 1945 Study and 1952 Report. Further, there is no utilization and racial composition data for the years immediately preceding and immediately after the opening of these facilities. However, it is apparent that during the 1952–53 school year, the North Junior and Senior High School facility was overutilized by 85 students. During the 1958–59 school year, North Senior High School, which no longer enrolled junior high school students, was underutilized by 108 students. It is therefore clear that a need for increased capacity in this district existed at the time the new North High School was built. However, in 1958–59, North Senior High's percentage black enrollment was approximately the same as that of Sciencehill Junior High. While the black enrollment at Sciencehill Elementary School was substantially greater than the elementary school average, it appears that this difference resulted primarily from the increasing number of black students enrolled in the system's elementary schools, as demonstrated by the 9.3% increase in the number of black elementary school students enrolled in the system between 1952 and 1958. Scienceville Elementary School was found in the 1945 Study to be structurally deficient; therefore, its closure was recommended. The 1952 Report, as one of its alternative recommendations, suggested converting Old North High School into an elementary and junior high school. It is clear that such utilization of a serviceable structure was more cost efficient. The Court finds no basis for concluding that the building of North Senior High School, the closing of Scienceville Elementary School and the opening of Sciencehill Elementary and Junior High School was either segregative in effect or evidence of intentional segregative action.

The parties have stipulated that in 1956 the western boundary of Thornhill Elemen-

tary School was contracted to transfer to Sciencehill Elementary School an area bound on the north by Datson and Edgar Streets, on the east by Jacobs Road, on the south by McGuffey Road, and on the west by Dudley. (Stip. 215). However, this stipulation directly conflicts with the elementary school overlays drawn by plaintiffs' expert William Lamson. The 1955–56 overlay, which assertedly shows the boundaries as of that year and which incorporates all boundary changes prior thereto, shows the above described area as already comprising part of the Sciencehill Elementary School attendance district. In accordance with this first overlay is the 1960–61 elementary overlay which does not show the boundary change between these two schools in this area.

| | 1952–53 | | 1958–59 | |
|---|---|---|---|---|
| Sciencehill Elem. | | | | 48.0% |
| Thornhill [38] | +155 | 83.3% | +51 | 96.0% |
| Coitsville | +26 | 0.0% | +26 | 10.4% |
| Total Elementary | | 20.1% | | 29.4% |
| Total System | | 18.6% | | 26.3% |

Assuming that the stipulation is correct, the area transferred to Sciencehill consisted of about one-half majority white residential blocks and the other half majority black residential blocks according to the 1960 census map. However, since there are no racial composition figures available for 1956 or 1957, the precise effect of this transfer upon said schools cannot be ascertained. The Court notes that the percentage black student enrollment at both schools was above the total elementary school average. However, from an optimum utilization standpoint, such a transfer would have significantly relieved Thornhill's overcrowding. While a transfer of a part of Thornhill's attendance area to Coitsville would have been more integrative in effect, Coitsville was overutilized in both 1952–53 and 1958–59 and such a transfer would un-

**38.** Plaintiffs' exhibit 83 provides that Thornhill had 12 classrooms and a maximum optimum utilization of 360. According to defendants' exhibit P–22, Thornhill originally had 12 classrooms and received a 2 classroom addition in 1958. Thus said exhibit shows Thornhill with a total of 14 classrooms and a maximum opti-

mum utilization of 450. Based on said figure, however, it appears that 3 classrooms were in fact added to Thornhill. Such was the case according to plaintiffs' exhibit 85 and stipulation 120 discussed below. Thus the Court finds defendants' exhibit P–22 to be in error; in 1958 Thornhill received a 3 room addition.

doubtedly have required costly transportation.

In 1958, three classrooms were added to Thornhill Elementary School. (Stip. 120). As Thornhill's percentage black student population was already well above the system average in 1952–53, it could be argued that said action constituted an attempt by the school officials to concentrate the black population in the Thornhill attendance area. However, it is apparent that Thornhill was significantly overutilized and that its contiguous schools provided no reasonable opportunity for relief therefrom. Therefore, this addition to Thornhill constituted a reasonable administrative reaction to overcrowding in this facility.

The parties have stipulated that in 1959 the southern and western boundaries of Sciencehill Elementary School were contracted to transfer an area south of Early and Liberty Roads to White Elementary School. (Stip. 209). Said stipulation further provides that said area was predominately white in its underlying residential population according to both the 1950 and 1960 census. However, the 1960 elementary school overlay does not fully reflect such a change. Said overlay demonstrates a transfer of only the Early Road area to the White attendance district. While this overlay's failure to include the Liberty Road area in the subject transfer contradicts the subject stipulation, it is in conformity with the February 16, 1959 boundary description for White contained in plaintiffs' exhibit 19.

|  | 1958–59 |  | 1961–62 |  |
|---|---|---|---|---|
| Sciencehill Elem. |  | 48.0% |  | 50.0% |
| White Elem. | -10 | 17.4% | -16 | 75.9% |
| Total Elementary |  | 29.4% |  | 33.2% |
| Total System |  | 26.3% |  | 29.8% |

In the year preceding this transfer to White, said school's percentage black student population was substantially below the elementary average. Thus, at first glance, it would appear that the transfer of a predominately white residential area to White was segregative in effect. However, two years after this transfer 75.9% of White's student population was black. As there was only one other intervening alteration to White's attendance area, and as neither of these changes could possibly explain this radical increase in the percentage black student population at White, it is reasonable to infer that there is either a mistake in the racial percentages given by the plaintiffs or that the racial character of this attendance area changed markedly in a very short period of time. If the first alternative comports with fact, further analysis is impossible. If the second alternative is accepted, it is most probable that in the year of the subject boundary change White's percentage black student population was significantly higher than it was in 1958–59; in this event, the transfer of a predominately White residential area to White might well have been integrative in effect. In summary, the Court cannot ascertain the racial effect of this transfer.

Neither can the Court precisely analyze the existence of any sound, racially neutral administrative criteria for effecting such a transfer. As previously noted, the evidence does not establish the optimum utilization figures for Sciencehill Elementary and Sciencehill Junior High Schools as separate institutions. Nor does the evidence, prior to 1964, provide a reasonable basis for determining the optimum utilization of said facility for its combined functions. While there is evidence from which the enrollment in said institution can be ascertained for the year 1958–59, no such evidence exists for the year 1961–62 nor for the intervening years. Yet it is clear that White was underenrolled during the school year immediately prior to this transfer; therefore, it is apparent that White could have absorbed at least some of the students transferred to it pursuant to this assumed transfer.

Although not elsewhere documented, the 1960–61 overlay for elementary schools shows a boundary change between Thornhill and Coitsville Elementary Schools. This transfer added a black residential area to Coitsville. However, since the Court cannot ascertain the year in which such transfer occurred, it cannot analyze either the racial or non-racial factors which may

have caused such transfer. However, the Court notes that in 1958–59 Coitsville enrolled only 10.4% black students. If the subject transfer occurred immediately prior to this year or the following school year, it is reasonable to infer that such transfer was integrative in effect.

Stipulation 212 provides that in 1961 Coitsville's western boundary was contracted to transfer a portion of its attendance area to the then newly built Mary Haddow Elementary School. Stipulation 213 provides that the transferred area contained all of the blacks residing within the Coitsville district; it further provides that an option was given to the students residing within such transferred area, and said students were permitted to continue to attend Coitsville Elementary School at their own transportation expense. However, examination of the 1960 census map reveals that, contrary to stipulation 213, not all of the black residential areas within the Coitsville attendance area were transferred to Mary Haddow.

|  | 1958–59 | | 1961–62 | |
| --- | --- | --- | --- | --- |
| Coitsville | +26 | 10.4% | −55 | 0.0% |
| Haddow |  |  | −141 | 16.3% |

Coitsville's racial composition figures for 1961–62 gives added support to the statement in stipulation 213 that all of the blacks residing within the Coitsville attendance area were by this transfer reassigned to Mary Haddow. Perhaps the inconsistency between the stipulation and the census map can be resolved by concluding that while black residential areas did remain within the Coitsville attendance district, the same included no black elementary school age children; the only other alternative is a mistake in the map drawn by plaintiffs' expert. In any event, assuming that all black students residing within Coitsville's attendance area were in fact transferred to Mary Haddow, such is certainly less than significant. Both Coitsville and Mary Haddow were, in 1961–62, significantly below the system average. Coitsville was, in the year next preceding the subject change for which figures are available, overutilized.

Therefore, a reasonable basis for the subject transfer existed. In view of these facts, the Court concludes that this transfer does not evidence segregative effect or intent.

The parties have stipulated that in June, 1961, a thirteen block area bound on the south by Stewart, on the east by Dean, on the north by McGuffey, and on the west by Homewood was transferred from John White to Warren Richey Elementary School. (Stip. 217, Px 249).

|  | 1958–59 | | 1961–62 | |
| --- | --- | --- | --- | --- |
| Richey | +43 | 2.2% | −19 | 15.5% |
| White | −10 | 17.4% | −16 | 75.9% |
| Total Elementary | . | 29.4% |  | 33.2% |
| Total System |  | 26.3% |  | 29.8% |

However, the 1965 elementary overlay shows the east boundary to be between Scioto and Dean, and the west boundary to be Magnolia. There is no Homewood on the map in this area.

The area transferred from White to Richey contained four blocks composed of 14% to 25% black residents and one block of 25% to 50% black residents, according to the 1960 census map. The remaining blocks were less than 14% black according to said census map. While the area transferred to Richey was predominately white in character, it is probable that this action was integrative as to it. It is most unlikely that this transfer and the one effected in 1959 affecting White's boundaries constitute the sole causes for the significant increase in White's percentage black student population. It is also clear that such transfer had a reasonable basis in terms of facility utilization. In the year of the transfer, Richey remained 19 students underutilized even after receiving additional students from White. Yet White remained underutilized by only 16 students.

According to the stipulations, the southeastern boundary of Sciencehill Elementary School was contracted in 1961 to permit the formal transfer of part of its attendance area to Mary Haddow and Coitsville. The area transferred from Sciencehill was predominately white in its underlying residen-

tial population based on the 1960 census data. (Stip. 209). This boundary change was probably made in June 1961 in connection with the opening of Haddow and with the transfer of territory between Coitsville and Haddow. However, the 1965 elementary school overlay does not show such a change. Moreover, according to the 1960 census map, the southeastern corner of the Sciencehill attendance district was majority black in it residential population. Assuming that the stipulation is correct, it is apparent that said transfer was segregative in effect. However, the precise extent of said effect cannot be ascertained except to note that in the year of this change Sciencehill Elementary School's black population was 50%, up from 48% three years prior; that 1961 was the first year in which the record demonstrates the percentage black enrollment at Mary Haddow; and to again observe that Coitsville's percentage black student population dropped to 0% in this year. Utilization analysis of this transfer cannot be effected since the record does not contain utilization figures for Sciencehill Elementary School as a separate facility; however, the Court observes that both Haddow and Coitsville were underutilized even after this transfer.

Of course, if the overlay drawn by the same person drafting said stipulation is correct, the racial effect of this action was clearly integrative. The Court cannot ascertain whether the overlay or the stipulation is correct. Therefore, the Court finds no basis in this record for concluding that said transfer constitutes a racially segregative action.

In 1965, six classrooms were added to White Elementary School. (Stip. 127).

| | 1963-64[39] | | 1967-68 | |
|---|---|---|---|---|
| White | +12 | 72.7% | -39 | 82.2% |
| Richey | -13 | 30.9% | -79 | 47.2% |
| Sciencehill Elem. | | 74.2% | | 77.4%· |
| Harrison | -37 | 64.2% | -47 | 69.8% |
| Madison | -163 | 50.0% | -150 | 67.6% |
| Total Elementary | | 39.1% | | 44.9% |
| Total System | | 35.1% | | 39.6% |

This addition brought the total number of classrooms at White to twelve.[40] It is apparent that the addition to this facility did not constitute a relocation or redistribution of the black students in this residential area. From review of the percentage black student enrollment statistics for the contiguous school areas, it is apparent that each of said schools, with the exception of Richey, were substantially above the elementary school average in the 1963–64 school year. Since by the 1967–68 school year even Richey's percentage black student composition had risen above the elementary school average, it is probable that by 1965 said facility's percentage black student enrollment was at or substantially near the elementary school average.

In the school year next preceding this addition, White was overutilized; therefore, from a utilization standpoint this addition was necessary. While both Madison and Harrison were underutilized at this time, each of these schools were also substantially above the elementary school average in black student enrollment. Therefore, any integrative effect in transferring students from White to these facilities would have been minimal; further, it is quite probable that such reassignments would have necessitated costly transportation. The Court concludes that this addition comports with a neutral neighborhood school policy and with reasonable utilization of facilities.

**39.** The utilization figures are based on the May 1964 Report regarding East High School, plaintiffs' exhibit 229.

**40.** As previously stated, this facility opened with four classrooms, and received an addition of two classrooms in 1940. In 1954, this facility received a temporary, prefabricated addition of two classrooms. Thus the addition in 1965 brought the total number of classrooms at this facility to 14; however, it appears from the evidence that the two prefabricated classrooms added in 1954 were not utilized after the 1965 addition at White. Therefore, the Court finds that after said addition, the optimum student utilization at White was 360 students based on 12 classrooms. It appears that plaintiffs also reached this conclusion as demonstrated by their exhibits and by the testimony of William Wayson.

In August 1967, the area described above as having been transferred to Warren Richey Elementary School in June 1961 was returned to John White Elementary School. (Px 249). Thus the southern boundary of White's attendance district was expanded to incorporate part of its former territory. (Stip. 218). Said area was majority black in its residential population according to the 1970 census map. It must be recalled that White had recently received an addition of six classrooms in 1965, the need for which was recognized in the May 1964 Report on the East High School area. (Px 229). While Richey also received a two room addition in 1964, the need for which was also recognized in the May 1964 Report, it does not appear to have been unreasonable to return this area to White where it had been assigned for years.

Since the area returned to White was predominately black, White's percentage black students increased. However, White was, even prior to this change, substantially above the elementary school average and thereafter Richey's percentage black student population was above the elementary school average. It appears that this transfer reinstalled the subject students into the East feeder pattern. From this viewpoint, the effect of this transfer was apparently integrative. In 1967–68, 32.9% of the students at East Junior and Senior High School were black; during the same school year, North's percentage black enrollment was 65.7%.

In 1968, Sciencehill Elementary School's southern and western boundaries were expanded. As stipulated, the census data for 1960 and 1970 indicates that the area transferred to White from Sciencehill in 1959 and returned to Sciencehill in 1968 had changed in the makeup of its residential population from predominately white in 1960 to predominately black in 1970. (Stip. 210).

| | 1967-68 | | 1968-69 |
|---|---|---|---|
| Sciencehill Elem. | 77.4% | | 71.1% |
| White | -39 | 82.2% | +2 | 81.8% |
| Total Elementary | 44.9% | | 43.1% |
| Total System | 39.6% | | 41.0% |

Both White and Sciencehill Elementary Schools were substantially above the system average in both 1967–68 and 1968–69. Thus, as between these schools, this reassignment was racially neutral in effect. However, even after transferring this block of students to Sciencehill, White Elementary School was overutilized in the 1968–69 school year. This reassignment therefore appears reasonable in view of utilization of the subject facility.

In August 1968, the Thornhill Elementary School attendance district was expanded to include a portion of the Sciencehill attendance area. This area included McGuffey Road from Lloyd to Jacobs Road. (Px 249). According to the 1970 census map, the area transferred from Sciencehill to Thornhill was predominately black in its residential population.

| | 1967-68 | | 1968-69 | |
|---|---|---|---|---|
| Thornhill | -155 | 93.2% | -85 | 92.1% |
| Sciencehill | | 77.4% | | 71.1% |

Both of these facilities were substantially above the system average in percentage black student enrollment. Therefore, the Court concludes that this transfer had no discriminatory racial effect. It is clear, however, that the transfer of students from Sciencehill to Thornhill substantially reduced the latter facility's underutilization in the 1968–69 school year. It thus cannot be said that this reassignment totally lacked administrative basis; however, in view of the probable underutilization at Sciencehill, said transfer may evidence poor administrative judgment.

In September 1969, Sciencehill Elementary School was closed and its students were reassigned to John White, Thornhill, Coitsville, Warren Richey, and Mary Haddow Elementary Schools. (Px 221). Sciencehill Junior High School was not closed at this time. The students transferred to Thornhill lived within walking distance of said school. However, the students reassigned to Coitsville, Richey, White, and Haddow Elementary Schools required transportation thereto.

The stipulations provide that according to the 1970 census data, the area transferred

to White from Sciencehill was predominately black in its residential population. (Stip. 210). Similarly, the 1970 census map reveals that the areas transferred to Coitsville and Haddow were predominately black residentially. The area transferred to Thornhill was majority black in its residential population and that assigned to Richey was not quite majority black residentially.

|  | 1968-69 | | 1969-70 | |
|---|---|---|---|---|
| Sciencehill |  | 71.1% | | |
| White | +2 | 81.8% | +46 | 79.6% |
| Thornhill | -85 | 92.1% | -104 | 93.4% |
| Coitsville | -66 | 0.5% | -34 | 19.9% |
| Richey | -56 | 57.6% | +8 | 65.7% |
| Haddow | -65 | 26.5% | -85 | 35.5% |
| Total Elementary | | 43.1% | | 44.7% |
| Total System | | 41.0% | | 42.7% |

The only racially identifiably black schools experiencing increases in their black student population were Thornhill and Richey. Thornhill's increase was a mere 1.3% while Richey's increase was 8.1%. However, considering that the neighborhoods were becoming increasingly blacker at this time, a portion of the increase in Richey's percentage black student enrollment is probably attributable to this fact. At the same time, however, Coitsville, which was practically an all white school prior to this reassignment, jumped 19.4% in its black student enrollment. Similarly, Haddow, which prior to this reassignment was well below the system average black student population, also experienced an increase in its black enrollment. White Elementary School, which was also racially identifiably black, actually dropped 2.2% in its black student enrollment.

Examination of the optimum utilization figures for said facilities, also infers a lack of any segregative intent involved in these student reassignments. Prior to the reassignment to White, said facility was overutilized; the addition of these students only aggravated said problem, while ameliorating its racial identifiability. Apparently a small number of students was involved in the transfer to Coitsville; they could have easily been absorbed into Thornhill or Haddow, thereby retaining Coitsville as a near-

ly all white school. Further, despite the addition of students to Haddow, said facility experienced an increase in its underutilization after the reassignment. In short, if the School Board maintained a policy of intentionally segregating its schools, it missed a golden opportunity in the reassignments resulting from the closure of Sciencehill Elementary School in 1969. Rather, said reassignments were integrative in effect.

In 1970–71, the grade structure of North Senior High School was changed from nine through twelve to ten through twelve. (Px 271). The ninth grade students residing within the North High district were retained at Sciencehill Junior High School.

|  | 1969-70 | | 1970-71 | |
|---|---|---|---|---|
| North Sr. | -183 | 73.9% | -215 | 73.7% |
| Sciencehill Jr. | -356 | 70.0% | -338 | 70.6% |
| Total Junior | | 51.8% | | 51.6% |
| Total Senior | | 34.1% | | 39.3% |
| Total System | | 42.7% | | 44.1% |

At the time of this grade structure change, both North Senior and Sciencehill Junior High Schools were substantially above the system averages in their black student enrollment. Analysis of the relevant statistics reveals that said grade structure change had a negligible effect upon the racial composition of said schools; upon consideration of this record, the Court can find no adverse racial impact resulting from this grade structure change.

However, prior to this change, both schools were substantially underutilized. This record contains no sound basis for this administrative action; however, it was not discriminatory in effect.

Plaintiffs' expert, William Lamson, testified that the portion of the Richey attendance district transferred to said facility upon the closing of Sciencehill in 1969 was transferred to White Elementary School in 1974. Such testimony is in accordance with the 1976–77 elementary school overlay drawn by the same expert. However, such testimony conflicts with the Boundary Change Report, plaintiffs' exhibit 221, which indicates that the same area was

transferred to White upon the closing of Lincoln in 1971. The record contains no indication as to precisely how Mr. Lamson reached the conclusion that this transfer was effected in 1974. The Court concludes that said transfer actually occurred during the reorganization following the closure of Lincoln in 1971, and has analyzed its effect in the appropriate section.

Effective in the 1974–75 school year, the grade structure change at North High School and Sciencehill Middle School (formerly known as Sciencehill Junior High School) effected in 1970–71 was rescinded. That is, North High School returned to a nine through twelve grade structure while Sciencehill returned to grades seven through eight. (Px 271). This change in grade structure effected no significant changes in the racial compositions of these schools.

In fact, Sciencehill Middle School closed in 1975. (Stip. 143). The grade structure of North High School was expanded to include eighth graders; also, the grade structures of Haddow, Richey, Thornhill and White Elementary Schools were apparently expanded to include seventh grades. The closure of Sciencehill and the grade restructuring to accommodate the same had no significant racial effect and appears to have been administratively sound in view of Sciencehill Middle School's declining enrollment.

### WILSON ZONE

The seven schools comprising the Wilson zone are: Wilson Junior and Senior High School;[41] and Adams,[42] Bennett, Bunn, Jackson, and Taft Elementary Schools.

The record does not reveal any actions taken by the Youngstown school officials in the Wilson attendance area prior to 1952.

**41.** The same facility apparently housed both the junior and senior high school; separate utilization figures for each school are not provided.

**42.** Adams Elementary School accommodated all the eighth grade students in the Wilson zone for a number of years. As a result, Adams is sometimes referred to as a junior high school

In that year 22 classrooms and an auditorium were added to Wilson Junior and Senior High School. (Stip. 119).

| | 1952–53 | |
|---|---|---|
| Wilson Jr. & Sr. | -457 | 0.7% |
| South Sr. | +101 | 9.9% |
| East Jr. & Sr. | +145 | 22.9% |
| Total Jr. | | 21.1% |
| Total Sr. | | 14.4% |
| Total System | | 18.6% |

According to the February 1952 Report on the Youngstown Public Schools, Wilson's optimum utilization figure was 1,025, and for the 1950–51 school year it was overutilized by 85 students. (Px 83). In view thereof, and of the expected population growth in the area, an addition was necessary.

Following the addition, the optimum utilization of Wilson High School was 1,575 based on 25 students per classroom. For the 1952–53 school year, Wilson was underutilized by 457 students. Such underutilization may reflect poor administrative judgment, but the evidence does not establish that this action was segregative in effect or intent.

In 1953, Taft Elementary School received an addition of four classrooms.

| | 1952–53 | |
|---|---|---|
| Taft | +79 | 0.0% |
| Bancroft | -67 | 0.0% |
| Sheridan[43] | -48 | 0.0% |
| Garfield | -160 | 0.0% |
| Bennett | -247 | 7.1% |
| Adams | -317 | 4.8% |
| Total Elementary | | 20.1% |
| Total System | | 18.6% |

The racial effect of the addition cannot be determined due to the lack of relevant data in this record for the year immediately following same. However, since Taft and its contiguous schools had a predominately, if

although the same building housed all students attending Adams.

**43.** According to plaintiffs' exhibit 83, Sheridan had 19 classrooms and a maximum optimum utilization of 570. Defendants' exhibit P–19, however, provides that Sheridan has 20 classrooms and a maximum optimum utilization of 600.

not totally, white student population during the next preceding school year, it appears that this was a racially neutral action.

Prior to such addition Taft was overutilized for the 1952–53 school year by 79 students. The Court is, however, unable to analyze the immediate effect of the addition in terms of facility utilization since enrollment data for 1953–54 has not been provided. Nevertheless, this addition was a reasonable response to the overcrowded condition at Taft. Although the schools surrounding Taft were all underutilized, the construction of an addition was consistent with the belief of school officials in the need for more modern classrooms in areas of rapid population growth such as the south side of Youngstown.

A letter dated September 3, 1954 was sent by Paul C. Bunn, then Superintendent of Schools, to the parents of students in the Youngstown City School District residing on Wingate, Brandon, and Youngstown Poland Roads. (Px 281). As stated therein, said students had been attending the Poland schools pursuant to an arrangement whereby the Youngstown Board of Education paid their tuition. Such arrangement was made at a time when the cost of transporting those few students was greater for the Youngstown Board than the cost of paying tuition to the Poland School District. For the 1954–55 school year, however, the letter states that the number of students then living in the area justified transporting them to the Youngstown Public Schools. As a result, parents were informed by this letter that, beginning on September 8, 1954, students in grades one through six would attend Jackson Elementary School and students in grades seven through twelve would attend Wilson Junior and Senior High School with transportation provided by the school system.

| | 1952–53 | |
|---|---|---|
| Jackson[44] | +29 | 0.0% |
| Adams | -317 | 4.8% |
| Taft | +79 | 0.0% |
| Wilson Jr. & Sr. | -457 | 0.7% |

| | |
|---|---|
| Total Elementary | 20.1% |
| Total Junior | 21.1% |
| Total Senior | 14.4% |
| Total System | 18.6% |

In connection with the aforedescribed letter of September 3, 1954, it should be noted that the Jackson attendance district was located in the extreme southeastern corner of Youngstown, and apparently bordered that of Poland. The area was predominately white in its residential population according to the 1950 census map. The Court, however, cannot accurately appraise the racial effect of this reassignment due to the lack of specific data in the record. Generally, this action appears to have been racially neutral.

According to the February 1952 Report on the Youngstown Public Schools, Jackson had a maximum optimum utilization of 480. (Px 83). Although the record does not contain any data for the years immediately preceding or following this reassignment, it is reasonable to infer that Jackson was also overutilized during these years due to the continued population growth in the area. In view thereof, it appears that Adams Elementary School may have been a more reasonable choice since it was underutilized in 1952–53 and located close to Wilson where the same bus brought the older students. Adams was, however, only 4.8% black for said school year and thus no inference of segregative intent arises from this reassignment. Moreover, reassigning these students to Jackson was consistent with the neighborhood school policy in that Jackson was apparently the closest elementary school.

With regard to Wilson, the Court is again precluded from fully analyzing the reassignment since the applicable data has not been presented. It does appear, however, and the Court so finds that this reassignment was neutral in its racial effect and reasonable from a facility utilization standpoint.

---

44. See footnote 25 at page 1005.

The utilization problem at Jackson appears to have worsened during the next two years. In a letter dated August 28, 1956, J. Fred Essig, then Superintendent of Schools, informed parents of sixth grade students within the Jackson district that Jackson could no longer properly accommodate all the students residing in its area. (Px 281). Consequently, it was determined that the sixth grade students would have to be transported to another school. The letter further provides that a survey of available space revealed two possibilities: one was within a junior high school; and the other was at Adams Elementary School. After discussion, it was deemed advisable to reassign the sixth graders to Adams since it had a lunch room, gymnasium and auditorium. As stated in the letter this appeared to be a "happy" solution until construction of a new building in the Poland Country Club section. Thus for the 1956–57 school year, Jackson Elementary School served students in grades one through five, while sixth grade students from its attendance area were transported to Adams.

As discussed above, Adams seems to have been a logical choice since it was a large facility with a maximum optimum utilization of 690 students, and since it was contiguous to Jackson. In terms of racial significance, this reassignment was neutral since the entire southeastern section of Youngstown was residentially white, and the percentage of black students at schools within the Wilson zone was considerably below the system average.

Despite the reassignment of sixth grade pupils for the 1956–57 school year, the utilization problems at Jackson only continued to worsen. Thus by separate letters dated June 7, 1957, J. Fred Essig, then Superintendent of Schools, informed parents of fifth and sixth grade students residing in the Jackson area of the necessity to transport such students to another school for the 1957–58 school year. (Px 281). Fifth grade students were to be transported to Adams Elementary School, while the sixth grade students were to be bused to Bancroft Elementary School. These letters further advised the parents that rapid progress was being made on the new building on the Poland Country Club site. Mr. Essig indicated that excavation was to start within a relatively short time, and that every effort was being made to have the facility ready for occupancy in September 1958.

Subsequently, in his letter of August 27, 1957, Dr. Essig urged parents of fifth and sixth grade students within the Jackson district to attend a meeting at Jackson regarding the transportation and reassignment of their children to other schools within the city. (Px 281). Such letter reiterated the necessity for this action in the face of Jackson's severe overcrowding. It was further stated that the Youngstown school officials sincerely hoped that this would be the last time that it would be necessary to accommodate Jackson students in this manner. Superintendent Essig expressed the belief that the Paul C. Bunn School on the Poland Country Club grounds would be completed by September 1958.

With regard to Bancroft, the only pre-1958 optimum utilization figures available therefor were those for the 1952–53 school year. In that year Bancroft was underutilized; use of Bancroft to relieve the overcrowded condition of Jackson thus appears to have been reasonable. Although Taft was the next closest contiguous school, it was overutilized for the 1952–53 school year and required an addition in 1953. Despite that addition, Taft was overutilized again in 1958–59. Thus from a facility utilization standpoint, use of Bancroft appears to have been a rational administrative action. Racially, this change was again neutral since the elementary schools within the Wilson district were all predominately white.

Despite the indications in the above described letters, the Paul C. Bunn Elementary School was not completed in September 1958. Rather, Superintendent Essig, in his letter of March 12, 1959, announced the school officials' plan to open Bunn on Monday, March 16, 1959. (Px 281). On that day, the letter indicates that students would

be transported and reassigned to either Bunn or Jackson Elementary Schools.

| | 1958-59 | |
|---|---|---|
| Bunn | | |
| Jackson | +194 | 0.2% |
| Adams | -204 | 8.2% |
| Taft | +19 | 0.0% |
| Bancroft | -6 | 0.0% |
| Total Elementary | | 29.4% |
| Total System | | 26.3% |

Thus it would appear that the Jackson students who had been attending Bancroft and Adams Elementary Schools were to be returned to Jackson, while some of the Jackson students were then to be reassigned to the new Bunn.

For the 1958–59 school year Jackson was extremely overcrowded, while Adams and Bancroft were underutilized. Taft Elementary School which was located between Adams and Bancroft was slightly overutilized. In view of the enrollment situation in the Wilson district, and the rapid growth in student population being experienced especially at Jackson, the construction of Bunn appears to have been logical. Moreover, it was consistent with the neighborhood school policy since students in the Bunn area could then walk to school and the transportation required in previous years could be decreased, if not eliminated altogether.

Moreover, the need for either an addition to Jackson or a new elementary school in the area was evidenced by the March 21, 1957 Report on Building Considerations By Section of Youngstown. (Px 264). Therein it is noted that on the south side of Youngstown, Jackson was the most troublesome spot. For the 1956–57 school year, 63 sixth grade students were being transported to Adams as noted in the above described letters. The Report further notes that for the coming school year, which was the 1957–58 school year, 67 sixth grade students would have to be transported from Jackson to Adams, and 106 fifth grade students would have to be transported from Jackson to another building. As indicated by the

above discussed June 7, 1957 letters, fifth graders were actually transported to Adams, while sixth graders were transported to Bancroft. Finally, the 1957 Report notes that the two kindergarten sections at Jackson would have to be put into the gymnasium. In view of the growing student population in the Jackson area evidenced by these figures, the construction of Bunn was indeed a reasonable and racially neutral action.

According to the stipulations, Bunn Elementary School received an addition of eight classrooms in 1960. (Stip. 126).

| | 1958-59 | | 1961-62 | |
|---|---|---|---|---|
| Bunn | | | -292 | 0.0% |
| Jackson | +194 | 0.2% | -111 | 0.9% |
| Adams | -204 | 8.2% | -444 | 13.4% |
| Total Elementary | | 29.4% | | 33.2% |
| Total System | | 26.3% | | 29.8% |

In view of the lack of relevant data for the 1960–61 school year, the Court is unable to analyze the immediate impact of this addition. For the 1961–62 school year, however, Bunn was underutilized by 292 students, and since the addition added only 240 places to Bunn, it appears that such was unnecessary. Due to the rapid growth in the area the construction of the Bunn addition appears at most to evidence poor calculation by the Youngstown School officials; however, the underutilization of Bunn decreased after 1963. No adverse racial inferences can be drawn from this construction since the entire area was whiter than the system average.

The boundary of Bennett Elementary School was moved in June 1961 one block west in order to include within its attendance district Franklin Avenue. Prior to this change, Gibson Street was the western boundary from the Youngstown-Suburban tracks north to the Mahoning River. (Px 294).

| | 1958-59 | | 1961-62 | |
|---|---|---|---|---|
| Bennett | -232 | 17.0% | -375 | 27.2% |
| Williamson[45] | +35 | 30.0% | +17 | 46.5% |
| Total Elementary | | 29.4% | | 33.2% |
| Total System | | 26.3% | | 29.8% |

45. Plaintiffs' exhibit 83 indicates that Williamson had 18 classrooms and a maximum optimum utilization of 600. According to defendants' exhibit P–26, Williamson's maximum optimum utilization is 540 based on the same number of classrooms.

According to the 1960 census map, the area transferred from Williamson Elementary School to Bennett by this boundary change was part 0% to 14% black and part 14% to 90% black in its residential population.

This boundary change served to relieve the overcrowdedness at Williamson. In terms of racial effect, the boundary change was probably integrative as to Bennett. It is highly improbable that this change caused the significant increase in the percentage black students at Williamson.

Similarly in June 1961, the northern boundary of Bunn Elementary School was moved one block north. This removed the Medford area from the Jackson Elementary School attendance district and placed it into that of Bunn. (Px 249).

|  | 1958-59 |  | 1961-62 |  |
|---|---|---|---|---|
| Bunn |  |  | -292 | 0.0% |
| Jackson | +194 | 0.2% | -111 | 0.9% |
| Total Elementary |  | 29.4% |  | 33.2% |
| Total System |  | 26.3% |  | 29.8% |

Based on the 1960 census map, the area transferred to Bunn was predominately white in its residential population.

In view of the aforedescribed overcrowded condition at Jackson, this territorial reassignment appears to have been a reasonable administrative decision. It served to relieve Jackson's condition while increasing the student population at the relatively new and underutilized Bunn. The change moreover was racially neutral as both schools were much whiter than the system average.

The parties stipulated that Jackson Elementary School received an addition of two rooms in 1961. (Stip. 126). This addition combined with the above described 1961 boundary change with Bunn Elementary School remedied the overcrowded condition of Jackson. Such is demonstrated by the 1961–62 enrollment figures which show Jackson as being underutilized for said school year by 111 students based on a maximum optimum utilization of 570.[46] Both the prior history of growth in the area and future enrollment figures supported the need for this addition to Jackson. Moreover, the addition was consistent with the racially neutral neighborhood school policy of the Youngstown School officials. The other schools within the Wilson district were all considerably whiter than the system average.

According to a January 6, 1966 memorandum from G. H. Schoenhard to Dr. J. H. Wanamaker, then Superintendent of the Youngstown Schools, regarding projected enrollments in Wilson and its contributing areas, Wilson High School was quite overcrowded as of that date. (Px 242). The memo states that with a maximum optimum utilization of approximately 1500 students, Wilson had steadily been overutilized despite the temporary relief given by the removal of the seventh grade therefrom in the 1963–64 school year, which the Court finds was racially neutral in effect. As shown by a table in the memo, Wilson's enrollment had been increasing since September 1960, and was projected to continue rising through 1970. Moreover, the retention of the seventh grades at the elementary schools since September 1963 provided an inadequate solution for this problem; at the same time Bunn, Jackson, and Taft were apparently with some adjustments able to handle their kindergarten through seventh grade enrollments. Thus, another solution needed to be found.

In 1968, the grade structure of Adams was changed from kindergarten through sixth grades to first through eighth grades. (Stip. 154). At the same time, for the 1968–

---

**46.** According to plaintiffs' exhibit 158, the present maximum optimum utilization for Jackson is 570. As indicated by the earlier discussion, the maximum optimum utilization of Jackson according to the 1952 Report was 480 based on 16 classrooms. Defendants' exhibit P–11, however, indicates that prior to the 1961 addition Jackson had 17 classrooms and thus an optimum utilization of 510. Accordingly, if the two room addition is added on to a 480 figure, Jackson's maximum optimum utilization as of 1961 was only 540 instead of 570. Based on the 540 figure, Jackson was underutilized by 81 students for the 1961–62 school year. However, based on the 570 figure, it was underutilized by 111. The record does not clarify the discrepancy with regard to Jackson's capacity. Therefore, the Court shall use the 570 figure.

69 school year, Bennett, Jackson, Taft, and Bunn contained kindergarten through seventh grades, while Wilson housed grades nine through twelve.  (Px 271).

|                   | 1967-68 |       | 1968-69 |       |
| ----------------- | ------- | ----- | ------- | ----- |
| Adams             | -394    | 14.5% | -164    | 3.8%  |
| Bennett           | -356    | 15.0% | -308    | 14.3% |
| Jackson           | -7      | 0.0%  | +25     | 0.0%  |
| Taft              | -132    | 0.0%  | -57     | 0.2%  |
| Bunn              | -126    | 0.0%  | -37     | 0.0%  |
| Wilson            | +25     | 1.0%  | -249    | 1.2%  |
| Total Elementary  |         | 44.9% |         | 43.1% |
| Total Junior      |         | 41.1% |         | 47.0% |
| Total Senior      |         | 30.4% |         | 34.1% |
| Total System      |         | 39.6% |         | 41.0% |

As a result of this grade structure change, Adams became a partial junior high school housing all the eighth grade students in the Wilson zone.  Such change served to relieve Wilson's overcrowded condition while reducing Adams underutilization.

Due to its central location, Adams appears to have been the most logical choice for this particular grade arrangement.  Although its percentage black student enrollment decreased considerably, the Court can find no significant adverse racial effect from this change since the black students were merely reassigned to other white schools.  All of the schools within the Wilson district were considerably below the system average in their black student populations.  This grade structure change and concomitant reassignment of students was not racially segregative.

For the 1970-71 school year, the grade structure of Adams was again changed from grades one through eight to kindergarten through grade eight.  (Stip. 154).  The elementary schools contiguous to Adams served, however, kindergarten through grade seven for both the 1969-70 and 1970-71 school years.  (Px 271).

|                   | 1969-70 |       | 1970-71 |       |
| ----------------- | ------- | ----- | ------- | ----- |
| Adams             | -168    | 4.8%  | -103    | 3.9%  |
| Jackson           | -8      | 0.2%  | -12     | 0.2%  |
| Bunn              | -95     | 0.0%  | -132    | 0.0%  |
| Taft              | -43     | 0.2%  | -53     | 0.7%  |
| Bennett           | -338    | 15.0% | -353    | 16.6% |
| Total Elementary  |         | 44.7% |         | 44.5% |
| Total System      |         | 42.7% |         | 44.1% |

Thus while Adams accommodated the eighth graders from these schools, it appears that kindergarten students from Adams attended one or all of these schools in 1969-70.  Adams and its contiguous schools each had a black student population far below the system average.  Thus this change appears to have been racially neutral.  The addition of kindergarten students to Adams may be considered integrative since Adams had more black students than the surrounding elementary schools.

SOUTH ZONE

The schools within the South High School attendance area are:  South High School; Princeton and Hillman Junior High Schools; and Bancroft, Cleveland, Garfield, Grant, Monroe, Sheridan, and Williamson Elementary Schools.

Prior to 1940, Grant was a junior high school.  The 1921 Youngstown Public Schools Survey of Building Requirements recommended, however, that Grant be converted into an elementary school as originally planned, and that the junior high school be removed to Hillman.  (Px 79).  Said recommendation was implemented in 1940 when Grant received an addition of three rooms.  The attendance area assigned the new Grant Elementary School was bound on the north by the Mahoning River, on the south by Lakewood Avenue, on the east by the Mahoning River and Oakhill, and on the west by Mill Creek.  (Stip. 230).  The parties stipulated that this area contained the principal portion of the black residential population residing south of the Mahoning River according to the 1940 census data.  (Stip. 230).

Concomitant with the conversion of Grant, Hillman Junior High School opened in 1940.  (Stip. 116, 259).  Whereas the former Grant Junior High School had fed old Chaney Senior High School, Hillman was within the South High School feeder pattern.  The attendance area served by Hillman was bound on the north by the Mahoning River, on the west by Mill Creek, and on the south by Willis, Oakhill, and Williamson Avenues.  (Stip. 116).  The parties stipulat-

ed that, according to the 1940 census, the largest pocket of black residents south of the Mahoning River resided within the Hillman area, and the majority of black students attending Hillman Junior High School were within the Grant Elementary School attendance district. (Stip. 116, 259). As further stipulated, the 1940 census data indicates that the attendance district for Hillman Junior High School contained the majority of black residents within the South High School area, and that the remaining part thereof served by Princeton Junior High School was predominately white in its residential population. (Stip. 116).

The opening of Hillman Junior High School was consistent with the 1921 Building Survey discussed above. Such Survey was concluded prior to the development of the subject racial residential patterns. The Court has not, however, been given the relevant data with which to specifically analyze either the opening of Hillman or the conversion of Grant. A comparison of the 1940 and 1950 census data shows a concentration of black residents within the attendance districts of these two schools. Nevertheless for the 1952–53 school year, the percentage black students enrolled at Grant Elementary School and Hillman Junior High School was not that substantially above the respective elementary and junior high school averages. Thus in 1940, said schools were probably at or only slightly above the system average in their black student populations.

Rather than being motivated by racial considerations, the Youngstown school officials were concerned with providing modern school plants within each of the six separate population zones of Youngstown. The Mahoning River and Mill Creek Park provided a natural boundary for this southwestern zone. Moreover, a safe and racially neutral neighborhood school policy required that children not walk across such potentially hazardous natural boundaries. In view of the foregoing, the preponderance of the evidence does not demonstrate any segregative intent in the conversion of Grant from a junior high school to an elementary school or in the opening of Hillman Junior High School. On the contrary, such actions were taken in response to the intensive growth in population south of the Mahoning River recognized as early as the 1921 Survey.

Likewise in 1940, an auditorium was added to Princeton Junior High School, and three classrooms were added to South Senior High School. (Stip. 116).

Prior to 1940, South Senior High School served the entire area of Youngstown located south and west of the Mahoning River with the exception of that area which today is essentially the attendance district for Grant Elementary School. (Stip. 267). Such district was at that time within the Chaney High School zone. (Stip. 267). In 1940, however, South's northern boundary was expanded to incorporate the Grant Elementary School attendance district. (Stip. 268). As stipulated, South Senior High School then served virtually all of the black population residing south of the Mahoning River. (Stip. 268).

Due to the lack of relevant data in the record, the Court cannot fully analyze the significance of this boundary change and three room addition. Race, however, has not been shown to have been a factor in either action; rather, both were consistent with the 1921 plan to provide a complete modern school plant for the six naturally bounded areas of Youngstown. That South High School contained most of the black population in the southern part of Youngstown was the result of housing patterns and trends and not of school action.

On June 1, 1943, students residing east of the Y & S tracks in the Bancroft attendance district were given the choice of attending either Princeton or Wilson Junior High School. (Px 249). Thus an optional attendance zone known as the Bancroft Option was created. Once a student indicated his choice of junior high school, that choice remained unless the residence of the student changed and was then within another school attendance district. Additionally, the student's choice of junior high school

established the senior high school he would attend; a student electing Princeton Junior High School attended South Senior High School, while a student electing Wilson Junior High School attended Wilson Senior High School.

The creation of the Bancroft Option appears to have been a neutral act in terms of its racial effect. According to the 1940 census data, the attendance district for Princeton Junior High School was mostly white in its residential population, while that of Wilson Junior High School was predominately, if not totally, white residentially. The South Senior High School attendance area probably contained more of the black residents south of the Mahoning River than did the Wilson Senior High School attendance area. Since the record herein contains a paucity of relevant racial data, however, the Court cannot specifically analyze the effect of this option on the schools involved.

Williamson Elementary School was built in 1949 south of the Mahoning River and directly opposite the central city area. The original attendance district for Williamson encompassed the areas previously served by the former South Avenue and Market Street Elementary Schools. (Stip. 234). The 1921 Building Survey for the Youngstown Public Schools had advocated the combination of these latter two facilities into one new elementary school. (Px 79). The 1945 Study also recommended this; such recommendation clearly resulted from a racially neutral examination of school facilities. (Px 78). Such recommendation was implemented by the construction of Williamson. The attendance district for the new Williamson Elementary School was bound on the north and east by the Mahoning River, on the south by Marion Street and Arbuckle, and on the west by Oakhill. (Stip. 234).

In view of the dearth of relevant data in this record, the Court cannot analyze the immediate racial effect of the construction of Williamson Elementary School. In 1952, three years later, Williamson's student enrollment was 24.5% black while the elementary school average was 20.1%. Thus Williamson probably opened as an integrated school. The evidence is insufficient to establish segregative effect or intent in either the construction of Williamson Elementary School or the establishment of its original boundaries.

The parties stipulated that, in 1954, the southern boundary of Grant Elementary School was expanded to incorporate the northern part of the Monroe Elementary School attendance district. (Stip. 232).

|  | 1952–53 | | 1958–59 | |
|---|---|---|---|---|
| Grant | +136 | 33.7% | +158 | 61.0% |
| Monroe[47] | +55 | 22.7% | +97 | 49.4% |
| Williamson[48] | +96 | 24.5% | +35 | 30.0% |
| Garfield | −160 | 0.0% | −104 | 3.2% |
| Cleveland | +147 | 7.3% | +85 | 14.4% |
| Washington | −268 | 0.0% | −342 | 0.0% |
| Total Elementary | | 20.1% | | 29.4% |
| Total System | | 18.6% | | 26.3% |

47. According to the February 1952 Report, Monroe Elementary School had 20 classrooms and a maximum optimum utilization of 600. (Px 83). Defendants' exhibit P–16, however, indicates that prior to 1964 Monroe had 15 classrooms for a maximum optimum utilization of 450. Using the 450 figure, Monroe was overcrowded by 205 students for the 1952–53 school year, and by 247 students for the 1958–59 school year. The Court shall, however, rely upon the 600 figure since its source is a contemporaneous document of the Youngstown School officials.

It should be noted that the 1952 Report lists the September 1950 enrollment of Monroe as a mere 495 students. Thus, for the 1950–51 school year Monroe Elementary School was underutilized by 105 students. Only two years later, however, it was overutilized by 55 students. These figures evidence either extremely rapid growth among the school age population in this area, or error in the figures. The Court cannot on the basis of this record determine which explanation is in fact correct.

48. The February 1952 Report, plaintiffs' exhibit 83, provides that Williamson had 18 classrooms and a maximum optimum utilization of 600 students. According to defendants' exhibit P–26, however, Williamson's maximum optimum utilization is 540 students based on the same number of classrooms. For the reasons discussed above and in the immediately preceding footnote, the Court shall use the 600 figure in calculating utilization herein.

According to the Boundary Change Report, this change, effective August 23, 1954, removed Falls and Parkwood Avenues between Hillman Street and Mill Creek Park from the Monroe attendance district and placed them into that of Grant. (Px 249). The area transferred was predominately white in its residential population according to the 1950 census map. On the basis of the present record, the Court is unable to accurately appraise the racial effect of this boundary change due to the lack of data for the school years immediately preceding and following same. Two years earlier, the percentage black student enrollment at Grant was considerably above the elementary average, while Monroe's black student enrollment was just about the elementary school average. Thus the transfer of a residentially white area to Grant Elementary School was probably an integrative action. However, such transfer evidences poor administrative judgment since both Grant and Monroe were overutilized and other contiguous schools had available space.

As stipulated, in 1954 Williamson Elementary School fed Hillman Junior High School. (Stip. 260). The stipulation does not establish, however, whether said pattern pre-dated 1954 or was established in that year. It does provide that the southern boundary of Hillman divided the Monroe Elementary School attendance district in such a manner as to include most thereof within the Hillman attendance area. (Stip. 260). The stipulation further provides that the portion of the Monroe district not included within the Hillman attendance area was predominately white in its residential population according to the 1950 census, and fed Princeton Junior High School. (Stip. 260). The part of the Monroe attendance district which fed Hillman was, as stipulated, predominately black in its resi-

dential population according to the 1950 census data. (Stip. 260). The parties further stipulated that analysis of such data reveals that the attendance area of Hillman Junior High School encompassed three of the four major pockets of black residential population south of the Mahoning River. (Stip. 260).

| | 1952-53 | | 1958-59 | |
|---|---|---|---|---|
| Williamson | +96 | 24.5% | +35 | 30.0% |
| Monroe | +55 | 22.7% | +97 | 49.4% |
| Hillman Jr.[49] | -70 | 27.5% | -118 | 41.0% |
| Princeton Jr.[50] | -125 | 5.7% | -192 | 10.0% |
| Total Elementary | | 20.1% | | 29.4% |
| Total Junior | | 21.1% | | 24.7% |
| Total System | | 18.6% | | 26.3% |

The unavailability of relevant data in this record precludes specific analysis of the immediate racial effect of the matters described in the stipulation. The Court can only analyze it in general terms.

The division of Monroe's attendance district resulted in a dual feeder pattern whereby Monroe students attended either Hillman or Princeton Junior High School depending upon the location of their residence. In terms of geographic proximity, most of the Monroe district was closer to Hillman although the extreme southern portion thereof was probably closer to Princeton. The three southern most blocks of the Monroe district ranged from 14% to 90% black in their residential population according to the 1950 census map; further, these blocks were located within the Princeton attendance area. Thus to the extent that the stipulation implies that all of the blacks residing within the Monroe district were assigned to Hillman, it is misleading. Additionally, the fact that the Hillman area contained three of the four major pockets of black residential population in the southern section of Youngstown has not been

49. According to the February 1952 Report, Hillman Junior High School had 32 classrooms and a maximum optimum utilization of 800. (Px 83). Defendants' exhibit P–28, however, indicates that Hillman has 32 classrooms for a maximum optimum utilization of 960. For the reasons previously discussed, the Court shall use the 800 figure in calculating utilization.

50. The February 1952 Report provides that Princeton Junior High School had 38 classrooms with a maximum optimum utilization of 850. (Px 83). Based on the same number of classrooms, defendants' exhibit P–30 indicates that Princeton's maximum optimum utilization is 690. The Court shall rely on the 850 figure herein for the reasons discussed earlier.

shown to be attributable to the actions of the school officials. Those three areas were geographically closer to Hillman, and thus a racially neutral neighborhood school policy dictated that the students residing therein attend Hillman, which was one of the best junior high facilities in the system according to the 1945 Study. (Px 78). Despite the concentration of black residents within the Hillman attendance area, Hillman's 27.5% black student enrollment for the 1952–53 school year was only slightly higher than the junior high school average. For the same school year, both Hillman and Princeton were underutilized. Therefore, the territorial division described in the stipulation appears to have been racially neutral and reasonable although the exact situation existing in 1954 is not known.

In 1955, the attendance district for Princeton Junior High School extended to the west beyond Arden Boulevard, and south of Canfield Road to the borders of the City of Youngstown. (Stip. 264). As stipulated, this area was predominately white in its residential population according to both the 1950 and 1960 census. (Stip. 264). The record before the Court does not, however, establish when said district was created, and therefore, no further analysis is appropriate.

The eastern boundary of Williamson Elementary School was contracted in 1956 approximately one-half mile to transfer nearly one third of its attendance district to Bennett Elementary School. (Stip. 235).

|  | 1952–53 | | 1958–59 | |
|---|---|---|---|---|
| Bennett | -247 | 7.1% | -232 | 17.0% |
| Williamson | +96 | 24.5% | +35 | 30.0% |
| Garfield | -160 | 0.0% | -104 | 3.2% |
| Hillman Jr. | -70 | 27.5% | -118 | 41.0% |
| Wilson Jr. & Sr. | -457 | 0.7% | -227 | 0.8% |
| South Sr.[51] | +101 | 9.9% | -54 | 14.9% |
| Total Elementary | | 20.1% | | 29.4% |
| Total Jr. | | 21.1% | | 24.7% |
| Total Sr. | | 14.4% | | 18.8% |
| Total System | | 18.6% | | 26.3% |

Bennett students traditionally fed Wilson Junior and Senior High School. The former Williamson students, however, continued to feed Hillman Junior and South Senior High Schools despite their inclusion within the Bennett Elementary School attendance district. (Stip. 235).

Due to the lack of relevant data in the record, the Court cannot analyze the immediate racial effect of this boundary change. According to the 1960 census map, the area transferred to Bennett from Williamson was majority black in its residential population. This area, however, contained the refuse transfer and sewage treatment plant, and thus it is difficult to assess whether many students were actually involved in the transfer. Nevertheless, in view of the above noted racial percentages, this boundary change was apparently integrative in effect as to Bennett. Also, subsequent to the transfer, the percentage black students enrolled at Williamson was virtually equal to the elementary school average. The basis for this territorial transfer was apparently the overcrowded condition of Williamson Elementary School. To the extent that Williamson's overutilization was remedied, this action represents sound administrative judgment.

Additionally, the Court notes that it has been alleged that the Williamson-Bennett boundary change could have been carried through on the secondary level, and that the failure to do so was segregative. The immediate problem facing the school officials, however, was the overutilization of Williamson Elementary School. The solution thereof did not require any action on the secondary level. Therefore, there was no need for a general reorganization of the feeder pattern structure in the area.

As stipulated, the eastern boundary of Monroe Elementary School was contracted in 1957 to transfer approximately six blocks to Garfield Elementary School. (Stip. 243). According to the stipulation this area con-

---

51. The February 1952 Report indicates that South Senior High School had 47 classrooms and a maximum optimum utilization of 1,175. (Px 83). Defendants' exhibit P–37, however, shows the maximum optimum utilization of South to be 1,470 based on 49 classrooms. The Court shall rely upon the 1,175 figure in computing utilization.

sisted of Chalmers, Willis, and Delason between Oakhill and Hillman.

| | 1952-53 | | 1958-59 | |
|---|---|---|---|---|
| Monroe | +55 | 22.7% | +97 | 49.4% |
| Garfield | -160 | 0.0% | -104 | 3.2% |
| Total Elementary | | 20.1% | | 29.4% |
| Total System | | 18.6% | | 26.3% |

The parties further stipulated that the 1960 census data indicated that these six blocks were predominately white in their residential population. (Stip. 243). The boundary change described in the stipulation is not, however, shown on the 1960–61 elementary school overlay. In an effort to clarify this apparent inconsistency, plaintiffs' expert William Lamson testified that the boundary change was probably an informal change, and that the formal change to conform to fact did not occur until June 13, 1961 as indicated by the Boundary Change Report, plaintiffs' exhibit 249. However, said Report does not mention Delason.

The Court is unable to specifically analyze the immediate racial effect of the Monroe-Garfield boundary change since the record lacks data for the next preceding and following school years. Although the parties stipulated that a "predominately white area" was transferred, this phrase is quite vague and only means that the area was more than 50% white in its residential population. The six block area transferred was no more than 14% black in its residential population according to the 1960 census map. Thus blacks could have resided in said area. To the extent that any black students were transferred thereby from Monroe to Garfield, this boundary change was integrative. From a facility utilization standpoint, the action appears to have been reasonable since Monroe was overutilized, while Garfield was underutilized. Also, the closest contiguous area was transferred in conformity with a racially neutral neighborhood school policy.

In 1958, as stipulated, the southern boundary of Williamson Elementary School was contracted to transfer the area located south of Williamson Avenue to the Garfield Elementary School attendance district. (Stip. 236).

| | 1952-53 | | 1958-59 | |
|---|---|---|---|---|
| Williamson | +96 | 24.5% | +35 | 30.0% |
| Garfield | -160 | 0.0% | -104 | 3.2% |
| Total Elementary | | 20.1% | | 29.4% |
| Total System | | 18.6% | | 26.3% |

It was further stipulated that the area transferred was predominately white in its residential population according to the 1960 census data. (Stip. 236).

Based on the 1960 census map, it appears that the area transferred from Williamson to Garfield was no more than 14% black residentially. If in fact some black students were transferred, the boundary change was integrative in its racial effect as to Garfield. This may have been the case since Garfield's student enrollment was 3.2% black for the school year immediately following the transfer. Moreover, for the 1958–59 school year Williamson was virtually the same as the elementary school average in its percentage black students. Further, this boundary change was obviously logical from a utilization viewpoint.

Plaintiffs' expert William Lamson testified that in 1958 there was an option at the elementary school level relative to the effect of the freeway construction on the Williamson attendance district. (Tr. Vol. 4, 723). He stated that students residing in the south and east portion of the Williamson district were given the option of attending either Bennett or Williamson Elementary School. Mr. Lamson further testified that the notice to parents advised that these students were assigned to Bennett, and if the freeway "does not remove the number of children—or does remove the number of children" anticipated that it will, the students had the option of remaining at Bennett or attending Williamson. In view of the unclear nature of the testimony, the Court is unable to determine exactly what happened. Any meaningful analysis is precluded herein.

In 1960, the northern boundary of Cleveland Elementary School was expanded to incorporate a portion of the Monroe Elementary School attendance district. (Stip. 256).

|  | 1958-59 |  | 1961-62 |  |
|---|---|---|---|---|
| Cleveland | +85 | 14.4% | -95 | 38.6% |
| Monroe | +97 | 49.4% | +190 | 74.0% |
| Total Elementary |  | 29.4% |  | 33.2% |
| Total System |  | 26.3% |  | 29.8% |

Based on the 1960 census map, it appears that the area transferred to Cleveland was mostly black in its residential population and that only a small part thereof was residentially white. The effect of this boundary change was thus integrative as to Cleveland Elementary School. Moreover, it was administratively sound to the extent that Cleveland had extra available space to relieve Monroe's overcrowded condition.

According to plaintiffs' expert William Lamson, for a number of years Monroe and Garfield are described in the documents within his possession, which documents were never identified to the Court, as overlapping in their attendance districts; this condition purportedly existed in 1961. Mr. Lamson further indicated that Monroe's attendance area is "somewhere" described as extending to include the area in question in its south and east corner, whereas Garfield supposedly included the same area in its north and west corner. It appears that an informal option zone existed in said area which was less than majority black in its residential population based on the 1960 census map. While its bounds are not established by this record, this option appears to have been more integrative than the informal 1957 boundary change since Garfield's student enrollment was 3.2% black for the 1958–59 school year, and had risen to 22.1% by the 1961–62 school year.

In 1960, the eastern and southern boundaries of Monroe Elementary School were contracted to transfer parts of its attendance district to Williamson and Cleveland Elementary Schools. (Stip. 244).

|  | 1958-59 |  | 1961-62 |  |
|---|---|---|---|---|
| Monroe | +97 | 49.4% | +190 | 74.0% |
| Williamson | +35 | 30.0% | +17 | 46.5% |
| Cleveland | +85 | 14.4% | -95 | 38.6% |
| Total Elementary |  | 29.4% |  | 33.2% |
| Total System |  | 26.3% |  | 29.8% |

Based on the 1960 census map, it appears that the area transferred to Cleveland was mostly 25% to 100% black in its residential population. With regard to Cleveland, therefore, this boundary change was clearly an integrative action. As to Williamson, it appears that the area transferred thereto was essentially 14% or less black residentially according to the 1960 census map. Thus as between Williamson and Monroe the boundary change was racially neutral in effect. By placing a predominately white area into the Williamson attendance district, Williamson was maintained as an integrated school in that its percentage black students thereby remained substantially closer to the elementary school average.

Although the record does not contain relevant data for the school years immediately preceding and following this boundary change, the available data indicates that Monroe was overutilized throughout the subject time period. In view thereof, a sound basis existed for the transfer of territory from Monroe to Williamson and Cleveland. Therefore, the Court finds that this boundary change was reasonable from a facility utilization standpoint.

The boundary of Bennett Elementary School was moved in June 1961 one block west in order to include within the Bennett attendance district Franklin Avenue. Prior to this change, Gibson Street had been the boundary from the Youngstown-Suburban tracks north to the Mahoning River. (Px 249).

|  | 1958-59 |  | 1961-62 |  |
|---|---|---|---|---|
| Bennett | -232 | 17.0% | -375 | 27.2% |
| Williamson | +35 | 30.0% | +17 | 46.5% |
| Total Elementary |  | 29.4% |  | 33.2% |
| Total System |  | 26.3% |  | 29.8% |

It appears from the 1960 census map that the area transferred to Bennett from Williamson by this boundary change was part 0% to 14% black and mostly 25% to 90% black residentially.

This boundary change was integrative as to Bennett since its black student enrollment increased for the 1961–62 school year. Additionally, the transfer probably served to keep Williamson's black student enrollment closer to the elementary average at a time when the black student population residing in its attendance district was increasing. Since both Bennett and Williamson were underutilized during the next school year, this boundary change does not appear to have been an unwise administrative decision.

Although the Franklin Avenue area remained within the Hillman Junior and South Senior High Schools feeder pattern, an informal option was apparently created at the time of the 1961 transfer.[52] (Tr. Vol. 15, 3215–20). Pursuant to said option, the students residing in the area could elect to attend Wilson Junior and Senior High Schools. The creation of this option was integrative in view of its application and availability to all students within the transferred territory, and Wilson's 1.4% black student enrollment in the 1961–62 school year. From a facility utilization standpoint, this action was not unreasonable since Wilson like Hillman and South was considerably underutilized.

According to the Boundary Change Report, plaintiffs' exhibit 249, there were two boundary changes involving Garfield Elementary School effected on June 13, 1961. In the first change, Garfield's northern boundary was moved south two streets to include Ellenwood and Chalmers Avenues in the Williamson attendance district. This change is feasible as described if the boundary of Williamson and Garfield was Marion Avenue as stated in stipulation 234 which notes the original 1949 boundary. However, said change is questionable if the boundary between Williamson and Garfield was south of Williamson Avenue as indicated in stipulation 236 which outlines a boundary change to such effect in 1958; such change was discussed above. If the boundary prior to 1961 was in fact south of Williamson Avenue, then the 1961 change would have to have been: the northern boundary of Garfield was moved south three streets, namely Marion, Ellenwood, and Chalmers Avenues. Resolution of this conflict in the data is hampered by the lack of evidence in the record as to the source of the 1958 boundary change described in stipulation 236, but not listed on the Boundary Change Report. Additionally, stipulation 250 provides that in 1961 the boundary between Garfield and Williamson Elementary Schools was changed although such stipulation does not furnish any details.

The second boundary change effected on June 13, 1961, as shown on the 1965–1966 elementary school overlay, is described in the Boundary Change Report as follows: Chalmers and Willis Avenues between Oakhill and Hillman were placed in the Garfield attendance district. (Px 249). As discussed above, plaintiffs' expert William Lamson testified that this boundary change was an official formalization of the 1957 informal arrangement described in stipulation 243. An inconsistency still exists since Delason is mentioned in said stipulation, but not in Lamson's testimony regarding same or the Boundary Change Report.

The confusion surrounding the above described 1961 boundary changes involving Garfield, Williamson and Monroe Elementa-

---

**52.** In their Proposed Findings of Fact and Conclusions of Law, plaintiffs provide that an informal option was created in 1958 whereby the students transferred from Williamson to Bennett in 1956 could elect to attend either Wilson or Hillman Junior High Schools. The asserted source for such proposed finding is the testimony of plaintiffs' expert William Lamson at page 723 of the trial transcript. Therein, however, Mr. Lamson testified to the creation of an option on the elementary school level between Bennett and Williamson; such option has been discussed by the Court *supra* at 1035. Thus the Court finds plaintiffs' proposed finding number 255 to be in error.

ry Schools is further exacerbated by the testimony of Mr. Lamson. He testified that the boundary changes were the opposite of that described in the Boundary Change Report, plaintiffs' exhibit 249. What Mr. Lamson meant by that testimony is unclear and contradicts his own stipulations and elementary school overlays. If he disputed the first boundary change, the opposite thereof would have resulted in Garfield's northern boundary being moved north, and Ellenwood and Chalmers Avenues being placed in the Garfield attendance district instead of that of Williamson. As a result, Marion Avenue would have been the boundary; but such contradicts Mr. Lamson's other testimony, the stipulations, and the relevant overlays. According to stipulation 234, the 1949 boundary between Garfield and Williamson was at Marion Avenue. The 1955–56 elementary school overlay shows that the boundary between these two schools was just north of Marion. In 1958, the boundary changed according to stipulation 236 and Garfield's attendance district was thereby expanded to just south of Williamson Avenue. Thus prior to the subject 1961 boundary change, Marion, Chalmers and Ellenwood Avenues all were within the Garfield attendance district according to the stipulations. Therefore, Mr. Lamson could not mean that the opposite of the first change occurred, that is that Ellenwood and Chalmers were placed within the Garfield district.

If, however, Mr. Lamson disputes the second June 13, 1961 boundary change, and believes that the opposite thereof occurred, he again contradicts his other testimony, the stipulations, and the elementary school overlays. To that extent, stipulation 251 provides that the western boundary of Garfield Elementary School was expanded to incorporate a portion of the Monroe attendance district.

Needless to say, the confusion exhibited by plaintiffs' expert in his testimony and the conflict in the relevant evidence render any significant analysis of the 1961 Garfield-Williamson-Monroe boundary changes impossible.

According to the Boundary Change Report, effective June 21, 1961, Breaden and Carroll Streets between Oakhill and Hillman were added to the Williamson attendance district. (Px 249). Said report is consistent with stipulation 237 which provides that the western boundary of Williamson was expanded to incorporate a portion of the Monroe Elementary School attendance district. Likewise, stipulation 245 states that the eastern boundary of Monroe was contracted to transfer two additional blocks to Williamson.

| | 1958–59 | | 1961–62 | |
|---|---|---|---|---|
| Williamson | +35 | 30.0% | +17 | 46.5% |
| Monroe | +97 | 49.4% | +190 | 74.0% |
| Total Elementary | | 29.4% | | 33.2% |
| Total System | | 26.3% | | 29.8% |

Based on the 1960 census map, these two streets were mostly 14% to 25% black in their residential population with an area south of Breaden being 25% to 50% black residentially.

With regard to Williamson, this boundary change was integrative in effect since proportionately more whites were transferred thereby to keep its percentage black students near the elementary average. The effect of the change upon Monroe is racially insignificant since its black student enrollment far exceeded the system average prior to 1961. As to Monroe, however, this boundary change is reasonable from a facility utilization standpoint since it was overutilized.

The Court notes that the 1965–66 elementary school overlay illustrates an additional boundary change between Williamson and Garfield Elementary Schools. Thereby, Williamson's southern boundary is shown to have expanded to annex from the Garfield attendance district the area north of Marion Avenue between Oakhill and Market. Based on the 1960 census map, the subject area was 14% to 25% black in its residential population. The Court cannot, however, specifically analyze this boundary change since the record does not indicate when between 1960 and 1965 such actually occurred. Nevertheless, since a 14% to 25%

black residential area was transferred, this change appears to have been integrative as to Williamson. With regard to Garfield, if the change occurred in 1961, it was integrative; and if it occurred in 1963, it was racially neutral.

In September 1962, according to the Boundary Change Report, several classes of sixth grade students from Monroe Elementary School were housed at Hillman Junior High School due to the overcrowded condition existing at Monroe. (Px 249).

|  | 1961-62 |  | 1963-64 |  |
|---|---|---|---|---|
| Monroe | +190 | 74.0% | +357 | 77.7% |
| Hillman Jr. | -198 | 63.0% | -242 | 70.0% |
| Total Elementary |  | 33.2% |  | 39.1% |
| Total Jr. |  | 31.1% |  | 35.4% |
| Total System |  | 29.8% |  | 35.1% |

Plaintiffs' expert William Lamson testified, however, that all of Monroe's sixth graders were reassigned to Hillman, and that Monroe thus became a kindergarten through grade five elementary school. The effect of this reassignment cannot be accurately analyzed due to the lack of data in the record for the 1962–63 school year. No adverse racial effect can be found, however, since both schools had black student enrollments that were considerably above the system average. Based on the available utilization figures, it appears that Hillman could relieve Monroe's overutilized condition. Moreover, Hillman was a logical choice in view of its close geographic proximity to Monroe.

According to the Boundary Change Report, Hillman Junior High School also experienced two boundary changes in June 1962. (Px 249). The first of these changes placed the south side of Marion Avenue between Market and Oakhill into the Princeton Junior High School attendance district. The

second boundary change placed West Chalmers and Willis Avenue between Oakhill and Hillman into the Princeton district. Stipulation 261 provides that a third boundary change occurred in 1962 whereby the southeastern corner of Hillman's attendance district was contracted to transfer Old Furnace Road to Princeton Junior High School.

|  | 1961-62 |  | 1963-64 |  |
|---|---|---|---|---|
| Hillman Jr. | -198 | 63.0% | -242 | 70.0% |
| Princeton Jr.[53] | -7 | 13.6% | -40 | 23.8% |
| Total Junior |  | 31.1% |  | 35.4% |
| Total System |  | 29.8% |  | 35.1% |

Based on the 1960 census map, the south side of Marion Avenue was 14% to 25% black in its residential population; West Chalmers and Willis Avenue were also predominately white residentially. The boundary change entailing these latter two streets is not, however, illustrated on the 1965–66 junior high school overlay. As stipulated, Old Furnace Road was predominately white in its residential population according to the 1960 census data. (Stip. 261). All three boundary changes involved the transfer of predominately white territory from Hillman Junior High School to Princeton Junior High School.

Due to the inadequacy of relevant data in the record, the Court is unable to accurately analyze the immediate impact of these boundary changes. This is particularly true with regard to the Marion Avenue transfer in that said area, as discussed below, was returned to Hillman prior to the 1963–64 school year. Nevertheless, the transfer of this 14% to 25% black area was probably integrative in effect as to Princeton in 1962. The removal of predominately white areas from the Hillman attendance district was, however, probably segregative in effect as to Hillman.[54] In view of the 1961–62 utili-

---

**53.** According to the 1952 Report, Princeton Junior High School had 38 classrooms and a maximum optimum utilization figure of 850. (Px 83). Defendants' exhibit P–30, however, shows Princeton's maximum optimum utilization to be 690 based on the same number of classrooms. The Court shall use the 690 figure in calculating utilization for the reasons previously discussed.

**54.** There is, however, no present continuing effect of this segregative action since the black student enrollment at Princeton today far exceeds that of the junior high school average, and Old Furnace Road is still within the Princeton attendance district. Moreover, according to the 1970 census map, Old Furnace Road is in part 50% to 90% black in its residential population.

zation figures, these territorial transfers do not appear to have been unreasonable administrative actions.

In July 1963, the south side of Marion Avenue between Market Street and Oakhill was returned to Hillman Junior High School. (Px 249). This territorial transfer vacated the June 1962 boundary change whereby the south side of Marion Avenue had been removed from the Hillman attendance district and placed within that of Princeton Junior High School. As discussed above, since the first transfer of the subject area to Princeton occurred prior to the 1962–63 school year, and since it was returned to Hillman before the 1963–64 school year, the racial effect thereof cannot be accurately analyzed in view of the lack of pertinent data in the record. However, this boundary change was probably integrative as to Hillman in that a predominately white area was added to its attendance district. On the other hand, since a 14% to 25% black area was transferred, this boundary change was probably neutral to segregative in effect with regard to Princeton. In view of the small amount of territory actually involved in the transfer, however, the effect of this boundary change had to be minimal.

Generally, it appears that the number of junior high school students residing in the southwestern part of Youngstown was decreasing, while the percentage black students enrolled at the junior high level was increasing. Both Hillman and Princeton were considerably underutilized for the 1963–64 school year. Thus this boundary change has not been shown to have been unreasonable from a facility utilization standpoint. Overall, the preponderance of the evidence does not support a finding of intentional segregation in this boundary change. Both before and after same, Hillman had a black student enrollment that more than doubled the junior high school average, while Princeton's percentage black students steadily increased.

According to the Boundary Change Report, a change was effected on July 20, 1964 in the northern boundary of Garfield Ele-

mentary School at the intersection of Market and Chalmers. Specifically, Garfield's boundary was moved north one block to remove Marion Avenue from the Williamson Elementary School attendance district and place it within that of Garfield. (Px 249). Said report also provides that, effective September 20, 1964, Marion Avenue between South Avenue and Market Street was removed from the Williamson attendance district and placed within the Garfield attendance district. (Px 249). However, there are numerous contradictions in the record as to these transfers.

Based on the June 13, 1961 boundary change described in plaintiffs' exhibit 249 and discussed above, the boundary between Garfield and Williamson Elementary Schools was at Ellenwood which was included within the Williamson attendance district. Thus to place Marion in the Garfield district would have required placing Ellenwood and Chalmers therein also, a move to the north of three blocks and not one as stated above. Further, the reference to the intersection of Market and Chalmers in the Boundary Change Report seems to imply that the boundary was located at that point. Such could be the case, however, only if two other contingencies in fact occurred. First, Williamson's western boundary must have followed Oakhill, Garfield Street and Market as shown on the 1955–56 elementary school overlay. Stipulation 234, however, lists Oakhill as the western boundary of Garfield, and there is no change in the same indicated in the record between 1949 and 1955. Secondly, Williamson's southern and Garfield's northern boundary must have been at Chalmers. Such could have occurred, however, if the 1958 boundary was south of Williamson Avenue and the 1961 boundary change of two streets south involved Marion and Chalmers instead of Ellenwood and Chalmers as stated in the Boundary Change Report.

Apparently cognizant of the problems involved in the 1964 Garfield-Williamson boundary change, plaintiffs' expert William Lamson testified that Marion Avenue was removed from the Garfield attendance dis-

trict and placed into that of Williamson. In other words, he testified that the change was just the opposite of that indicated in the Boundary Change Report, plaintiffs' exhibit 249. However, this explanation is totally inconsistent with other testimony and stipulations. Initially, stipulation 238 provides that in 1964 the southern boundary of Williamson was contracted to transfer part of its attendance area to Garfield. Secondly, the boundary would have to have been south of Williamson Avenue where it was in 1958 according to stipulation 236. There was, however, a 1961 boundary change which according to Mr. Lamson and the stipulations altered said 1958 boundary. Thus, Mr. Lamson's view of the instant change is possible only if the boundary between Garfield and Williamson prior to July 1964 was south of Williamson Avenue, that is the 1958 boundary, and no change occurred in 1961 contrary to stipulation 250. The elementary school overlays do not clarify to any degree the confusion in the record. The 1965–66 elementary school overlay shows the boundary between Garfield and Williamson Elementary Schools as located south of Williamson Avenue. Actually, the boundary is illustrated as being the same from the 1955–56 overlay until that of 1970–71 which shows the boundary as located south of Marion Avenue.

|  | 1963–64 |  | 1967–68 |  |
|---|---|---|---|---|
| Garfield | +304 | 26.2% | −53 | 53.6% |
| Williamson | +43 | 48.7% | −62 | 45.4% |
| Total Elementary |  | 39.1% |  | 44.9% |
| Total System |  | 35.1% |  | 39.6% |

Based on the 1960 census map, it appears that Marion Avenue between Oakhill and Market was 14% to 25% black in its residential population. The lack of relevant data in the record for the year immediately following this boundary change makes accurate assessment thereof difficult. If the Boundary Change Report and stipulation 238 which place Marion Avenue within the Garfield attendance district are correct, this boundary change was probably neutral to integrative in effect. If, on the other hand, Mr. Lamson is correct in placing Marion Avenue within the Williamson attendance district, as shown on the 1965–66 elementary school overlay, such is consistent with maintaining Williamson as an integrated school with a black student enrollment near the elementary school average. Thus, either way the boundary change was actually made, the effect has not been shown to have been segregative. Based on the 1963–64 utilization figures, a transfer of additional territory to Garfield does not appear to have been administratively wise. However, the confusion in the record as to the exact direction of the boundary change and the lack of data precludes any further analysis.

The Boundary Change Report, plaintiffs' exhibit 249, provides that, on July 20, 1964, the boundary between Grant and Monroe Elementary Schools was restored to that of August 23, 1954 by returning to Monroe the area assigned Grant in that year. In other words, Parkwood and Falls Avenues between Glenwood and Hillman were removed from the Grant attendance district and placed into that of Monroe. (Px 249).

|  | 1963–64 |  | 1967–68 |  |
|---|---|---|---|---|
| Grant | +198 | 91.9% | −4 | 91.1% |
| Monroe | +357 | 77.7% | +217 | 89.6% |
| Total Elementary |  | 39.1% |  | 44.9% |
| Total System |  | 35.1% |  | 39.6% |

This boundary change is consistent with stipulation 246 which provides that the northern boundary of Monroe was expanded to take back area previously given Grant in 1954.[55] Said stipulation also provides

55. There are three inconsistencies in the data which need be noted. First, the Boundary Change Report provides that the 1954 boundary change involved the area between Hillman and Mill Creek Park. Said report, however, indicates that the 1964 change involved the area between Hillman and Glenwood. This discrepancy within the same exhibit has not been clarified in the record. Second, the 1965–66

elementary school overlay is apparently incorrect. According to stipulation 230, in 1940 the southern boundary of Grant Elementary School was Lakewood Avenue. The record does not note any changes therein until 1954. With the 1954 change, Lakewood Avenue appears to have been the boundary between Oakhill and Hillman, while Falls was the boundary between Hillman and Mill Creek. In 1964, the boundary

that Monroe received an addition which consisted of eight classrooms according to stipulation 128.

The area returned to Monroe in 1964 was mostly 14% to 50% black in its residential population with one 0% to 14% black block according to the 1960 census map. Thus a relatively white residential area was removed from the Grant attendance district and placed within that of Monroe. The Court cannot specifically analyze the immediate effect of this boundary change since the record does not contain data for the following school year. During the school year immediately preceding this boundary change, the student enrollment at Grant was 91.9% black, while that of Monroe was 77.7% black. Thus a majority white residential area was transferred from one racially identifiable black school to another. Such hardly evidences segregative intent. In terms of facility utilization, the transfer of additional territory to Monroe was apparently not administratively sound absent the addition. However, Grant was similarly overutilized for the 1963–64 school year. Nevertheless, in view of the inadequacy of the data before the Court, any further analysis of the reasonableness of the boundary change and the effect of the addition is precluded.

In June 1965, Superintendent Wanamaker informally discontinued the Bancroft option, according to the Boundary Change Report, plaintiffs' exhibit 249. Said option was originally created in 1943 and allowed students attending Bancroft Elementary School to chose either Princeton Junior and South Senior High Schools or Wilson Junior and Senior High School. (Px 249).

| | 1963–64 | | 1967–68 | |
|---|---|---|---|---|
| Princeton Jr. | −40 | 23.8% | +59 | 47.9% |
| Wilson Jr. & Sr. | −255 | 1.6% | +25 | 1.0% |
| South Sr. | −252 | 34.9% | −199 | 58.1% |
| Total Jr. | | 35.4% | | 41.1% |
| Total Sr. | | 30.1% | | 30.4% |
| Total System | | 35.1% | | 39.6% |

apparently reverted back to Lakewood Avenue and was not as shown on the 1965–66 overlay at Lakewood Avenue between Mill Creek and Hillman and Falls Avenue between Hillman and Oakhill. Third, the July 20, 1964 boundary

Thus, effective with the 1965–66 school year, Bancroft students could no longer elect their secondary schools but were assigned to Wilson Junior and Senior High School. As the testimony of Dr. Schoenhard, a school official, indicates, the termination of the option constituted a "temporary operational change" to conform to the status quo in that under the option plan most students elected Wilson. Dr. Schoenhard further testified that a note was left instructing his successor to make this temporary change formal or official since the area involved was still within the Princeton-South attendance zone. Such formal boundary change was not, however, effected until 1970 when Bancroft Elementary School was closed.

The former Bancroft option zone assigned to Wilson was 0% to 14% black in its residential population according to the 1960 census map. Since the record does not contain relevant data for the school years immediately preceding and succeeding the discontinuation of the option, specific analysis thereof is precluded. Two years earlier, only South had a black student enrollment that exceeded the relevant secondary school average, but it was slightly less than the total system average in its black student enrollment. In view thereof, this assignment did not raise its percentage black students above the system average, and in that respect was racially neutral in effect. The reasonableness of this action from a facility utilization standpoint cannot be determined due to the apparent fluctuation in student enrollment. However, the discontinuation of the Bancroft option has not been shown to have been an unwise administrative decision.

According to the Boundary Change Report, on July 13, 1966, Chalmers Avenue from Hillman Street eastward was removed from the Williamson Elementary School at-

description of Grant Elementary School provided by plaintiffs' exhibit 19 is not consistent with either the Boundary Change Report or the overlay.

tendance district and placed within that of Garfield Elementary School. (Px 249).

| | 1963-64 | | 1967-68 | |
|---|---|---|---|---|
| Garfield | +304 | 26.2% | -53 | 53.6% |
| Williamson | +43 | 48.7% | -62 | 45.4% |
| Total Elementary | | 39.1% | | 44.9% |
| Total System | | 35.1% | | 39.6% |

Said boundary description is consistent with stipulation 239 which provides that the southern boundary of Williamson Elementary School was changed to return some of the area obtained in 1961 to Garfield. Although the Boundary Change Report and stipulation 239 appear to be consistent, there are numerous other inconsistencies involved herein. Initially, the 1966 boundary change is not necessary if the change of July 20, 1964 described in plaintiffs' exhibit 249 is correct. This 1964 change moved Garfield's boundary north to Marion Avenue, which is located north of Chalmers. Therefore, Chalmers east of Market would have already been within the Garfield attendance district based on such action. Further, according to the Boundary Change Report, in 1961 Chalmers between Oakhill and Hillman was placed in the Garfield attendance district. Based on the foregoing, only the section of Chalmers between Market and Oakhill would not have already been within the Garfield district prior to 1966.

Plaintiffs' expert William Lamson testified that the 1966 boundary change actually placed Chalmers within the Williamson attendance district. Such is of course inconsistent with the Boundary Change Report and stipulation 239. Stipulation 239 is, however, consistent with the 1961 boundary change described in plaintiffs' exhibit 249, while inconsistent with the 1964 boundary change described in the same exhibit. Although Mr. Lamson's testimony is inconsistent with stipulation 239, it is consistent with the 1964 Williamson-Garfield boundary change discussed above if Marion and Chalmers were placed into the Williamson attendance district. Also, Mr. Lamson's testimony on the subject 1966 change is consistent with his earlier testimony on the 1964 boundary change. With regard thereto, he stated that Marion Avenue was removed from the Garfield attendance district and placed within that of Williamson which change thus left the boundary north of Chalmers. Then in 1966, Chalmers was incorporated into the Williamson attendance district as Williamson's boundary was again moved south to take more area from Garfield. Such testimony by Mr. Lamson on the 1964 boundary change is not, however, shown on the 1965–66 overlay. Rather, the above described 1964 change with regard to Marion Avenue is shown only on the 1970–71 elementary school overlay. Further, Mr. Lamson's testimony on the 1966 change whereby he stated that Chalmers was included within the Williamson district is not shown on the 1970–71 overlay. Said overlay merely illustrates the removal of Marion Avenue from the Garfield attendance district and its relocation within that of Williamson.

Thus the 1970–71 elementary school overlay does not show either the 1966 boundary change described in plaintiffs' exhibit 249 and stipulation 239, or the 1966 change described in Mr. Lamson's testimony. The 1965-66 elementary school overlay shows Chalmers Avenue as located within the Garfield attendance district. The 1970–71 overlay, however, places Chalmers east of Oakhill in the Garfield district, but Chalmers between Hillman and Oakhill is shown to be within the Monroe attendance district having been removed from that of Garfield.

It is evident from the foregoing that confusion pervades the record as to the boundary changes in the Williamson-Garfield-Monroe area. Since these contradictions are not resolved in the record, this purported 1966 boundary change cannot be accurately analyzed. Based on the 1960 census map, Chalmers from Hillman eastward was 0% to 14% black in its residential population except for the area between Oakhill and Market which was 14% to 25% black residentially. Chalmers' black population was, however, increasing. The 1970 census map reveals that Chalmers between Hillman and Oakhill was 50% to 90% black residentially,

while east of Oakhill it was 14% to 50% black in its residential population with one block being 0% to 14% black. In view thereof, it appears that the black student enrollment of whichever school students residing on Chalmers attended was probably increasing. If Chalmers was in fact placed within the Garfield attendance district, as indicated by the Boundary Change Report, the probable result would have been not only an increase in Garfield's percentage black students, but also maintenance of Williamson as an integrated school with a black student enrollment close to the elementary average. On the other hand, if Mr. Lamson is correct in stating that Chalmers was placed within the Williamson attendance district, the percentage black students enrolled at Williamson would most likely have increased above the elementary average. However, Williamson's student enrollment was 45.4% black for the 1967–68 school year, which figure represents a decline in its percentage black students from the 1963–64 school year. The percentage black students enrolled at Garfield, on the other hand, doubled from the 1963–64 to the 1967–68 school year. Such substantial increase was probably attributable to the increase in black residents in the area as a whole, and does substantiate the boundary change as described in plaintiffs' exhibit 249. In any event, due to both the confused condition of the record and the lack of relevant data, the Court cannot conclude that the evidence supports a finding of intentional segregation as to this boundary change.

The Boundary Change Report provides that, on July 13, 1966, the boundary between Williamson and Monroe Elementary Schools was returned to that existing on June 21, 1961. In other words, Breaden and Carroll Streets between Oakhill and Hillman were removed from the Williamson attendance district and returned to that of Monroe. (Px 249).[56]

|  | 1963–64 | | 1967–68 | |
|---|---|---|---|---|
| Williamson | +43 | 48.7% | –62 | 45.4% |
| Monroe | +357 | 77.7% | +217 | 89.6% |
| Total Elementary | | 39.1% | | 44.9% |
| Total System | | 35.1% | | 39.6% |

Plaintiffs' expert William Lamson testified, however, that he did not believe this boundary change actually took place. Further, the 1970–71 elementary school overlay does not show a return of Breaden and Carroll Streets to the Monroe attendance district.

Based on the 1970 census map, it appears that the area transferred from Williamson to Monroe, according to plaintiffs' exhibit 249, was 50% to 90% black in its residential population. Thus it seems that an increase in Monroe's black student population would probably result. However, since the record does not contain data for the years immediately preceding and following this transfer, accurate analysis thereof is precluded. Three years earlier, Monroe had a student enrollment that was 77.7% black; it was thus a racially identifiable black school prior to the boundary change. Williamson's student enrollment, however, was 48.7% black for the 1963–64 school year. Therefore, this boundary change kept Williamson an integrated school with a black student enrollment just above the elementary average. In view thereof, any adverse racial or segregative effect as to Monroe was balanced by the racially neutral or integrative effect upon Williamson. From a facility utilization standpoint, this transfer does not appear administratively sound since Monroe was considerably overutilized throughout this period. Nevertheless, this boundary change has not been shown to have been intentionally segregative.

In 1968, Garfield Elementary School experienced two boundary changes. Accord-

56. Actually, the Boundary Change Report, is unclear. It merely states that the boundary of Williamson was changed back to its June 21, 1961 status. It appears that such probably means that the boundary was returned as described above. The question arises, however, whether or not this return to the 1961 boundary possibly meant the June 13, 1961 boundary between Garfield and Williamson discussed above.

ing to stipulation 240, the boundary between Williamson and Garfield Elementary Schools was returned to its original Marion Avenue location. Further, stipulation 253 provides that the northern boundary of Garfield was contracted to return Chalmers Avenue on both sides of the street to the Monroe Elementary School attendance district.

| | 1967-68 | | 1968-69 | |
|---|---|---|---|---|
| Garfield | -53 | 53.6% | -66 | 56.1% |
| Williamson | -62 | 45.4% | -56 | 46.1% |
| Monroe | +217 | 89.6% | +111 | 92.4% |
| Total Elementary | | 44.9% | | 43.1% |
| Total System | | 39.6% | | 41.0% |

In connection with the Garfield-Monroe boundary change, a June 17, 1968 letter from R. G. Gilbert, Director of Instruction and Curriculum, to Mr. W. W. Zinser, then Superintendent of Schools, makes recommendations regarding Monroe, Garfield, and Grant Elementary Schools. (Px 280). As to Garfield, it was recommended that some relief be provided by transferring one class to Monroe; such would enable a reduction of the pupil-teacher ratio at Garfield. Said letter neither discusses nor recommends changing the boundary of Garfield. The record does not indicate whether this recommendation with regard to Garfield was in fact implemented.

Based on the 1970 census map, the subject Marion Avenue area removed from the Garfield attendance district and placed within that of Williamson was predominately white in its residential population; about half thereof was 0% to 14% black, while nearly half was 14% to 25% black with a small section that was 25% to 50% black residentially. The parties stipulated that Chalmers Avenue, which was then placed within the Monroe attendance district, was predominately black in its residential population according to the 1960 and 1970 census data. (Stip. 253). For the school year immediately preceding these boundary changes, the percentage black students enrolled at Garfield and Williamson was not substantially above that of the elementary average, while Monroe's black student enrollment far exceeded said average. Thereafter for the 1968–69 school year, the percentage black students at all three schools increased slightly; nevertheless, the black student enrollment of Garfield and Williamson remained relatively close to the elementary school average. Thus, it appears that the Garfield-Williamson boundary change was racially neutral to integrative in effect since it maintained Williamson as an integrated school.

With regard to the Garfield-Monroe boundary change, Monroe was already a racially identifiable black school prior thereto. Thus the transfer of a predominately black residential area to Monroe would not have had a significant segregative effect. Rather, this boundary change probably helped maintain Garfield as a relatively integrated school. From the standpoint of facility utilization, however, the transfer of additional territory to Monroe does not appear administratively sound since Monroe was substantially overutilized throughout this period. Garfield, on the other hand, was underutilized both prior to and after the boundary change according to the figures shown above. Said figures, however, appear to be in conflict with the above mentioned June 1968 letter recommending that relief be given Garfield. (Px 280). Thus Garfield was apparently experiencing some difficulty in accommodating its student enrollment. Although Monroe does not appear to have been the solution, as discussed below, the Glenwood facility was leased at this time. In any event, if the actual intent of the school officials was to segregate, more black students could have been transferred to Monroe in order to preserve Garfield as a racially identifiable white school; however, such was not done. Thus, this boundary change was not meaningfully segregative as to Monroe; rather, it was racially neutral to integrative in effect as to Garfield.[57]

---

57. Plaintiffs' exhibit 19 provides that, as of September 5, 1968, the boundary between Garfield and Williamson Elementary Schools was just south of Marion Avenue. Further, according to said boundary description, West Chalmers, west of Oakhill was within the Monroe

The overutilized condition of Monroe Elementary School was the subject of a February 15, 1967 memorandum from G. H. Schoenhard to Dr. J. H. Wanamaker regarding the projected enrollments in the Monroe and adjoining elementary school attendance areas, and the probable need to lease the St. Patrick, Glenwood Avenue facility. (Px 245). Said memorandum indicates that attendance at Cleveland, Garfield, Grant, Monroe, and Williamson Elementary Schools would be steadily maintained over the course of the next five years. This was one of several factors considered in favor of securing St. Patrick Parochial School, a nine classroom facility located on Glenwood Avenue between Cleveland and West Chalmers Avenue, and approximately one and a half blocks northwest of Monroe. The positive factors were weighed against a number of negative factors such as the general belief that the school population was on the decline. The memorandum concluded by recommending that if the Glenwood facility was available at a moderate price its acquisition appeared feasible. Although there are references throughout the memorandum to sociological principles and the nature of the population residing in the area, the overriding consideration and motivation appears to have been the overcrowded conditions existing at the elementary schools.

Although the February 1967 memorandum recommended leasing the Glenwood facility, no action was taken to implement the same prior to the 1967–68 school year. Rather, it appears that a further survey of Monroe, Garfield, and Grant Elementary Schools was undertaken. Following such survey, recommendations were submitted by R. G. Gilbert, Director of Instruction and Curriculum, to Mr. W. W. Zinser, then Superintendent of Schools, in a letter dated June 17, 1968. (Px 280). The first recommendation therein was that relief be provided Monroe by transferring six classes of sixth grade students and three classes of fifth grade students to either Washington Elementary School or the St. Patrick, Glenwood Avenue facility.

Finally, the above recommendations were acted upon with the leasing of the Glenwood facility in 1968. As stipulated by the parties, Glenwood opened in that year with an attendance district coterminus with that of Monroe. (Px 249, Stip. 247).

|  | 1967–68 | | 1968–69 | |
|---|---|---|---|---|
| Glenwood | | | | 34.1% |
| Monroe | +217 | 89.6% | +111 | 92.4% |
| Total Elementary | | 44.9% | | 43.1% |
| Total System | | 39.6% | | 41.0% |

According to plaintiffs' exhibit 271, for the 1968–69 school year, Monroe served students in kindergarten through fifth grade while Glenwood housed only fifth and sixth grade students.

Initially, the Court notes the gross disparity between the percentage black students enrolled at Glenwood and Monroe for the 1968–69 school year. Since the two schools had the same attendance district, the racial composition of their student populations should logically be the same or at least similar. The record before the Court does not, however, provide any reasonable explanation for this disparity.

The leasing of the Glenwood facility in effect amounted to a purchased addition to Monroe Elementary School. It was not, however, equal to the construction or purchase of a new school. In view of the substantial overutilization of Monroe, this addition was clearly needed. Although the leasing of Glenwood may raise an inference of active isolation of the black students within the Monroe district, it equally may raise an inference that a racially neutral neighborhood school policy was actually the reason therefor.

The Boundary Change Report provides that, in August 1968, Falls and Parkwood

attendance district as shown on the 1970–71 elementary school overlay. Thus the boundary change described in stipulation 253 was correct in part. It should be noted, however, that the elementary school overlay for 1970–71 does not match that part of the boundary description in plaintiffs' exhibit 19 which provides that the boundary line runs north on the center of Market to the rear line on the south of Marion. Thus yet another discrepancy exists between the documents and overlays.

Avenues between Glenwood and Hillman were removed from the Monroe attendance district and returned to that of Grant Elementary School. (Px 249).

|         | 1967-68 |       | 1968-69 |       |
|---------|---------|-------|---------|-------|
| Monroe  | +217    | 89.6% | +111    | 92.4% |
| Grant   | -4      | 91.1% | -67     | 94.6% |
| Total Elementary |  | 44.9% |        | 43.1% |
| Total System     |  | 39.6% |        | 41.0% |

According to the 1970 census map, the area transferred was approximately half 0% to 14% black and half 50% to 90% black in its residential population. Since both Monroe and Grant were identifiably black schools, this boundary change had no significant racial effect. From the standpoint of facility utilization, the action appears to have been administratively sound in that Grant was underutilized.

For the 1969–70 school year, both Monroe and Glenwood Elementary Schools experienced a change in their respective grade structures. Monroe was changed from a kindergarten through grade five school to a kindergarten through grade six school, while Glenwood was changed from grades five and six to a grade four through six school. (Px 271).

|         | 1968-69 |       | 1969-70 |       |
|---------|---------|-------|---------|-------|
| Monroe  | +111    | 92.4% | +23     | 92.6% |
| Glenwood |        | 34.1% | -71     | 95.5% |
| Total Elementary |  | 43.1% |        | 44.7% |
| Total System     |  | 41.0% |        | 42.7% |

The racial data implies that this grade structure change had a segregative effect upon Glenwood. According to said data, when Glenwood opened it was an integrated school with a student enrollment that was 34.1% black. However, for the 1969–70 school year, the percentage black students enrolled at Glenwood drastically increased to 95.5%. Such increase cannot logically be attributed to the subject grade structure

change alone. Thus the 1968–69 figure purporting to represent the percentage black students enrolled at Glenwood is clearly suspect. The Court finds that this grade structure change was more likely an attempt to better and more efficiently utilize existing facilities consistent with the neighborhood school policy.

According to the Boundary Change Report, on September 25, 1970, Dr. R. Viering announced the closing of Bancroft Elementary School and the assignment of its students to Sheridan Elementary School. (Px 249; Stips. 145, 151).

|               | 1969-70 |       | 1970-71 |       |
|---------------|---------|-------|---------|-------|
| Bancroft [58] | -186    | 1.1%  |         |       |
| Sheridan      | -220    | 10.3% | -89     | 7.2%  |
| Taft          | -43     | 0.2%  | -53     | 0.7%  |
| Adams         | -168    | 4.8%  | -103    | 3.9%  |
| Princeton Jr. | +90     | 64.0% | +75     | 71.2% |
| South Sr.     | -209    | 67.9% | -249    | 74.9% |
| Wilson Jr. & Sr. | -311 | 1.5%  | -266    | 1.1%  |
| Total Elementary |      | 44.7% |         | 44.5% |
| Total Jr.     |         | 51.8% |         | 51.6% |
| Total Sr.     |         | 34.1% |         | 39.3% |
| Total System  |         | 42.7% |         | 44.1% |

Thus plaintiffs' exhibit 221 provides that, on October 5, 1970, Bancroft closed and its 130 students in grades one through seven were transported to Sheridan for the remainder of the 1970–71 school year. Bancroft's 50 kindergarten students were also transferred to Sheridan, but the parents of such students were responsible for their transportation thereto. (Px 221). It should be noted that prior to this assignment, Sheridan Elementary School was only a kindergarten through grade six school with no seventh graders of its own. (Px 271).

As indicated by a September 25, 1970 letter from R. F. Viering, then Superintendent of Schools, to the parents of Sheridan students, it was recommended that use of Bancroft be discontinued due to a decrease

---

**58.** According to plaintiffs' exhibit 85, Bancroft Elementary School had 12 classrooms. Thus its maximum optimum utilization was 360 students. Further, it should be noted that there is another discrepancy between the exhibits with regard to Bancroft's enrollment for the 1969–70 school year. For that year, plaintiffs' exhibit

158 provides that Bancroft's enrollment was 174 while plaintiffs' exhibit 221 indicates that Bancroft's enrollment just prior to its closing was 180. The record before the Court does not clarify this inconsistency and thus the Court shall rely on plaintiffs' exhibit 158 for the previously discussed reasons.

in enrollment, and that Bancroft students be assigned to Sheridan since adequate facilities existed therein. (Px 284). Said letter further provided that when former Bancroft students progressed to the secondary level, they would attend the same junior and senior high schools as if they were still within the Bancroft attendance district. Such feeder pattern arrangement was to continue unless and until boundary changes were effected. (Px 284).

The Bancroft area was 0% to 14% black in its residential population according to the 1970 census map. A reassignment of the Bancroft students to Sheridan was most logical in light of the distance between the two and the optimum utilization of Sheridan. Prior to the assignment, Sheridan was underutilized for the 1969–70 school year by 220 students and Bancroft and Sheridan each had a black student enrollment that was considerably below the elementary average. Thereafter, Sheridan's percentage black students declined slightly probably as a result of the influx of additional white students. The closing of Bancroft and concomitant reassignment of its students to Sheridan were racially neutral in effect and administratively reasonable. The failure to assign the Bancroft students to Princeton and South was apparently attributable to Princeton's overutilized condition, whereas Wilson was significantly underutilized.

The Boundary Change Report provides that, on September 25, 1970, Glenwood Elementary School closed. (Px 249). Plaintiffs' exhibit 221, however, indicates that Glenwood closed on October 5, 1970. The conflict in the data does not end with the date of Glenwood's closing. Stipulation 150 provides that all of Glenwood's students were assigned to Monroe Elementary School, whereas stipulation 248 indicates that a majority of said students were returned to Monroe. Further, plaintiffs' exhibit 221 provides that 175 students in grades four, five, and six were transferred upon the closing of Glenwood. All students residing on either side of Parkwood and Falls Avenues, and on Edwards, Hillman, and Glenwood between Falls and Parkwood

within the Monroe attendance district were assigned to Grant Elementary School. (Px 221). According to said exhibit, all other Glenwood students were assigned to Monroe Elementary School. (Px 221).

| | 1969-70 | | 1970-71 | |
|---|---|---|---|---|
| Glenwood | -71 | 95.5% | | |
| Monroe | +23 | 92.6% | +76 | 95.0% |
| Grant | -82 | 94.5% | -55 | 95.6% |
| Total Elementary | | 44.7% | | 44.5% |
| Total System | | 42.7% | | 44.1% |

According to the Boundary Change Report, upon the closing of Glenwood in September 1970, Falls and Parkwood Avenues were removed from the Monroe attendance district and returned to that of Grant Elementary School. (Px 249). This same report, however, placed these two streets within the Grant district in 1968. With regard to this conflict, plaintiffs' expert William Lamson testified that there was a chance that Glenwood actually serviced the entire area up to the original Monroe boundary at Lakewood Avenue, and that the boundary change involving Parkwood and Falls did not occur until the closing of Glenwood. Additionally, as indicated above, plaintiffs' exhibit 221 provides that students residing on Parkwood and Falls Avenues were reassigned to Grant at Glenwood's closing. Based on the foregoing, it appears that the subject boundary change actually occurred in 1970. Based on the 1970 census map, Falls and Parkwood Avenues were approximately half 0% to 14% black and half 50% to 90% black in their residential population.

Prior to the 1970 closing of Glenwood, Monroe, Grant, and Glenwood itself all had black student enrollments that far exceeded the elementary average. Thus the closing of Glenwood and reassignment of its students was not racially significant as to these elementary schools. Moreover the assignment of Glenwood students to Monroe was consistent with the neighborhood school policy since the attendance districts for Glenwood and Monroe had been coterminous. In terms of facility utilization, however, this reassignment was apparently

not administratively sound in that Monroe's overutilization increased thereby. With regard to alternatives, the only contiguous school which had sufficient available space during the 1970–71 school year to accommodate both Glenwood's students and Monroe's overflow was Washington Elementary School. Although assignment of these students to Washington would have been clearly integrative, such would have been contrary to the neighborhood school policy and would have entailed the added cost of transportation. In view thereof, the assignment of Glenwood students to Monroe does not appear to have been unreasonable.

The boundary change between Monroe and Grant at the closing of Glenwood was racially neutral in effect as to these schools. Both prior to and after the change, Grant and Monroe were racially identifiable black schools with student enrollments that were over 90% black. From a facility utilization standpoint, this boundary change was a sound administrative action in light of Grant's underutilization.

As discussed above, for the 1970–71 school year Sheridan Elementary School accommodated the seventh grade students from the former Bancroft Elementary School. With the 1971–72 school year, however, Sheridan returned to its original kindergarten through grade six grade structure. (Px 271, Stip. 156). As a result, seventh grade students from the former Bancroft area probably attended Adams which at the time was a kindergarten through grade eight elementary-junior high school. All of the other elementary schools feeding Adams for the eighth grade were, however, kindergarten through seventh grade schools.

|  | 1970–71 | | 1971–72 | |
|---|---|---|---|---|
| Sheridan | –89 | 7.2% | –90 | 7.8% |
| Adams Elem. & Jr. | –103 | 3.9% | –53 | 2.8% |
| Princeton Jr. | +75 | 71.2% | +82 | 73.4% |
| Total Elementary | | 44.5% | | 39.8% |
| Total Junior | | 51.6% | | 63.0% |
| Total System | | 44.1% | | 43.4% |

Although the assignment of predominately white students from the former Bancroft area to Adams instead of Princeton appears to have been segregative in effect, it was a reasonable action. During the school years immediately preceding and following this assignment, Princeton was overutilized and had no available space for any additional students. On the other hand, Adams was considerably underutilized prior to the assignment and remained so thereafter despite the addition of the former Bancroft students. Further, this reassignment continued a previously existing feeder pattern.

## CHANEY ZONE

The Chaney High School zone consists of only the following seven schools: Chaney High School; Volney Rogers and West Junior High Schools; and Kirkmere, Stambaugh, Washington, and West [59] Elementary Schools.

In 1940, a gymnasium was added to the present West Elementary and Junior High School facility. At that time, however, it appears that said facility was in fact Old Chaney Elementary and Senior High School. Further analysis of this addition is not necessary herein. However, said addition constituted the only action taken by the school officials on the west side of Youngstown prior to 1953 according to the record before the Court.

As stipulated by the parties, Chaney Senior High School opened with 28 classrooms in 1953. (Stip. 118). This facility obviously replaced the Old Chaney High School built in 1925, and was located south of that structure and almost in the center of the area of Youngstown west of Mill Creek Park. The Old Chaney High School site was shared with Chaney Elementary School which was, in fact, housed within the high school building. (Px 78). Apparently said facility was converted into West Elementary and Junior High School. The exact date of such con-

59. Based on defendants' exhibits P–24 and P–32, it appears that West Elementary and Junior High Schools are located within the same building. Such is confirmed by plaintiffs' exhibit 85 which provides that facilities for the elementary school are located on the south wing of West Junior High School. Further, as will be discussed below, the West Elementary-Junior High School facility is apparently the Old Chaney Elementary and High School building.

version cannot be determined on the basis of the record before the Court.[60]

| | 1950-51 | 1952-53 | |
|---|---|---|---|
| Chaney Elementary | +21 | | |
| West Elementary | | | 0.0% |
| Washington | -509 | -268 | 0.0% |
| Stambaugh | -424 | -314 | 13.3% |
| West Jr. | | | |
| Old Chaney Sr. | +131 | +120 | 3.0% |
| South Sr. | +45 | +101 | 9.9% |
| Rayen Sr. | -225 | -238 | 19.5% |
| Total Elementary | | | 20.1% |
| Total Junior | | | 21.1% |
| Total Sr. | | | 14.4% |
| Total System | | | 18.6% |

The construction of a new facility for Chaney High School was probably prompted in part by the post World War II housing boom on the west side of Youngstown. Whereas prior to the war this area was substantially undeveloped, thereafter it experienced a considerable population growth. As evidence thereof, Old Chaney was overutilized for both the 1950-51 and 1952-53 school years. Such overutilization clearly demonstrated the need for a larger high school facility in the area. Although the new Chaney High School facility actually contained fewer classrooms than did Old Chaney, Old Chaney High School served as both a junior and senior high school. With the opening of West Junior High School, however, Chaney became exclusively a senior high school. Further, the building of a new high school facility on the west side was consistent with the overall goals of the 1921 Survey. The west side of Youngstown was separated from the rest of the city by a natural barrier, Mill Creek. Being isolated and an area of residential growth, a complete, modern school plant was needed to effectuate a neutral neighborhood school policy. Race has not been shown to have been a factor at the time of the planning and building of Chaney High School. Rather, the Court finds that the construction of a new Chaney High School was racially neutral in effect and administratively sound.

Additionally, the opening of West Elementary School as a replacement for Chaney Elementary School appears to have been racially neutral in effect. Although Washington and Stambaugh Elementary Schools were substantially underutilized, for the 1952-53 school year, Washington had no black students, while the percentage black students enrolled at Stambaugh was considerably below the elementary average. This action was consistent with a neutral neighborhood school policy, and reasonable in terms of facility utilization.

Since the Court is unable to determine from the data presented herein when West Junior High School actually opened, specific analysis thereof is precluded. It does not appear, however, that such action was either intentionally segregative or unreasonable. As indicated above, the population residing on the west side of Youngstown grew significantly after World War II. Further, prior to the opening of West Junior High School, there was no separate or distinct junior high school west of Mill Creek Park. Thus, both sound administrative judgment and a neutral neighborhood school policy dictated the opening of West Junior High School.

Also in 1953, Kirkmere Elementary School was opened on the southwest side of

---

**60.** Based on the February 1952 Report, plaintiffs' exhibit 83, it is clear that West Elementary and Junior High School were not opened as of that time. However, students were attending West Elementary School in the 1952-53 school year according to the enrollment figures contained in plaintiffs' exhibits 106 and 108. Said exhibits do not list the enrollment of West Junior High School until the 1958-59 school year. Thus it appears that West Junior High School was opened sometime between the 1952-53 school year and the 1958-59 school year. It should be noted that prior to the opening of West Junior High School, there was no junior high school as such on the west side of Youngstown. The February 1952 Report recommended the opening of such a facility by 1960. (Px 83).

Prior to 1961-62, however, the maximum optimum utilization of West Elementary and West Junior High Schools cannot be determined on the basis of this record. Thereafter, according to defendants' exhibits P-24 and P-32, the West facility had 53 classrooms with 20 used for elementary functions and 33 for junior high functions.

Youngstown. The February 1952 Report on the Youngstown schools had recommended that a new elementary school be built in the Kirk-Schenley Avenue district as soon as possible since that area was the most rapidly developing section of Youngstown, and was expected to house over 1000 families by 1957. (Px 83). As stated in the Report, this southwestern area of Youngstown was not properly served by an elementary school, and as a result the children residing therein had to travel extensive distances to reach a school.

|  | 1952-53 | | 1958-59 | |
|---|---|---|---|---|
| Kirkmere |  |  | +13 | 0.0% |
| Cleveland | +147 | ·7.3% | +85 | 14.4% |
| Washington | -268 | 0.0% | -342 | 0.0% |
| West Elementary |  | 0.0% |  | 0.0% |
| Stambaugh | -314 | 13.3% | -381 | 12.5% |
| Total Elementary |  | 20.1% |  | 29.4% |
| Total System |  | 18.6% |  | 26.3% |

The need for Kirkmere Elementary School is confirmed by the fact that despite an addition thereto in 1957, Kirkmere was overutilized for the 1958–59 school year. Furthermore, the construction of Kirkmere was thoroughly consistent with a racially neutral neighborhood school policy. Although West, Washington, and Stambaugh Elementary Schools served the west side of Youngstown and the latter two were underutilized for the 1952–53 school year, they all were located a substantial distance from the new housing development in the Kirkmere area. To utilize these schools, transportation would probably have been necessary. In view of the growth in the area, a capital expenditure in the form of a new school appears to have been a rational response. Additionally, since there were no black residential areas within a reasonable distance of Kirkmere Elementary School, its opening appears to have been a racially neutral action.

Following the opening of Kirkmere Elementary School, a boundary change was effected between Cleveland and Kirkmere in 1954. As stipulated, the eastern and southern boundaries of the Cleveland Elementary School attendance district were contracted to transfer all of the area west of Arden Boulevard to Kirkmere. (Stip. 255).

|  | 1952-53 | | 1958-59 | |
|---|---|---|---|---|
| Kirkmere |  |  | +13 | 0.0% |
| Cleveland | +147 | 7.3% | +85 | 14.4% |
| Total Elementary |  | 20.1% |  | 29.4% |
| Total System |  | 18.6% |  | 26.3% |

Based on the 1950 census map, this area was 0% to 14% black in its residential population.

Since the relevant data for the school years immediately preceding and following this boundary change are not available in the record, the Court cannot accurately analyze this boundary change. However, Cleveland was overutilized during this period, while Kirkmere, a new facility, could probably help to relieve Cleveland's overcrowded condition. The attendance districts for both schools were predominately white residentially, and thus the evidence does not establish that the subject boundary change was segregative in effect or intent.

It should be noted that the oldest boundary description in the record for Kirkmere Elementary School is dated August 23, 1954. (Px 19). Said boundary description confirms the above described 1954 Cleveland-Kirkmere boundary change. In conjunction therewith, plaintiffs' expert William Lamson inferred that at the opening of Kirkmere in 1954 there was an option in existence between Kirkmere and Washington Elementary Schools. Such is substantiated by a July 7, 1961 memorandum from G. H. Schoenhard concerning "Regulations regarding transportation of children in Kirkmere attendance area to Washington School." (Px 19). As indicated therein, the purpose of the memorandum was to put in writing the existing or unwritten policy that had been in effect for several years. Such policy provided that children residing on Old Furnace Road, West Warren Avenue, Neshobo Avenue, Tioga Avenue and DeCamp Road in the Kirkmere attendance district could elect to be transported to Washington Elementary School. However, kindergarten children residing on these

streets were to attend Kirkmere unless special permission was obtained from the Division of Child Accounting. Further, once a student had chosen an elementary school, the decision was final. (Px 19). Based on both the 1950 and 1960 census maps, the streets subject to the option were 0% to 14% black in their residential population. It should be noted that the existence of this option is not illustrated prior to the 1965–66 elementary school overlay.

From the opening of Kirkmere through the 1961–62 school year, both Kirkmere and Washington Elementary Schools were predominately, if not totally, white. Thus, any such option was racially neutral in effect. In view of Washington's underutilization during this period, and Kirkmere's overutilized condition in 1958–59, this option does not evidence poor administrative judgment to the extent that it served to decrease the enrollment of Kirkmere. Therefore, the existence of the option was neither unreasonable nor segregative. A more detailed analysis thereof is precluded since the record before this Court does not demonstrate exactly when the option was created and discontinued, or if it is still in existence today.

The March 21, 1957 Report entitled "Some School Building Considerations By Sections Of The City" indicates that Kirkmere needed an addition of four regular classrooms and two kindergartens. (Px 264). In apparent response thereto, and as stipulated by the parties, Kirkmere Elementary School had a six room addition built in 1957. (Stip. 123).

| | 1952-53 | | 1958-59 | |
|---|---|---|---|---|
| Kirkmere | | | +13 | 0.0% |
| Cleveland | +147 | 7.3% | +85 | 14.4% |
| Washington | -268 | 0.0% | -342 | 0.0% |
| West | | 0.0% | | 0.0% |
| Stambaugh | -314 | 13.3% | -381 | 12.5% |
| Total Elementary | | 20.1% | . | 29.4% |
| Total System | | 18.6% | | 26.3% |

Construction of Kirkmere's addition took place during the 1957–58 school year. As a result, it was necessary for some Kirkmere students to be reassigned to other elementary schools during said construction period. Two letters of August 28, 1957 from J. Fred Essig, then Superintendent of Schools, informed parents of the reassignment of fifth and sixth grade students.

The first letter was sent to parents of fifth and sixth graders residing south of Canfield Road. (Px 281). These students were to be transported to Cleveland Elementary School via municipal buses with the Board of Education providing the necessary bus tickets. Said letter provides that it was the sincere hope of the school officials to return these students to Kirkmere on February 1, 1958. (Px 281).

The second letter was addressed to parents of sixth grade students in the Kirkmere school district. (Px 290). It appears that this letter was sent to all such parents with the exception of those residing in the area south of Canfield Road who probably received the above described letter. According to the instant letter, these sixth graders were to be transported by the Board of Education to Stambaugh Elementary School commencing September 4, 1957. As with the previous letter, this one advised parents of the school officials' hope that this temporary reassignment would terminate by February 1, 1958 upon the completion of the Kirkmere addition. (Px 290).

Due to the lack of relevant data in the record for the 1957–58 school year, the Court cannot specifically analyze these temporary reassignments. However, such can be generally assessed by interpolating from the 1958–59 data. Of the three elementary schools within the Chaney zone, it appears that only Washington and Stambaugh had sufficient available room to accommodate Kirkmere students. Although Washington was the closer of the two in terms of geographic proximity, it had no black students enrolled during the 1958–59 school year. Stambaugh, however, had a student enrollment that was 13.3% black for the 1952–53 school year, and 12.5% black for the 1958–59 school year. Thus the temporary assignment of white students from Kirkmere to Stambaugh Elementary School was appar-

ently integrative in effect. Likewise, the reassignment of Kirkmere students to Cleveland Elementary School was racially integrative in effect since Cleveland had a 14.4% black student enrollment for the 1958–59 school year. Although Cleveland was overutilized for said school year, such may not necessarily have been the case during the next preceding school year. Thus it is not established that the use of Cleveland was unwise from a facility utilization standpoint. On the basis of the record herein, the Court cannot reasonably draw a conclusion that these temporary reassignments were intentionally segregative.

The construction of an addition to Kirkmere Elementary School was a rational response on the part of the Youngstown school officials to the continued growth in this southwestern corner of the city. After the addition, Kirkmere was overutilized by thirteen students for the 1958–59 school year. This fact clearly demonstrates the need for the addition to Kirkmere Elementary School. Although Washington and Stambaugh were considerably underutilized prior to and after the Kirkmere addition, the permanent reassignment of students to those schools would undoubtedly have entailed transportation.[61] Such was not only costly, but in conflict with the dictates of a neighborhood school policy that required provision of adequate facilities within walking distance for students.

The Kirkmere addition appears to have been a racially neutral action on the part of the Youngstown school officials. The schools contiguous to Kirkmere all had a black student enrollment that was considerably less than the system average both prior to and after the addition. In fact, Kirkmere, Washington and West had no black students enrolled for the 1958–59 school year. During the same school year, the percentage black students attending Cleveland and Stambaugh was less than half the total elementary average. Thus, the Court finds from this record that factors other than race motivated the construction of the Kirkmere addition, and that such was not an intentionally segregative action.

In 1959, Volney Junior High School opened with 24 classrooms. (Stip. 124). Located on the burgeoning southwest side of Youngstown, it was the first facility constructed for exclusive use as a junior high school west of Mill Creek Park.

|  | 1958–59 |  | 1961–62 |  |
|---|---|---|---|---|
| Rogers Junior |  |  | −275 | 0.0% |
| West Junior |  | 2.1% | −364 | 3.0% |
| Princeton Junior | −192 | 10.0% | −7 | 13.6% |
| Hillman Junior | −118 | 41.0% | −198 | 63.0% |
| Total Junior |  | 24.7% |  | 31.1% |
| Total System |  | 26.3% |  | 29.8% |

Although the record herein lacks relevant data for the 1959–60 school year, it appears that Volney Rogers Junior High School opened with a predominately, if not totally, white enrollment. Based on the 1960 census map, the area surrounding Rogers was 0% to 14% black residentially, and there were no significant black residential areas within a reasonable distance from this facility. With a maximum optimum utilization of 720 students, Rogers' enrollment for the 1961–62 school year was only 445 students. Thus two years after its opening, Volney Rogers Junior High School was underutilized by 275 students. At the same time, there were 569 empty seats available in the three contiguous junior high schools. Neither West nor Hillman Junior High Schools could alone accommodate Rogers' total enrollment. Additionally, the assignment of

---

61. The March 21, 1957 Report, plaintiffs' exhibit 264, in discussing the west side of Youngstown, noted that Stambaugh would have some extra room apparently to provide relief for Kirkmere. Said report states, however, that to utilize such space would require not only "long hauls," but also placing students "from better neighborhoods into a school very much below their scale." (Px 264). Although the latter statement indicates consideration of factors outside of pure utilization statistics, it is unlikely that such refers to race or that, if it did, race played any role in the final decision. This conclusion is premised upon the fact that Kirkmere students were temporarily reassigned to Stambaugh during the addition construction although they could have been sent to Washington which had sufficient unused space and was closer geographically.

the students residing in the southwestern section of Youngstown to Hillman would most assuredly have required transportation and would have been contrary to the neighborhood school policy. Moreover, in view of the substantial post World War II housing development of the southwest section of Youngstown, and the concomitant increase in the student population as evidenced by the Kirkmere Elementary School enrollment, sound administrative planning called for affirmative action to meet the needs of this growing area. Although the school officials may have overestimated the future population growth, the construction of Volney Rogers Junior High School evidences a rational response by the school officials under the circumstances then existing. In view thereof, it cannot be concluded that the capital investment involved in this school construction was an unreasonable approach to the growth experienced on the southwest side, and that transportation of students considerable distances to existing facilities was a more reasonable solution. Thus on the basis of this record, the Court finds that the construction of Volney Rogers Junior High School was not an intentionally segregative action.

Prior to 1960, the western boundary of South Senior High School extended beyond Arden Boulevard to the western border of Youngstown and included all territory south of Canfield Road. (Stip. 269). In 1960, however, the western boundaries of both Princeton Junior and South Senior High Schools were contracted to transfer the area west of Arden Boulevard and south of Canfield Road to Volney Rogers Junior and Chaney Senior High Schools, respectively. (Stips. 265, 269).

|  | 1958-59 | | 1961-62 | |
|---|---|---|---|---|
| Princeton Junior | -192 | 10.0% | -7 | 13.6% |
| Rogers Junior | | | -275 | 0.0% |
| Chaney Senior | +49 | 1.3% | -57 | 1.9% |
| South Senior | -54 | 14.9% | -595 | 24.1% |
| Total Junior | | 24.7% | | 31.1% |
| Total Senior | | 18.8% | | 23.7% |
| Total System | | 26.3% | | 29.8% |

As further stipulated, the area transferred was predominately white in its residential population according to the 1950, 1960 and 1970 census data. (Stip. 269).

Since the record herein does not contain the relevant data for the school years immediately preceding and following these boundary changes, the Court is precluded from fully analyzing the same. However, it does appear that the subject boundary changes were racially neutral in effect. Both Princeton and Volney Rogers Junior High Schools had black student enrollments for the 1961-62 school year that were considerably less than the system average. During the same school year, the black student population at Chaney was substantially below the system average, while that at South was approaching said average. From a facility utilization standpoint, Volney Rogers Junior High School could easily accommodate additional students whereas Princeton was near its optimum utilization level. On the senior high level, both Chaney and South were underutilized although only South was substantially so. Thus in terms of facility utilization, these boundary changes do not appear to have been administratively unsound.

Moreover, the subject boundary changes eliminated the dual feeder pattern in effect for students attending Kirkmere Elementary School, and made the boundaries of Rogers and Chaney conform therewith. Such was consistent with the 1921 Survey which advocated the establishment of a complete school plant west of the natural boundary created by Mill Creek Park; it was also consistent with a neutral neighborhood school policy. Thus the court concludes that these boundary changes have not been shown by the evidence to have been racially segregative.

In 1961, one classroom was added to the West facility. However, it is unclear from the data before the Court whether this addition was to West Elementary or West Junior High School.

|  | 1958-59 |  | 1961-62 |  |
|---|---|---|---|---|
| West Elementary |  | 0.0% | -131 | 0.0% |
| West Junior |  | 2.1% | -364 | 3.0% |
| Total Elementary |  | 29.4% |  | 33.2% |
| Total Junior |  | 24.7% |  | 31.1% |
| Total System |  | 26.3% |  | 29.8% |

Since both West Elementary and West Junior High Schools were substantially underutilized for the 1961–62 school year, it appears that for whichever level the classroom was built it was probably not needed. There may be, however, an explanation for this addition which has not been made known to the Court. Although the addition appears to evidence poor administrative judgment, it was a racially neutral action, if of any significance.

According to the Boundary Change Report, in September 1963, all of Chaney Circle and Thurber were transferred from the West Elementary School attendance district to that of Washington Elementary School. (Px 249). Previously, it appears that this area had been split between the two schools. According to the 1960 elementary school overlay, however, Thurber appears to have already been within the Washington attendance district. Thus there is an inconsistency between the Report and overlay. Further, the 1965 elementary school overlay shows an additional boundary change whereby part of McCollum Road and Mill Creek Park were also transferred from the West Elementary School attendance district to that of Washington.

|  | 1961-62 |  | 1963-64 |  |
|---|---|---|---|---|
| Washington | -458 | 0.0% | -316 | 0.3% |
| West Elementary | -131 | 0.0% | -21 | 0.0% |
| Total Elementary |  | 33.2% |  | 39.1% |
| Total System |  | 29.8% |  | 35.1% |

Based on the 1960 census map, the areas transferred from West to Washington were 0% to 14% black in their residential population. Since both schools had a negligible black enrollment for the school year subsequent to these changes, it appears that such were racially neutral in effect. From a facility utilization standpoint, the subject territorial transfers served to reduce to a degree Washington's underutilization. West's enrollment situation also benefited since during this period it was apparently experiencing an increase in its student population. Although West Elementary School lost territory in these transfers, its enrollment increased. Without these transfers, West probably would have been overutilized.

Moreover, the subject Chaney Circle boundary change seems logical in terms of geographic proximity. Prior thereto, some of the students residing on Chaney Circle had to pass through the Washington attendance district in order to reach West Elementary School. After the boundary change, all students living on Chaney Circle attended Washington Elementary School.

The May 1964 Report on the East High School zone noted that Chaney High School was more crowded than East at that time. (Px 243). Specifically, it is noted therein that for two years the Youngstown school officials had been forced to use an extended school day at Chaney in order to accommodate its enrollment. Such day was 25% or more longer than that of East High School. (Px 243). Apparently in response to the foregoing, Chaney had fourteen additional classrooms built in 1966. (Stip. 129).

|  | 1963-64 |  | 1967-68 |  |
|---|---|---|---|---|
| Chaney | +298 | 1.0% | +92 | 1.2% |
| Rayen | -270 | 36.5% | -299 | 43.4% |
| South | -252 | 34.9% | -199 | 58.1% |
| Total Senior |  | 30.1% |  | 30.4% |
| Total System |  | 35.1% |  | 39.6% |

The need for this addition to Chaney is demonstrated not only by the 1964 Report, but also by the enrollment figures for the 1963–64 school year. In that year, Chaney was overutilized by 298 students. Although it appears that Rayen and South High Schools could have relieved Chaney's overcrowded condition, the assignment of Chaney students to these schools would have entailed additional transportation. Such may have been considered an undesirable solution in light of the expected continued

growth on the west side of Youngstown; such growth apparently counseled an addition to Chaney in order to meet the future needs of this area. A number of competing considerations undoubtedly faced the school officials. On the basis of this record, it cannot be reasonably concluded that their decision to build an addition to Chaney was intentionally segregative. The construction of the Chaney High School addition was consistent with the overall plan to provide a complete school plant on the west side of Youngstown, and a neutral neighborhood school policy.

## COMPARATIVE ANALYSIS

The preceding detailed analysis of the actions of the school officials does not demonstrate a clear pattern of segregative action in the Youngstown public school system during the past thirty-odd years. Virtually every school in the city has experienced integrative changes, segregative changes, and neutral changes. Virtually every action or inaction which was segregative in effect had a sound, racially neutral basis demonstrated in the record. As a rule, the actions with the least support in the record from non-racial factors were integrative in effect.

Yet the primary focus of the prior analysis has been on the individual changes; broader comparative analysis, where necessary, has been reserved for this section.

Upon careful review and evaluation of the entire record, the Court finds that only three categories of the many acts and omissions to act of the Youngstown school officials and their predecessors demonstrate any reasonable possibility of establishing a pattern of intentionally segregative actions. These are: 1) the various assignments of the students residing north of Thornhill Avenue in the Old Harrison district from 1947 through 1976; 2) the various boundary changes between Monroe, Garfield, Cleveland and Williamson Elementary Schools; and 3) those actions which allegedly isolated Washington Elementary School from the black population of the City of Youngs-

town. These categories shall be separately addressed.

A short summary of the assignments of the Old Harrison students will aid analysis. Old Harrison was closed in 1949, and the students residing south of Thornhill Avenue were assigned to Madison Elementary School. Since in 1952–53, Madison's percentage black student population was almost exactly at the elementary school average despite this influx of white students, it is reasonable to infer that its percentage black student population prior to 1949 was above the elementary school average. Therefore this assignment was integrative in effect.

The students residing north of Thornhill Avenue were, as a result of their parents' protests, assigned to Richey Elementary School. So as to permit their retention in the Rayen High School feeder pattern, there were relatively few students involved; in fact, the record does not demonstrate that this area ever generated more than thirty-odd students. Residentially, this area has since 1940 been 0% to 14% black.

This arrangement continued until 1951 when the students residing north of Thornhill Avenue were reassigned to Elm Elementary School. As Elm was 26.4% black in 1952–53, and thus over the elementary school average, this reassignment was clearly integrative in effect. The Old Harrison students attending Madison were unaffected by this change.

This arrangement continued until, in 1957, Harrison Elementary School was opened. It replaced Old Harrison, and was built, in part, to serve Kimmel Brook and Thornhill Village. Though said facility was quite sizeable by local standards, it was apparently insufficient to house all the students residing in its territory, which included the area north of Thornhill Avenue. This fact, apparently in conjunction with the 1949 promise to families residing north of Thornhill Avenue that their children would continue in the Rayen feeder pattern, probably resulted in the continued assignment of those students to Elm. Yet

Elm had a significantly greater percentage black student population than did Madison; thus the failure of the school officials to require those students to attend their neighborhood school can only be viewed as integrative in effect. This effect, together with the obvious need for a new facility in that area, totally negates an inference of intentional discrimination in either the assignment of these students or the construction of Harrison.

These assignments continued until, in 1965, Elm was closed. The students residing north of Thornhill Avenue were informally reassigned to Harding. Harding was significantly below the elementary school average percentage black population, and thus the subject assignment may be regarded as slightly segregative in effect. A readily apparent, non-racial justification for the action taken exists. Harding and McKinley were the only schools contiguous to these students' residential area that were not overutilized in 1963–64, the school year next prior to 1965 for which figures are available. Harrison was, at this time, assigning part of its students to other contiguous schools; therefore it may not reasonably be considered "underutilized" for purposes of analysis herein.

Finally, in 1971, the 1965 reassignment of these students was formalized. Harding's percentage black student population was significantly below the elementary school average in 1971–72, while that of Harrison significantly exceeded it. Further, it appears that by 1971, Harrison was significantly underutilized and thus could have accommodated said students.

Finally, these students were reassigned from Harding to McKinley Elementary School in September, 1973. This reassignment resulted from the school officials' conclusion that Harding, which in that year was substantially below the total elementary school percentage black student enrollment, was overutilized. Again, however, these students were not assigned to Harrison.

When viewed in this chronological framework, it is apparent that, prior to 1965, there is no reasonable basis for inferring discriminatory effect or intent as to these assignments. The reassignment of these students in 1965, and the formal boundary change reflecting this in 1971, provide only two bases for such an inference: the 1965 reassignment to Harding was slightly segregative in effect and by 1971 Harrison had sufficient unutilized space to house these students. The Court finds these bases insufficient, in light of the historical background of these decisions to establish a prima facie case of segregative intent. The reassignment in 1973 to McKinley, though slightly segregative in effect, did not result from segregative purposes as demonstrated by Irene Ward's December 19, 1972 memorandum to Superintendent Robert Pegues, Jr. Further Superintendent Pegues ordered this reassignment. In view of Superintendent Pegues' expressed commitment to improve racial balance in Youngstown and his actions effecting same, the Court simply cannot credit an inference that this reassignment resulted from a segregative purpose.

However, the record also contains the September 11, 1967 memorandum from G. H. Schoenhard to W. W. Zinser. (Px 244). This memorandum states, *inter alia,* as follows:

> Harrison School (1958), an 18 classroom, elementary school, was not built to accommodate all of the children of its attendance area. Each year it is filled to reasonable capacity and the other children of the area are bussed to Madison School and to Harding.

> .     .     .     .     .     .

> Harding School takes about 30–35 children from the far north end of the Harrison attendance area. These pupils (1–6) live in a rather isolated area and sociologically are quite different from those pupils who attend Harrison or Madison. At one time they had their own little school there but it has been taken down. They

are quite happy to be bussed to Harding. Harding has plenty of room for them.

. . . . .

Although there is plenty of room at the Harrison site, it has never been thought wise to enlarge the school. The socio-economic problems are severe in this area. It includes a large public housing development, Kimmelbrook Homes, and Thorn Hill Village, an inexpensive private home area developed immediately after World War II.

Please feel free to discuss this situation with me. It is an interesting one.

The statement that Harrison was "not built to accommodate all of its children" may, in view of the later references to socio-economic problems, be read to mean that racial factors influenced the decision of school officials in the design of Harrison. However, such statement most probably constituted mere hindsight analysis. In 1957, Dr. Schoenhard was only an assistant principal.

More troubling is the reference to the "sociological" differences between the students residing north of Thornhill Avenue and the remaining students in the Harrison district. Since sociological compatibility with the students at Harding is inferred, it is possible that Dr. Schoenhard was referring to the residents' races. If such was his intention, the subsequent statement that it was never thought "wise" to enlarge Harrison, presumably because of the socio-economic problems, raises an inference of an intentional omission to act, on racial grounds, to relieve the overcrowding at Harrison by building an addition thereto.

Yet Dr. Schoenhard testified that Thornhill Village was a white residential neighborhood. (Tr. Vol. 13, 2900). This fact implies that Dr. Schoenhard's reference to sociological and socio-economic problems was referring to factors such as "income and social position." Webster's Third New International Dictionary 2163 (1965); such factors clearly cross racial lines. Upon close scrutiny of the entire record, including Dr. Schoenhard's testimony regarding the role of racial considerations in his decisional process, the Court does not believe that he was referring to race in this memorandum. Further, the credible evidence will not support a finding that Dr. Schoenhard was, by the broad and rather ambiguous comments, indicating that race was a factor in the decisional processes of other school officials.

The Court's prior discussion of the various actions of the Youngstown School officials in the South High School zone demonstrated the insufficiency of the evidence of intentional segregative action or inaction in said area. However, plaintiffs argue that there were long-term, segregative effects which evidence intentional racial discrimination.[62] This argument merits further discussion.

The theory espoused at trial by another of plaintiffs' experts, William Wayson, essentially states that during the 1950's and 1960's, the school officials gerrymandered the school boundaries of Williamson and Garfield Elementary Schools so as to channel the expansion of black residential growth to the south of Monroe, and away from the Wilson Junior and Senior High School attendance districts, which include Bennett, Adams, Taft, Jackson, Bancroft and Bunn Elementary Schools. A short discussion of the assumptions of this theory and of its purported mechanism is necessary to analysis.

Dr. Wayson testified that among the factors influencing a person's choice of residence is the racial identifiability of the neighborhood schools. Thus, black families are and were inclined to move to schools having significant numbers of black students and white families are and were inclined to move into areas having predominately white schools. Therefore, according

---

**62.** This contention of short-term and long-term effects has not been demonstrated to be signifi- cant in any areas of the city except the South High zone.

to Dr. Wayson, actions of school officials noticeably affecting the racial composition of a school have affected the racial composition of the residential area assigned to that facility, thereby further affecting the racial percentages at the school.

Dr. Wayson testified that the school officials during the subject period of time effected numerous boundary changes between Garfield, Williamson, Monroe and Cleveland Elementary Schools which impacted upon housing patterns so as to contain the expansion of black residential areas within the South High School district, by directing it down a southerly "corridor" into Cleveland Elementary School. The west boundary of this corridor was Mill Creek; there is apparently no claim that this specific redirection of black residential patterns was implemented by boundary changes along Mill Creek. In fact, Dr. Wayson testified that rivers and highways form natural boundaries for school attendance areas (Tr. Vol. 11, 2529); presumably, this means that the existence of Mill Creek and its park obviated the need for action by school officials to gerrymander boundaries of school districts abutting Mill Creek to effectuate the containment of blacks in the corridor.

Specifically, Dr. Wayson stated that school officials repeatedly altered the boundaries of Williamson, and particularly Garfield Elementary School, so as to keep these facilities majority white, and therefore presumably attractive to white families and discouraging further influx of black families toward the protected Wilson attendance area. Once the flow of black residential population southward was established, and Garfield had served its purpose, Dr. Wayson testified that the school officials permitted Garfield to become majority black in its student enrollment.

In their Proposed Findings of Fact and Conclusions of Law, plaintiffs have expanded this theory to include Roosevelt Elementary School as a containment or "wedge" school. However, the Mahoning River divided the Roosevelt and the Wilson areas; there has been no showing of significant alterations of boundaries between Roosevelt and Bennett and Adams. In fact, this natural boundary consistently defined the relevant boundary between these schools. Roosevelt has not been shown to be a significant component in any policy of maintaining the Wilson area as a predominantly white enrollment area.

In formulating this wedge theory, Dr. Wayson admittedly did not consider any specific reasons for the boundary changes effected. He merely analyzed the overall effects of the changes indicated by the stipulations and by the testimony of Mr. Lamson. This theory lacks significant evidentiary support.

The wedge theory is premised upon Dr. Wayson's view of precisely what boundary changes occurred. Yet, as discussed above, this record is so confused as to the changes between Williamson, Garfield, Monroe, and Cleveland that the Court cannot establish that the boundary changes relied upon by Dr. Wayson in fact occurred. This fact alone precludes reliance upon this theory.

Yet, even assuming that the facts assumed by Dr. Wayson were proven, the credible evidence still does not infer intentional discrimination in this regard. Essentially, plaintiffs are requesting the Court to conclude that the various boundary changes effected between the subject schools affected housing patterns over a long-term period, and that the school officials knew or should have known of this assumed effect. Yet, the boundary changes made were almost uniformly insignificant in the number of students involved. Since the mechanism is premised upon the perceptions of a school's racial population by various people, it is not clear to the Court that this effect on residential patterns in fact occurred.

Yet assuming further that the requisite effect on perceptions was achieved, the preponderance of the evidence clearly does not show the school officials' knowledge of this effect and their intention to achieve it. It must be recognized that the wedge theory is a sophisticated, sociological explanation

for past behavior. It deals in planning periods of up to a decade and beyond. There is no basis in the record for inferring that anyone in a policy making position with the Youngstown Board of Education possessed such knowledge and sophistication, nor can the Court conclude that such knowledge was reasonably required of persons performing the functions assigned to these officials.

In fact, the evidence infers to the contrary. The record is replete with examples of administrative errors and miscalculations. Planning was apparently rare, incomplete, and sporatically implemented. School officials, faced with limited budgets, conflicting demands for action, and unexpected growth in student population in various geographic areas, including the South High School zone generally ran a "stop gap" operation: they dealt with the problem as it arose, "tinkering" with the system only as, and to the extent, necessary. While the school system functioned, apparently adequately, the credible evidence will not sustain an inference of such sophisticated, long-range planning in this regard.

There are still more reasons for rejecting a theory of intentional containment in the South High School area. First, a number of the actions of the school officials were integrative in effect.[63] While this fact may not necessarily refute the wedge theory, it is clearly relevant to a determination of the school officials' intent. Second, if the element of this theory stating that the racial identifiability of a school affects housing trends is true, one would expect Bennett and Taft Elementary Schools to have begun experiencing increased black enrollment after Garfield's percentage black enrollment jumped to 53.6% in 1968; yet the record demonstrates no such effect. Similarly, Dr. Wayson's testimony that Garfield was permitted to become a racially identifiable black school once it had established the

southward trend of black residential expansion, would imply that Williamson would also have been permitted to become a racially identifiable black school; yet Williamson's percentage black student enrollment was consistently lower than that of Garfield commencing in 1967, and in fact has steadily declined since 1970. Further, the percentage black student enrollment of Bennett, one of the "protected" schools, rose to 27.2% in 1961, compared to an elementary school average of 33.2% although it thereafter declined.

The plaintiffs have, in substance, proven only the following long-term effects: black residential area expansion southward; Williamson was generally maintained as an integrated school, while Garfield's percentage black student enrollment increased for every year for which data is available until 1969; and there were a number of boundary changes effected between the subject schools during a period of marked population growth. The Court finds the plaintiffs have failed to prove that school officials have intentionally caused or exacerbated the effects of housing segregation in the area, or otherwise intentionally effected segregated schools therein.

The third and final geographic area of the City of Youngstown meriting further discussion is the Chaney High School zone. While plaintiffs argue that the siting of new facilities, additions to existing facilities, boundary changes, and feeder patterns each evidence a pattern of isolation of said zone from black student entrance, the key issue is racial isolation at Washington Elementary School. None of the other actions or omissions to act of the school officials relating to the west side are sufficient, either individually or in combination, to reasonably infer discriminatory intent.

Analysis must commence with the statement of certain indisputable facts. First, the Chaney zone has been, and apparently

---

**63.** Examples include the maintenance of Williamson as an integrated school; the 1971 transfer of a majority black residential area from Williamson to Bennett; and the 1960 transfer from Monroe to Cleveland.

continues to be, virtually an all white residential area; this fact is reflected in the percentage black enrollments of the various schools therein. Second, certain elementary schools in the South and Rayen zones were, in the 1950's and 1960's, both identifiably black and enrolling more students than the subject facilities' maximum optimum utilization. Third, school officials made a number of boundary changes among, and effected certain additions to, the elementary schools in the South and Rayen zones. Fourth, Washington Elementary School, which is located west of Mill Creek Park in the Chaney zone and contiguous to the subject South and Rayen Schools, was an identifiably white school enrolling considerably fewer students than its stated optimum student utilization; yet, with one exception, students from the South and Rayen zones were never assigned thereto.

There were numerous, non-racial reasons for the actions taken. It is clear that inter-zone assignments were perceived by the school officials as requiring transportation, since Mill Creek and its park separated Chaney from the South and the Rayen zones. Yet, as Dr. Schoenhard testified, transportation was viewed as a more viable remedy for short term reassignments; long-term utilization problems were believed to be better solved by capital expenditures for building additions. (Tr. Vol. 14, 3051). Further, until at least 1971,[64] there

were only two available bridges to cross Mill Creek: one on Mahoning Avenue, which intersects Glenwood, and one on Canfield Road. (*Id.*). While there were apparently park bridges and park roads which could have reduced the distances involved, the park authorities would not permit school officials to use them, despite repeated efforts on the part of Dr. Schoenhard. (Tr. Vol. 14, 3051–52). Thus, despite the physical proximity of Washington Elementary School to Monroe, Cleveland, Grant, Butler, and Jefferson Elementary Schools, for all practical purposes Washington was contiguous only with Grant and Butler until 1961, when the former Butler attendance area became assigned to Tod Elementary School.[65]

This fact of practical non-contiguity with the remaining South and Rayen Elementary Schools demonstrates that the school officials' options were not as varied as plaintiffs have suggested. Further limiting these options was the defendants' demonstrated reluctance to effect inter-zone transfers because of the dislocation to students thereof. The record contains few examples of such transfers, but of the ones effected, a substantial proportion were integrative in effect. For example, upon the closing of Elm in 1965, a majority black area was reassigned and transported to Washington Elementary School.[66] Another

64. Mr. Kennedy testified that in 1971, the Division Street Bridge, which is located in the extreme northern section of the Mill Creek area was under construction. Mr. Kennedy testified that this construction was one of the reasons why children were reassigned to Covington upon the closing of Tod.

65. It must be noted that in 1971, upon the closure of Tod, the former Butler attendance area was reassigned to Covington. Therefore, as of 1971, Washington also became contiguous with Covington Elementary School. The figures available to the Court demonstrate that both Tod and Butler were continuously underutilized prior to their closing. Grant was, however, overutilized until approximately 1976.

66. This reassignment was foreseeably temporary in nature. It was therefore in accordance

with the school officials' perception that transportation was an acceptable remedy for temporary utilization problems, as opposed to capital expenditures. It is further apparent that the number of students involved in the transfer from Elm was considerably smaller than any proposed transfers from the other South and Rayen Elementary Schools. Finally, the Court notes that although plaintiffs recognize the fact that this reassignment was clearly integrative in the portion of their post-trial Proposed Findings of Fact and Conclusions of Law discussing the segregative effect of termination of this reassignment, see page 64, plaintiffs also argue at page 21 thereof that the original assignment to Washington was segregative in effect. The Court presumes that this inconsistency in the plaintiffs' arguments resulted from mere oversight.

example was the temporary reassignment of Kirkmere students to Cleveland and Stambaugh in 1957.

Further, it is apparent that Washington's actual optimum utilization was significantly lower than that represented in the exhibits. Washington is an extremely old facility. It was built in 1912, and its last addition was constructed in 1918. Many of its classrooms were and are subground level; Dr. Schoenhard described them as ". . . dismal looking things." (Tr. Vol. 14, 3032). Other rooms were used for a day care nursery, and some for civil defense purposes. *Id.* In short, because of the age of this facility and the condition of a number of its classrooms, the school officials decided not to fully employ its space. Thus Washington was not as underutilized as the bare statistics suggest. The degree of actual underutilization, if any, is not established by this record.

The Court might view this explanation with more suspicion if the record demonstrated that only black children were not reassigned to Washington. However, as previously described, children from Kirkmere Elementary School were, during the construction of an addition to Kirkmere during the 1957–58 school year, reassigned and transported to Cleveland and Stambaugh Elementary Schools. Yet, transportation of these students to Stambaugh necessitated traveling through or around the Washington attendance area; Washington is located immediately north of and contiguous to Kirkmere's attendance area. In 1958–59, Washington purportedly was underutilized by 342 students, and its black student enrollment was 0%. During the same year, Stambaugh Elementary School's black student enrollment was 12.5%. Therefore, school officials also declined to reassign white students to Washington Elementary School during the subject time period.

In summary, the combination of these factors constitutes a reasonable, non-racial basis for the failure of the school officials to reassign Rayen and South zone students to Washington. On the basis of the entire record, the Court finds no reasonable basis for drawing an inference of segregative purpose in this category of student assignments.

## STUDENT TRANSFER POLICY

Over the years, the Youngstown school officials have permitted students to transfer from their regularly assigned school to another school upon formal application supported by the prescribed documentation. The grounds for such transfers have included court orders, medical affidavits, working parents, parental request, racial balancing, and educational needs.

Prior to the 1973–74 school year, transfers were permitted for only three reasons: court orders; medical affidavit; and working parent as verified by an affidavit. It appears that the latter two grounds accounted for the majority of these transfers, as demonstrated by Chart I. Effective with the 1973–74 school year this policy was amended to permit transfers for the following four reasons: working parents of elementary students only; medical affidavit; court or agency placements; and educational needs. (Px 212). All transfers were to be reviewed and approved by the Superintendent and his Transfer Advisory Committee. The Board of Education further provided that school placement on transfer applications for medical reasons would be based upon classroom space, enrollment, and ethnic percentages and availability of programs. Additionally, all elementary school students were automatically to be reassigned to their neighborhood school, at the end of each school year, thus requiring annual applications. These amendments to the student transfer policy were made to curb possible abuses as to medical transfers.

Effective with the 1974–75 school year, the Youngstown defendants instituted the Open Transfer Plan. The key element of this plan was authorization for transfer applications to voluntarily improve racial balances in the schools. Such applications were approved only if the transfer would improve the racial balance at both the send-

ing and receiving schools. The purpose and effect of this plan was clearly integrative.[67]

The transfer data in the record is very incomplete. There is no data prior to the 1970–71 school year; the data for 1972–73 through 1975–76 refers to numerous transfers which are not racially coded; and there is insufficient information regarding the rejected applications as a group.

Chart II shows the total number of transfers, transfers by race where listed, and the system average percentage black enrollment for each of the years listed.[68] The significant numbers of racially uncoded transfers precludes detailed analysis. However, certain general observations may be made.

It is clear that the new and more strictly enforced transfer policy commenced in 1973–74 significantly reduced the number and percentage of identified white student transfers. This fact implies that this policy amendment cured actual abuses previously occurring.

This inference is strengthened by examination of Charts III, IV, and V. Chart III reflects the number of transfers from schools exceeding the system average black student enrollment by 5% to schools with black student enrollments more than 5% below the system average. Chart IV demonstrates the numbers and percentage black and white students transferring to whiter schools for the years listed. Chart V develops a comparison of the data reflected in Chart IV to the total number of student transfers per year.

These charts also show that both the total number of transfers and the number of transfers to whiter schools have increased between 1970–71 and 1975–76. Chart V demonstrates the fact that medical transfers, the purportedly most abused category,

increased in 1975–76 to thirty, thus exceeding the numbers permitted in 1970–71; this implies either that enforcement of the 1973–74 limitations was relaxed or that the numbers of medical transfers approved prior to 1973–74 was not unreasonable. The record reveals that defendant Robert L. Pegues, Jr., the Superintendent during this period, is a man of outstanding credentials with a sensitivity to racial imbalance; he would not suffer the first alternative explanation. This conclusion, together with the limitations on the available data noted above, precludes a finding of significant abuse of the student transfer policy. The record does not establish significant disparity in the approval or denial of transfer applications on the basis of race. At most, this record shows that there probably was some limited abuse of the transfer policy by both black and white parents and students prior to 1973–74; the amount of abuse has not been demonstrated to be so significant to infer contemporaneous knowledge by the school officials. That such abuse was not checked by school officials establishes at most negligent enforcement of the policy.

The Court finds that commencing with the 1973–74 school year, no abuse of the transfer policy has been proven. In fact, it is clear that at least with the adoption of the Open Transfer Plan, the Youngstown defendants have affirmatively acted to integrate the schools through this mechanism. The Court finds no sound basis for inferring segregative intent in the application of the student transfer policy and the Open Transfer Plan at any time.

Assuming *arguendo* that a reasonable inference of segregative intent in the application of the student transfer policy prior to 1973–74 was established, plaintiffs' have failed to demonstrate any significant, continuing effects thereof.

---

**67.** Plaintiffs asserted that defendants subtly discouraged racial balance transfers. While the application therefor contained certain cautions and limited athletic eligibility in certain circumstances, obviously to prevent "recruit-

ing" of athletic talent, this assertion is meritless.

**68.** The first listing, March 15, 1971, reflects transfers only to that date.

## CHART I

### REASONS FOR TRANSFERS

| YEAR | TOTAL | COURT | | MEDICAL | | WORKING PARENT | | EDUCATIONAL NEEDS | | RACIAL BALANCE | |
|------|-------|---|---|---|---|---|---|---|---|---|---|
| | | # | % | # | % | # | % | # | % | # | % |
| 3-15-71 | 86 | 7 | 81.0 | 27 | 31.3 | 52 | 60.4 | | | | |
| 72-73 | 94 | 6 | 63.0 | 50 | 53.1 | 37 | 39.3 | | | | |
| 73-74 | 71 | 1 | 14.0 | 9 | 12.6 | 61 | 85.9 | | | | |
| 74-75 | 107 | | | 11 | 10.2 | 56 | 52.3 | 13 | 12.1 | 25 | 23.3 |
| 75-76 | 136 | 3 | 22.0 | 30 | 22.0 | 69 | 50.7 | 6 | 4.4 | 28 | 20.5 |

DATA DERIVED FROM PX 257

## CHART II

### TRANSFERS

| YEAR | TOTAL | BLACK | | WHITE | | NOT LISTED | | % BLACK IN YOUNGSTOWN SCHOOLS |
|------|-------|---|---|---|---|---|---|---|
| | | # | % | # | % | # | % | |
| 3-15-71 | 86 | 30 | 34.8 | 56 | 65.1 | | | 44.1 |
| 72-73 | 94 | 27 | 28.7 | 48 | 51.0 | 19 | 20.2 | 44.7 |
| 73-74 | 71 | 22 | 30.9 | 16 | 22.5 | 33 | 46.4 | 45.5 |
| 74-75 | 107 | 45 | 42.0 | 28 | 26.1 | 34 | 31.7 | 46.7 |
| 75-76 | 136 | 60 | 44.1 | 34 | 25.0 | 42 | 30.8 | 48.2 |

DATA DERIVED FROM PX 257

## CHART III

| YEAR | TOTAL TRANSFERS | TRANSFERS TO WHITER SCHOOLS | |
|------|-----------------|---|---|
| | | # | % |
| 3-15-71 | 86 | 39 | 45.3 |
| 72-73 | 94 | 49 | 52.1 |
| 73-74 | 71 | 13 | 18.3 |
| 74-75 | 107 | 42 | 39.2 |
| 75-76 | 136 | 60 | 44.1 |

DATA DERIVED FROM Px 257

CHART IV

TRANSFERS TO WHITER SCHOOLS

| YEAR | TOTAL | BLACK | | WHITE | | NOT LISTED | |
|------|-------|-------|-------|-------|-------|------------|-------|
| | | # | % | # | % | # | % |
| 3-15-71 | 39 | 2 | 5.1* | 37 | 94.8* | | |
| 72-73 | 49 | 3 | 6.1 | 42 | 85.7 | 4 | 8.1* |
| 73-74 | 13 | | | 7 | 53.8 | 6 | 46.1 |
| 74-75 | 42 | 13 | 30.9 | 17 | 40.4 | 12 | 28.5 |
| 75-76 | 60 | 28 | 46.6 | 18 | 30.0 | 14 | 23.3 |

* PERCENT OF TOTAL TRANSFERS TO WHITER SCHOOLS

DATA DERIVED FROM PX 257

CHART V

TRANSFERS TO WHITER SCHOOLS

| YEAR | TOTAL TRANSFERS FOR YEAR | WHITE TO WHITE SCHOOL | | BLACK TO WHITE SCHOOL | |
|------|--------------------------|-----------------------|-------|-----------------------|-------|
| | | # | % | # | % |
| 3-15-71 | 86 | 37 | 43.0 | 2 | 2.3 |
| 72-73 | 94 | 42 | 44.6 | 3 | 3.1 |
| 73-74 | 71 | 7 | 9.8 | | |
| 74-75 | 107 | 17 | 15.8 | 13 | 12.1 |
| 75-76 | 136 | 18 | 13.2 | 28 | 20.5 |

DATA DERIVED FROM Px 257

## SEGREGATION INDICES

Dr. Karl Taeuber testified on behalf of plaintiffs as to segregation trends in Youngstown. Dr. Taeuber measures these trends by indices: one for residential segregation and one for each of the three school levels in Youngstown. A short discussion of these indices will aid analysis.

The residential segregation index is computed from census data. It compares concentrations of black and white residences in a given geographic area, which in this case is the City of Youngstown. It is important to emphasize that the unit of comparison is households (Tr. Vol. 1-B, 214); whether the household contains one or ten members is not considered in this measure. Perfect integration is reflected by an index value of zero; total segregation is reflected by an index value of one hundred.

The school indices measure concentrations of white and black students in the elementary, junior and senior high school levels. Again, an index value of zero represents perfect integration while an index value of one hundred represents total segregation. However, the school indices are predicated upon an analysis of the actual number of students attending each level in the school system; it is not predicated upon an analysis of households.

The following chart represents the residential segregation index for the City of Youngstown, and the mean index value for

109 cities surveyed by Dr. Taeuber, for the years listed:

|  | 1940 | 1950 | 1960 | 1970 |
|---|---|---|---|---|
| Youngstown | 80.0 | 83.5 | 78.5 | 74.9 |
| Mean for cities surveyed | 85.2 | 87.3 | 86.1 | 81.6 |

The following are Dr. Taeuber's school segregation indices and the percentage black student enrollment for each of the three levels in the Youngstown Public School System for each of the years listed, as derived from plaintiffs' exhibit 421:

|  | 1953 | 1958 | 1967 | 1975 |
|---|---|---|---|---|
| **ELEMENTARY** |  |  |  |  |
| Segregation Index | 53.4 | 59.6 | 68.2 | 69.1 |
| Percent black | 20 | 29 | 44 | 47 |
| **JUNIOR** |  |  |  |  |
| Segregation Index | 27.6 | 41.9 | 55.5 | 62.0 |
| Percent black | 21 | 25 | 41 | 56 |
| **SENIOR** |  |  |  |  |
| Segregation Index | 39.6 | 43.4 | 52.0 | 70.7 |
| Percent Black | 14 | 19 | 30 | 46 |

While Dr. Taeuber calculated the school indices for other school years, the results of such calculations were not presented to the Court.

Examination of this data obviously demonstrates that there is residential and school segregation in Youngstown. That conclusion has not seriously been challenged by defendants. The real significance of these indices, plaintiffs argue, lies in comparing their trends. Specifically, plaintiffs argue that the increases in the school segregation indices occurring while the residential segregation index decreased evidence segregative actions by Youngstown school officials.

Yet in Dr. Taeuber's opinion, this is not necessarily the case. Specifically, Dr. Taeuber testified that the increasing school segregation may have resulted from any number of factors, and he listed certain factors which in his opinion might have caused the observed increases. These factors are: (1) actions of school officials in the form of boundary changes and other student assignments; (2) the existence of a parochial school system; (3) the existence of other private schools.[69] Whether these factors were intended by Dr. Taeuber to be a complete listing is not established by this record.

Dr. Taeuber testified that he has not specifically examined the Youngstown School System to determine which of these or other factors may have accounted for the observed increases in the school segregation indices. However, Dr. Taeuber indicated that of the factors noted, he would have first investigated school officials' actions in the form of boundary changes and other student assignments as the most likely cause thereof. The Court's prior discussion of such action was, in part, just such an inquiry. Upon careful analysis of all the evidence in this record, the Court concludes that this evidence is insufficient to establish that this first identified factor actually caused an aggregate increase in segregation in the Youngstown public schools. Therefore, as stated by Dr. Taeuber:

> Now, if one examined that and found, looking school by school, district by district at all these changes, if one couldn't

69. The Court presumes that Dr. Taeuber did not intend these two stated conditions to be taken literally. It is apparent that during periods of declining student enrollments, the relative percentages of decline between the parochial and public school systems must be considered. For example, if the decreases in student enrollment in the parochial schools were significantly smaller than those experienced by the public schools, the actual effect would be that an increasing proportion of students in this geographic area were attending the parochial schools. Further, other evidence in this record indicates that there is a likelihood that the parochial school system's impact upon the public school system's level of segregation var-

ied from school level to school level. Cursory examination of the enrollments of both the parochial and public school systems from 1967 through 1976 reveals that generally the percentage decline in student enrollment in the parochial school system exceeded that of the public school system enrollment; therefore, the first observed qualification to these two expressed conditions is probably not applicable herein. The record contains insufficient information with which to determine the actual variances in effect of the Youngstown parochial school system on the three educational levels existing in the Youngstown Public School System.

explain it that way, that one would have to try some other interpretation.

Tr. Vol. 1–B, 294.

Analysis must next proceed to the factor next most likely to have caused the increases in the school segregation indices: the existence of a parochial school system in Youngstown. While Dr. Taeuber has not specifically studied the effects of this factor in this case, he has outlined the conditions necessary for this factor to actually cause increases in the school segregation indices:

> Well, in order for the parochial school situation to explain an increase in public school segregation, there are a couple of conditions that would have to be met that I think are not met. And that could be investigated, but I simply have not done it.
>
> And these two conditions were, first, that there had to be an increasing white parochial school enrollment . . .. And second, it would have to come not from these areas where the kids would otherwise be in all white public schools but from those areas where they would otherwise be in schools which would have some significant black [student enrollment].

Tr. Vol. 1–B, 331. Plaintiffs have introduced statistical information regarding Youngstown parochial schools from 1965 through 1976. Application of this data to the conditions outlined above by Dr. Taeuber probably precludes consideration of the existence of a parochial school system in Youngstown as the cause of increasing school segregation for the period 1967 through 1975.[70] However, since the data regarding the parochial school system does not extend beyond 1965, there is insufficient basis in this record for conclusively determining that the parochial school system in fact accounted for the substantial increases in the school segregation indices noted for the years 1953, 1958, and 1967; yet since according to Dr. Taeuber this is the most likely remaining factor, the probability that it caused the increases in school

segregation between 1953 and 1967 must be recognized.

Examination of the school segregation index for the elementary school level demonstrates that the only significant increases are reflected in 1953, 1958, and 1967. The increase demonstrated between 1967 and 1975 is functionally insignificant. This significant alteration from a pattern of increasing elementary school segregation may be either coincidental or it may substantiate the inference that the Youngstown parochial system was in fact a cause of increasing school segregation prior to 1967.

Examination of the school segregation index at the junior high school level also reveals that the major increases in the index occurred in 1953, 1958, 1967. The increase between 1967 and 1975 is only approximately 12% of the segregation index listed for 1967. These figures might also support an inference that the Youngstown parochial school system was a causal factor in the increasing school segregation noted at the junior high school level in the 1950's and 1960's.

Examination of the school segregation index at the high school level reveals a different pattern: the largest increase occurred between 1967 and 1975. The fact of a significant increase in the school segregation index at this level between 1967 and 1975 undermines the inference that the parochial schools caused increasing school segregation prior to 1967.

However, the significance of the demonstrated increase in the senior high school level segregation index between 1967 and 1975 is questionable. Dr. Taeuber observed during his testimony that a high school level segregation index value which exceeded that of the elementary school level was very unusual. He explained that such could occur only if there was "some kind of interference with this district hierarchical feeder system that has the effect of making the senior highs more racially disparate than they otherwise would have been." Tr. Vol.

---

**70.** The record contains no evidence sufficient to examine the probability that private, non-parochial schools caused increases in the school segregation indices.

1–B, 289. Yet careful review of this record demonstrates no such changes at least during the period between 1967 and 1975. Thus both of the first two factors identified by Dr. Taeuber as possibly accounting for the increasing school segregation index values are not demonstrably applicable to the increase in the school segregation index between 1967 and 1975 at the high school level. In short, this increase is inexplicable in this record. On balance, the Court concludes that there is a significant probability that the existence of the parochial school system in Youngstown caused or contributed to the increasing school segregation in the Youngstown Public Schools for the period between 1953 and 1967. After 1967, at least at the senior high school level, and possibly at the junior high school level, other factors must have been operating to account for the increases in the school segregation index values noted in 1967.

There are, however, other factors which might account for the observed variations in the trends of the residential and school segregation indices. First, the Court notes that Dr. Taeuber never articulated his definition of elementary, junior, and senior high schools. Yet it is apparent that throughout the years in question there was not uniformity within the Youngstown Public School System at each of these levels. For example, in some years an elementary school was grades one through six while in other years it was grades one through eight. There is a significant possibility that this lack of uniform definition might account for the variations in the observed school segregation indices, and for the otherwise inexplicable increase at the senior high school level between 1967 and 1975.

The second potential explanation is more basic. As previously noted, the residential segregation index uses households as its basic unit; however, the school segregation indices are calculated from data actually reflecting the number of students enrolled at the various school levels. Thus, comparison of the residential and school indices is precluded absent a demonstration that these dissimilar base units of measurement may logically be compared. There has been no such demonstration in this record.

This conclusion is not purely hypothetical. If, as Dr. Schoenhard testified, there is a variation in the size of families of black and white residents of the City of Youngstown, comparison of the residential segregation index to the school segregation indices for anything but the broadest purposes might well exaggerate the effects observed. Further, assuming that from 1953 to date the number of retired citizens residing in separate households in the City of Youngstown has increased, and further accepting the testimony of Dr. Wayson that younger white families are more prone to move from an integrated neighborhood than are older white persons or families, it is apparent that Dr. Taeuber's residential segregation index might well indicate a slight decrease in residential segregation and yet be perfectly consistent with the observed increases in the school segregation indices resulting solely from factors beyond the control of the school officials.

In summary, this record does not demonstrate that actions of the school officials caused increases in the school segregation index; there is a probability that the parochial school system was a cause of increasing school segregation between 1953 and 1967; it does not exclude the existence of non-parochial, private schools as a cause of increasing school segregation at any time. Further, comparison of the residential and school segregation indices has not been demonstrated to be feasible. On this record, the Court cannot conclude that Dr. Taeuber's indices are significant proof of segregative actions by school officials.

Assuming *arguendo* that this record was sufficient to demonstrate that the student assignments made by school officials did, in fact, cause increasing school segregation, the Court finds that the preponderance of the credible evidence will not support the conclusion that such effect was intentionally caused by the present or former Youngstown school officials.

Assuming *arguendo* that the evidence established a prima facie case of intentional

segregation, defendants have satisfied their burden of rebutting such evidence by proving that the Youngstown school officials have followed a neutral neighborhood school policy.

As applied in Youngstown, this policy consisted of student assignments to the "closest practicable" school. (Wanamaker Deposition, 4). "Practicability" was defined in terms of facility utilization and conditions affecting student safety such as natural boundaries, the existence of sidewalks, traffic conditions, etc. (*Id.*) Application of these criteria to the various actions and omissions in controversy reveals that nearly all were in accordance therewith.

Of course, there were exceptions to such a policy. Yet careful scrutiny of the record demonstrates that there was no pattern of discriminatory effect or intent, either generally or in any particular area of the city, resulting from these exceptions. Illustrations of integrative "deviations" from this neighborhood school policy include: the 1965 assignment of former Elm students to Washington; the 1971 assignment of a white residential area located in the former Tod Elementary School district to Covington; the transportation of children residing in the Kirkmere district to Stambaugh and Cleveland in 1957; and the 1951 reassignment of the students residing north of Thornhill Avenue to Elm. Other deviations meriting mention are the 1973 opening of Choffin Career Center, which draws its students from the entire city, and the Open Transfer Plan discussed above.

While perhaps the school officials did not always choose the most integrative options, their actions and omissions regarding student assignments were not intentionally segregative.

## TEACHERS, ADMINISTRATORS, STAFF

The hiring and assignment policies and practices of the Youngstown defendants as to teachers, administrators, and other staff must be scrutinized in order to determine whether the effect and purpose thereof was intentional segregation. The record before the Court, however, is incomplete and, with the exception of new teacher hirings, presents relevant statistical data only from 1967 or later until the present time. Thus the Court's analysis must be limited accordingly.

In 1940, the first black teacher in the Youngstown Public School System was hired. At that time, blacks comprised slightly less than nine percent of the city's total population. Yet during the period from 1940 through 1949, 12.8% of all teachers hired by the Youngstown school officials were black. Thereafter, the percentage black teachers hired has consistently been disproportionately low in comparison to the racial composition of the city and schools. Since 1954, however, new black teachers have been hired each year, and commencing with 1971 the percentage black teachers hired yearly has increased significantly. (Px 112–B).

Nevertheless, the percentage black teachers employed in the Youngstown Public School System has remained insubstantial. In 1967, only 7.2% of the total number of classroom teachers were black. While said percentage has risen during the past ten years, the increase has been a mere 6% to 13.3% in 1976. By contrast, the percentage black student enrollment of the Youngstown public schools was 39.6% in 1967 and 48.9% ten years later in 1976 for a 9% increase.

Review of the foregoing percentages alone would permit an inference of a racially discriminatory teacher hiring policy. However, the fact that a relatively nominal number of black classroom teachers have been employed by the Youngstown public schools appears to be the result of the interplay of several non-discriminatory factors. Included among such factors are the number of available black teachers, the qualifications of black teacher applicants, and the salary scale of the Youngstown school system.

The record before the Court does not establish that a significant number of certi-

fied black teachers applied for positions in the Youngstown public schools and were denied employment. Rather, it demonstrates that at least since 1972 a concerted effort has been made to recruit black teachers. In that year Robert L. Pegues, Jr., then Assistant Superintendent of Schools, and McCullough Williams traveled to Southern University in Baton Rouge, Louisiana, the largest predominately black university in this country. (Px 196). Although four applications were received and all four were offered jobs, two immediately, none of these applicants joined the Youngstown school system even after signing the contract. (Tr. Vol. 2, 425).

It should be noted that this recruiting trip was not a first for the Youngstown schools. Dr. Garland during the 1960's visited many institutions, including some in West Virginia and Wilberforce, seeking black teachers. (Tr. Vol. 2, 422). That these recruiting trips were not fruitful, however, is amply demonstrated by the percentage black teachers employed by the Youngstown schools.

Thus despite a demonstrated willingness to hire qualified black applicants [71], the Youngstown school officials have been unsuccessful in securing the services of same. Their affirmative efforts have apparently been hampered by a low salary scale which is unattractive to the relatively limited number of black teacher applicants. Simply stated, the Youngstown schools have been unable to compete with school systems, business, and industry which have successfully lured qualified black applicants with higher salary offers. (Px 196).

Moreover, it appears that the Youngstown Public School System has not even been able to obtain significant numbers of black teachers from the local university, Youngstown State University. As indicated, in 1972, the neighboring Warren School System drew the qualified black teacher applicants therefrom. (Px 196).

The Youngstown schools have also experienced difficulty in hiring blacks certified to teach certain subjects or skills on the secondary level. Such again is apparently a consequence of a limited number of interested and qualified black applicants rather than a discriminatory hiring policy. Illustrative thereof was the testimony that although seven industrial arts teachers were needed by the system, only one black teacher applied and he refused a position. (Tr. Vol. 2, 426).

Therefore, the Court must conclude that the Youngstown school officials did not intentionally discriminate on the basis of race in hiring classroom teachers.

Since 1955, the assignment and transfer of teachers within the Youngstown school system has been the sole responsibility of the Superintendent of Schools. As of September 1964, the responsibility for the assignment of teachers to buildings was delegated to the Assistant Superintendent for Administration, and as of November 1974, such was delegated to the Director of Personnel. (Px 210, 103). Nevertheless, assignments were subject to the approval of the Superintendent.

It has also been the policy of the Youngstown System since at least 1955 that teacher transfers may be made upon the request of an employee or the initiative of the Superintendent. Further, the November 1974 Master Agreement Between the Youngstown Board of Education and the Youngstown Education Association provides that teachers may not refuse an administration-initiated transfer. (Px 103).

In 1967, 38% of the Youngstown schools did not have any black classroom teachers on their faculties. During the ensuing ten year period, such percentage has declined and in 1974 reached a low of 17%. For the last school year for which data has been presented, 1976–77, nine of the thirty-eight Youngstown schools or 23% thereof were without black teachers.

---

**71.** The Court finds that during the 1960's and 1970's a black applicant was given preference over an equally qualified white teacher applicant. See Deposition of Dr. Wanamaker.

The schools to which black teachers have been assigned have, for the most part, been those with a predominately black student enrollment. Between 1967 and 1976, more than 60% of all black elementary school teachers in the Youngstown system have been assigned yearly to schools with a 60% to 100% black student population. On the junior high school level, with the exception of 1967 and 1968, 100% of the black teachers were on the faculties of schools with said percentage black student enrollment. Prior to 1972, less than 55% of black teachers in the senior high schools were assigned to schools with said percentage black student population, but thereafter, more than 84% of such teachers have been assigned to said schools.[72] As a result, more than 60% of the total number of black teachers employed by the Youngstown public schools have each school year been assigned to schools with predominately black student bodies.

Additionally during the period encompassing 1967 through 1976, three schools have not had any black teachers: Bancroft Elementary[73], Warren Richey Elementary, and West Junior High Schools.[74] Similarly, three schools have had a black teacher for only one school year within such time frame: Jackson Elementary, Tod Elementary[75], and Volney Rogers Junior High Schools. With the exception of Richey, none of these six schools at any time have had a predominately black student enrollment. Moreover, since 1967, more than 50% of the elementary schools each school year have had a disproportionate assignment of black teachers.[76] On the junior high level, between 33% and 100% of the schools have had a disproportionate number of black teachers. Since 1974, 50% of the senior high schools have had faculties with a disproportionate assignment of black teachers; prior thereto, 16% or less of the schools did so yearly with the exception of 1967.

With regard to teacher transfers, it appears that substantially more white teachers have transferred into and out of schools since 1971 than black teachers have. (Px 282). The majority of black teacher transfers have been into schools with a predominately black student enrollment. White teachers have likewise transferred in greater numbers into black schools than into white schools. The fact that significantly more white teachers yearly transferred into white schools whereas from the 1973–74 through 1975–76 school years, no black teachers transferred into such schools shows that the opportunity for integrative teacher assignments existed.

This evidence raises a credible inference of intentional segregative action as to both original teacher assignments and teacher transfers. The facts that teachers were originally assigned to schools primarily on the basis of vacancies; that the predominately black schools generally had larger numbers of vacancies than predominately white schools; and that the Youngstown defendants have made some efforts to assign black teachers to white schools, do not, in this Court's opinion, adequately rebut this inference of discrimination as to original teacher assignments. Similarly, the facts that plaintiffs have not demonstrated that the Youngstown defendants have denied transfer applications on the basis of race; that transfers were almost uniformly teacher initiated; that the requests stemmed primarily from teachers' desires to work near their residence; and that, in

---

72. Plaintiffs' Proposed Findings of Fact and Conclusions of Law suggest that different percentage black student enrollments be used to define predominately black senior high schools in showing the assignment of black teachers thereto. The Court, however, shall, for the sake of uniformity, use the 60% to 100% black student enrollment percentage herein.

73. Bancroft Elementary School closed in September 1970.

74. It appears that West Junior High School did have a black librarian for a number of years.

75. Tod Elementary School closed in 1971.

76. As defined in plaintiffs' Proposed Findings of Fact and Conclusions of Law, disproportionate means that a school's percentage black teachers is either 5% more or 5% less than the level average for the school year involved.

part, this policy was motivated by a desire to maintain harmony with the staff, are insufficient to rebut this inference as to teacher transfers. The Court finds that teacher assignments were intentionally segregative.

One remaining factor affecting this analysis should be mentioned. As previously indicated, the Youngstown defendants have had serious difficulties in securing qualified black teachers. This fact infers that the Youngstown defendants were inclined to honor their requests, either for original assignment or transfer so as to retain them in the system. Since it appears that most of the black teachers resided in black neighborhoods, it was predictable that the majority of black teachers were assigned to majority black schools.

While insufficient in the circumstances of this case to rebut the inference of intentional segregation, this factor is relevant to a determination regarding the extent of the effects of this constitutional violation. Insofar as these assignment practices resulted from the perceived necessity of satisfying the requests of black teachers to encourage their continued employment in Youngstown, these actions were clearly unique. The Court finds, as a matter of fact, that the intentional segregative policies under consideration played no role in other acts and omissions of the school officials. Cf. *Higgins v. Board of Education,* 395 F.Supp. 444, 478–79 (W.D.Mich.1973), aff'd, 508 F.2d 779 (6th Cir. 1974). Further, the Court finds that the credible evidence does not establish that the subject violations had segregative effects in other areas of the school system. Cf. *Brinkman v. Gilligan,* 446 F.Supp. 1232, 1239–1240 (S.D.Ohio 1977).

With regard to substitute teachers, this record fails to establish any practice of racial discrimination. That there were a disproportionate number of white substitutes is essentially a consequence of a general lack of significant numbers of unemployed black teachers. Further, there has been no showing that substitute teachers have been assigned on the basis of race.

Since 1967, the Youngstown schools have had a disproportionate number of white administrators. The few black principals in the system have for the most part been assigned to schools with a majority black student enrollment. Notable exceptions to such practice are McKinley and Taft Elementary Schools. The hiring and promotion of administrators or principals has not been shown to be the result of an intentional policy of discrimination on the basis of race. Non-racial factors, some of which have been clearly beyond the control of the school officials, have contributed to and caused any imbalance in the racial composition of such personnel. However, as with teachers, plaintiffs have proven intentional segregative assignments of principals and administrative personnel, though no other effects in other areas have been established.

Finally, it appears that there has been a disproportionate number of black non-certificated staff, including custodians, cooks, secretaries, and various helpers, since 1970. The record does not establish that such has resulted from a racially discriminatory hiring policy. As in the case of head custodians, non-racial factors such as labor agreements have played a decisive role in personnel practices.

## ADDITIONAL CLAIMS

Plaintiffs also assert that the resources of the Youngstown school system have been segregatively allocated. Examination of the record reveals that both presently and in the past, the school buildings were generally of the same quality throughout the system. Cf. Px 78. There is no credible evidence that school materials varied in quality, at the time in issue, in light of a school's racial composition. Plaintiffs' claim in this regard is meritless.

Plaintiffs also assert that student discipline has been discriminatively applied. Yet the record fails to demonstrate significant disparity in the discipline prescribed for the same offenses. This claim is also meritless.

The record does, however, establish that in the 1940's and 1950's, Youngstown school

officials discriminated against black students with regard to curriculum availability, quota systems in sports, extracurricular activities, and in the hiring of black teachers. Such conduct, intolerable though it may have been, had ceased in the 1960's at the very latest, and all vestiges thereof have long since disappeared from the Youngstown public school system. It has been demonstrated that these practices "did not create or contribute to the current segregated condition[s]. . . ." *Keyes v. School District No. 1,* 413 U.S. 189, 211, 93 S.Ct. 2686, 2699, 37 L.Ed.2d 548 (1973). Therefore they do not constitute remedial constitutional violations.

Plaintiffs further allege that the Youngstown defendants have intentionally incorporated known residential segregation into their planning and actions thereby fostering and maintaining residential segregation; and have intentionally exacerbated the effects thereof in the schools. Based on the foregoing analyses and for the reasons stated above, the Court finds this claim to be without merit.

In summary, the record establishes intentional segregative conduct only as to teacher and administrator assignments to schools.

## STATE DEFENDANTS

Article VI, Section 4 of the 1851 Constitution of the State of Ohio, as amended on November 3, 1953, established the State Board of Education and the office of Superintendent of Public Instruction. The powers of the Board are defined by statute, and in particular Ohio Revised Code Section 3301.07 which provides that the Board shall generally supervise the system of public education in Ohio.

The Superintendent of Public Instruction is appointed by the State Board of Education and serves as its secretary. Ohio Rev. Code §§ 3301.08 and 3301.09. Pursuant to law, the Superintendent is also the executive and administrative officer of the State Board in its administration of all educational matters; it is his responsibility to exe-cute the educational policies, orders, and directives of the State Board. Ohio Rev. Code § 3301.11. Additional duties of the Superintendent are prescribed in Ohio Revised Code Section 3301.12, and include the provision of technical and professional assistance to all school districts and the conduct of such studies as are necessary or desirable to improve education in Ohio.

Although ultimate responsibility for public education in Ohio rests with the State Board, the management and control of the public schools is vested in the city or local boards of education. Ohio Rev.Code § 3313.47. Such local boards historically have been delegated authority for the day-to-day operation of the schools within their respective districts.

The State Board of Education held its first meeting in January 1956. It appears that shortly thereafter it became concerned with the problem of the existence of segregation in the public schools. After much debate and apparently uncertainty as to its authority with regard thereto, the Board, on June 11, 1956, passed a resolution directing the Superintendent of Public Instruction to request the opinion of the Attorney General on four specific questions. (Dx 5–13).

The Attorney General for the State of Ohio formally responded to the State Board in a letter dated July 9, 1956. (Px 310). Therein, he specifically stated as follows:

1. The term "law" as used in Section 3317.14, Revised Code, forbidding the distribution of state funds to school districts which have not "conformed with the law," is used in the abstract sense and embraces the aggregate of all those rules and principles enforced and sanctioned by the governing power in the community. Such term embraces the equal protection provision in the Fourteenth Amendment of the Constitution of the United States under which the segregation of pupils in schools according to race is forbidden.

2. The primary responsibility for administering the laws relating to the distribution of state and federal funds to the

several public school districts is placed with the state board of education, subject to the approval of the state controlling board.

3. It is the responsibility of the state board of education in the first instance to determine whether a particular school district, or the board of education of such district, "has not conformed with the law" so as to require the withholding of state funds from such district. In making such determination the state board of education should observe the requirements of the Administrative Procedure Act, Chapter 119, Revised Code, as to notice, hearing, summoning of witnesses, presentation of evidence, degree of proof, and procedural matters generally.

4. Following a determination by the state board of education that a school district "has not conformed with the law" so as to require the withholding of state funds as provided in Section 3317.14, Revised Code, such board and the controlling board, acting separately, may, for "good and sufficient reason" established to the satisfaction of each board, order a distribution of funds to such district notwithstanding such lack of conformity with the law.

Thus where the State Board finds intentional segregation in the public schools of a local district, state and federal funds should be withheld absent good and sufficient reason to the contrary.

Although the State Board and Superintendent are aware of racial imbalance in the Youngstown Public School System, an investigation thereof has not been made and funds have not been withheld. However, in view of this Court's finding of no intentional segregative conduct on the part of the Youngstown defendants, except in one area to be discussed below, the Court cannot conclude that the State defendants have perpetuated illegal racial segregation in the Youngstown public schools.

The Court has found intentional segregation only as to teacher and administrator assignments. Since the 1968–69 school year, the State defendants have conducted an ethnic count of all students and faculty in the public schools throughout Ohio; local school districts including Youngstown have submitted statistical information as to the number and percentage of black teachers and administrators in their schools. Although such data indicates a racial imbalance of the faculties of the Youngstown schools, the State defendants have not undertaken an investigation to determine the reasons therefor.

From this failure to investigate, the Court may draw an inference of intentional segregation on the part of the State defendants in the area of teacher and administrator assignments. However, as discussed above, such inference is clearly permissible and not mandatory. On the basis of this record the Court must conclude that the drawing of an inference of intentional segregation as to the State defendants is not warranted.

On May 13, 1968, the State Board adopted a policy statement on equal educational opportunities whereby it stated its commitment to the prevention and elimination of segregation of students and staff in schools on the basis of race. In implementing said policy, the State defendants have, *inter alia,* offered and provided information and technical assistance to the Youngstown defendants on desegregation techniques and the elimination of racial imbalance. On a number of occasions from 1966 through 1976, they have denied petitions to transfer territory from the Youngstown City School District to neighboring districts because the effect thereof would have been to cause or create racial imbalance.

These examples of affirmative action on the part of the State defendants illustrate an active concern for the elimination of racial segregation. Moreover, the State defendants through their contacts with the Youngstown school officials have had actual knowledge of their efforts to recruit and hire black teachers, and their desire to achieve racial balance in the Youngstown schools. Therefore, while the State defend-

ants' actions of persuasion and education may not have been sufficient to prevent the subject segregative actions, they do not reasonably evidence segregative intent.

Therefore, the Court finds that the State Board of Education and State Superintendent have not intentionally fostered and maintained racial segregation in the Youngstown schools.

## CONCLUSION

In view of the magnitude of this action, the Court has been faced with a difficult task in determining the numerous questions presented. The Court has been greatly aided in this task by the diligence and cooperation of all counsel and the Court commends them for their efforts.

The Court has been required to resolve the complex constitutional issues raised by this litigation in accordance with the law as enunciated by the United States Supreme Court. Throughout the Court has been guided by the decisions of the Supreme Court and other federal courts. The findings and conclusions arrived at herein are solely the result of the Court's application of established principles of law to the facts demonstrated in this record.

Upon consideration of the entire record herein, the Court hereby specifically finds as follows:

1. The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.

2. The defendants, the Youngstown Board of Education and its individual members, and the Superintendent of the Youngstown City School District have not at any time referred to in plaintiffs' complaint and at the time of trial operated a dual or intentionally segregated public school system.

3. The Youngstown defendants in their assignment practices with respect to teachers and administrators at the school level have violated the rights of plaintiffs and the class they represent as guaranteed under the Equal Protection Clause of the Fourteenth Amendment by the disproportionate assignment of black teachers and administrators to predominately black schools.

4. This impermissible assignment practice continued to the time of trial herein, but while violative of plaintiffs' rights, has not alone, or with other practices complained of, created a segregated or dual system within the Youngstown City School District or any part thereof.

5. The credible evidence has failed to establish the other allegations in plaintiffs' complaint as to the Youngstown defendants or as to the Ohio State Board of Education and its individual members, and the Superintendent of Public Instruction, Ohio Department of Education.

Accordingly,

IT IS ORDERED that the plaintiffs' complaint is hereby dismissed on the merits with prejudice as to all defendants except the Youngstown Board of Education and its individual members, and the Superintendent of the Youngstown City School District.

IT IS FURTHER ORDERED that the Youngstown Board of Education, its members, Superintendent, employees, agents, and anyone acting in concert with them are hereby permanently enjoined from assigning teachers and administrators at the school level within the Youngstown City School District so as to further maintain, foster or establish therein racially identifiable teaching or administrative staffs.

IT IS FURTHER ORDERED that the Youngstown defendants immediately take steps to eliminate any racial identifiability of said teaching and administrative personnel, on their own initiative, and that said defendants file with the Court and submit to counsel for plaintiffs within sixty (60) days of the date of this Order a plan for the assignment and reassignment of teachers and administrators at the school level which will expeditiously, effectively, and fully eliminate the racial identifiability of staff at the school level and any vestiges thereof.

IT IS FURTHER ORDERED that, the Court, on its own motion, being of the opin-

ion that this Order involves a controlling question of law as to which there is a substantial ground for difference of opinion, and that an immediate appeal from this Order may materially advance the ultimate termination of this litigation, the instant action is hereby certified for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

## APPENDIX

### 1952-53

| SCHOOL | OPTIMUM UTILIZATION | ENROLLMENT | UTILIZATION |
|---|---|---|---|
| ELEMENTARY | | | |
| Adams | 690 | 373 | -317 |
| Bancroft | 360 | 293 | -67 |
| Bennett | 750 | 503 | -247 |
| Bunn | NOT OPEN | | |
| Butler | 480 | 267 | -213 |
| Cleveland | 600 | 747 | +147 |
| Coitsville | 270 | 296 | +26 |
| Covington | 600 | 653 | +53 |
| Elm | 600 | 759 | +159 |
| Garfield | 540 | 380 | -160 |
| Grant | 720 | 856 | -136 |
| Haddow | NOT OPEN | | |
| Harding | 360 | 538 | +178 |
| Harrison | NOT OPEN | | |
| Jackson | 480 | 509 | +29 |
| Jefferson | 480 | 445 | -35 |
| Kirkmere | NOT OPEN | | |
| Lincoln | 1,080 | 1,055 | -25 |
| McKinley | 330 | 350 | +20 |
| Madison | 690 | 638 | -52 |
| Monroe | 600 | 655 | +55 |
| Richey | 180 | 182 | +2 |
| Roosevelt | 480 | 546 | +66 |
| Sciencehill | NOT OPEN | | |
| Scienceville | 240 | 244 | +4 |
| Sheridan | 570 | 522 | -48 |
| Stambaugh | 810 | 496 | -314 |
| Taft | 360 | 439 | +79 |
| Thornhill | 360 | 515 | +155 |
| Tod | 330 | 279 | -51 |
| Washington | 1,020 | 752 | -268 |
| West | | 518 | |
| White | 180 | 194 | +14 |
| Williamson | 600 | 696 | +96 |
| JUNIOR HIGH | | | |
| Hayes | 925 | 961 | +36 |
| Hillman | 800 | 730 | -70 |
| Lincoln | NOT OPEN | | |
| Princeton | 850 | 725 | -125 |
| Rogers | NOT OPEN | | |
| Sciencehill | NOT OPEN | | |
| West | NOT OPEN/NO DATA | | |
| SENIOR HIGH | | | |
| Chaney | 900 | 1,020 | +120 |
| East | 1,325 | 1,470 | +145 |
| North | 650 | 735 | +85 |
| Rayen | 1,325 | 1,087 | -238 |
| South | 1,175 | 1,276 | +101 |
| Wilson | 1,575 | 1,118 | -457 |

### 1958-1959

| SCHOOL | OPTIMUM UTILIZATION | ENROLLMENT | UTILIZATION |
|---|---|---|---|
| ELEMENTARY | | | |
| Adams | 690 | 486 | -204 |
| Bancroft | 360 | 354 | -6 |
| Bennett | 750 | 518 | -232 |
| Bunn | NOT OPEN | | |
| Butler | 480 | 208 | -272 |
| Cleveland | 600 | 685 | +85 |
| Coitsville | 270 | 296 | +26 |
| Covington | 600 | 681 | +81 |
| Elm | 600 | 758 | +158 |
| Garfield | 540 | 436 | -104 |
| Grant | 720 | 878 | +158 |
| Haddow | NOT OPEN | | |
| Harding | 360 | 603 | +143 |
| Harrison | 570 | 644 | +74 |
| Jackson | 480 | 674 | +194 |
| Jefferson | 480 | 553 | +73 |
| Kirkmere | 600 | 613 | +13 |
| Lincoln | 1,080 | 1,144 | +64 |
| McKinley | 330 | 345 | +15 |
| Madison | 690 | 809 | +119 |
| Monroe | 600 | 697 | +97 |
| Richey | 180 | 223 | +43 |
| Roosevelt | 480 | 580 | +100 |
| Sciencehill | | 271 | |
| Scienceville | CLOSED | | |
| Sheridan | 570 | 487 | -83 |
| Stambaugh | 810 | 429 | -381 |
| Taft | 480 | 499 | +19 |
| Thornhill | 450 | 501 | +51 |
| Tod | 330 | 216 | -114 |
| Washington | 1,020 | 678 | -342 |
| West | | 621 | |
| White | 240 | 230 | -10 |
| Williamson | 600 | 635 | +35 |
| JUNIOR HIGH | | | |
| Hayes | 925 | 867 | -58 |
| Hillman | 800 | 682 | -118 |
| Lincoln | NOT OPEN | | |
| Princeton | 850 | 658 | -192 |
| Rogers | NOT OPEN | | |
| Sciencehill | | 332 | |
| West | | 682 | |
| SENIOR HIGH | | | |
| Chaney | 700 | 749 | +49 |
| East | 1,725 | 1,602 | -123 |
| North | 600 | 492 | -108 |
| Rayen | 1,325 | 981 | -344 |
| South | 1,175 | 1,121 | -54 |
| Wilson | 1,575 | 1,348 | -227 |

### 1961-62

| SCHOOL | OPTIMUM UTILIZATION | ENROLLMENT | UTILIZATION |
|---|---|---|---|
| ELEMENTARY | | | |
| Adams | 690 | 246 | -444 |
| Bancroft | 360 | 160 | -200 |
| Bennett | 750 | 375 | -375 |
| Bunn | 720 | 428 | -292 |
| Butler | CLOSED | | |
| Cleveland | 600 | 505 | -95 |
| Coitsville | 270 | 215 | -55 |
| Covington | 600 | 581 | -19 |
| Elm | 600 | 565 | -35 |
| Garfield | 540 | 470 | -70 |
| Grant | 720 | 780 | +60 |

| SCHOOL | OPTIMUM UTILIZATION | ENROLLMENT | UTILIZATION |
|---|---|---|---|
| Haddow | 510 | 369 | -141 |
| Harding | 540 | 450 | -90 |
| Harrison | 570 | 375 | -195 |
| Jackson | 570 | 459 | -111 |
| Jefferson | 480 | 507 | +27 |
| Kirkmere | 600 | 563 | -37 |
| Lincoln | 1,080 | 1,031 | -49 |
| McKinley | 420 | 289 | -131 |
| Madison | 690 | 525 | -165 |
| Monroe | 450 | 640 | +190 |
| Richey | 180 | 161 | -19 |
| Roosevelt | 630 | 470 | -160 |
| Sciencehill | NO DATA | | |
| Scienceville | CLOSED | | |
| Sheridan | 600 | 320 | -280 |
| Stambaugh | 810 | 278 | -532 |
| Taft | 480 | 292 | -188 |
| Thornhill | 450 | 520 | +70 |
| Tod | 330 | 168 | -162 |
| Washington | 1,020 | 562 | -458 |
| West | 600 | 469 | -131 |
| White | 240 | 224 | -16 |
| Williamson | 540 | 557 | +17 |

**JUNIOR HIGH**

| | | | |
|---|---|---|---|
| Hayes | 1,080 | 761 | -319 |
| Hillman | 960 | 762 | -198 |
| Lincoln | NOT OPEN | | |
| Princeton | 690 | 683 | -7 |
| Rogers | 720 | 445 | -275 |
| Sciencehill | | 352 | |
| West | 990 | 626 | -364 |

**SENIOR HIGH**

| | | | |
|---|---|---|---|
| Chaney | 840 | 783 | -57 |
| East | 1,980 | 1,706 | -274 |
| North | 720 | 542 | -178 |
| Rayen | 1,530 | 1,126 | -404 |
| South | 1,470 | 875 | -595 |
| Wilson | 1,800 | 1,561 | -239 |

**1963-64**

| SCHOOL | OPTIMUM UTILIZATION | ENROLLMENT | UTILIZATION |
|---|---|---|---|
| **ELEMENTARY** | | | |
| Adams | 690 | 393 | -297 |
| Bancroft | 360 | 209 | -151 |
| Bennett | 750 | 533 | -217 |
| Bunn | 720 | 688 | -32 |
| Butler | CLOSED | | |
| Cleveland | 600 | 619 | +19 |
| Coitsville | 270 | 216 | -54 |
| Covington | 600 | 526 | -74 |
| Elm | 600 | 540 | -60 |
| Garfield | 540 | 844 | +304 |
| Grant | 720 | 918 | +198 |
| Haddow | 490 | 386 | -104 |
| Harding | 540 | 482 | -58 |
| Harrison | 470 | 433 | -37 |
| Jackson | 570 | 672 | +102 |
| Jefferson | 480 | 616 | +136 |
| Kirkmere | 600 | 730 | +130 |
| Lincoln | 1,060 | 918 | -142 |
| McKinley | 420 | 370 | -50 |
| Madison | 610 | 447 | -163 |
| Monroe | 450 | 807 | +357 |
| Richey | 180 | 167 | -13 |
| Roosevelt | 580 | 457 | -123 |
| Sciencehill | | 353 | |
| Scienceville | CLOSED | | |
| Sheridan | 600 | 356 | -244 |
| Stambaugh | 810 | 360 | -450 |

| SCHOOL | OPTIMUM UTILIZATION | ENROLLMENT | UTILIZATION |
|---|---|---|---|
| Taft | 480 | 460 | -20 |
| Thornhill | 450 | 446 | -4 |
| Tod | 330 | 143 | -187 |
| Washington | 1,020 | 704 | -316 |
| West | 600 | 579 | -21 |
| White | 240 | 252 | +12 |
| Williamson | 540 | 583 | +43 |

**JUNIOR HIGH**

| | | | |
|---|---|---|---|
| Hayes | 1,080 | 646 | -434 |
| Hillman | 960 | 718 | -242 |
| Lincoln | NOT OPEN | | |
| Princeton | 690 | 650 | -40 |
| Rogers | 720 | 457 | -263 |
| Sciencehill | | 405 | |
| West | 990 | 605 | -385 |

**SENIOR HIGH**

| | | | |
|---|---|---|---|
| Chaney | 840 | 1,138 | +298 |
| East | 2,120 | 2,019 | -101 |
| North | 720 | 578 | -142 |
| Rayen | 1,530 | 1,260 | -270 |
| South | 1,470 | 1,218 | -252 |
| Wilson | 1,800 | 1,545 | -255 |